**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | MDL 2724<br>16-MD-2724<br>HON. CYNTHIA M. RUFE |
| IN RE:  CLOBETASOL CASES | LEAD CASE: 16-CB-27240<br>END-PAYER CASE: 16-CB-27242 |
| THIS DOCUMENT RELATES TO: | |
| *ALL END-PAYER ACTIONS* | JURY TRIAL DEMANDED |
| 1199SEIU NATIONAL BENEFIT FUND, 1199SEIU GREATER NEW YORK BENEFIT FUND, 1199SEIU NATIONAL BENEFIT FUND FOR HOME CARE WORKERS, 1199SEIU LICENSED PRACTICAL NURSES WELFARE FUND; AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES DISTRICT COUNCIL 37 HEALTH & SECURITY PLAN; HENNEPIN COUNTY;  LOUISIANA HEALTH SERVICE & INDEMNITY COMPANY d/b/a BLUE CROSS AND BLUE SHIELD OF LOUISIANA AND HMO LOUISIANA, INC.;  SELF-INSURED SCHOOLS OF CALIFORNIA; SERGEANTS BENEVOLENT ASSOCIATION OF THE POLICE DEPARTMENT OF THE CITY OF NEW YORK HEALTH AND WELFARE FUND;  UNIFORMED FIRE OFFICERS ASSOCIATION FAMILY PROTECTION PLAN LOCAL 854; and UNITE HERE HEALTH, on behalf of themselves and all others similarly situated, <br><br>                          Plaintiffs,<br>     v.<br>ACTAVIS HOLDCO U.S., INC.; ACTAVIS PHARMA, INC.; AKORN, INC.; AKORN SALES, INC.; FOUGERA PHARMACEUTICALS INC.; HI-TECH PHARMACAL CO., INC.; MORTON GROVE PHARMACEUTICALS, INC.; PERRIGO NEW YORK, INC.; SANDOZ, INC.; TARO PHARMACEUTICALS U.S.A., INC.; and WOCKHARDT USA LLC,<br><br>                        Defendants. | <u>**CONSOLIDATED AMENDED END-PAYER CLASS ACTION COMPLAINT**</u> |

**TABLE OF CONTENTS**

I.      NATURE OF THE ACTION ................................................................. 1

II.     ONGOING FEDERAL AND STATE INVESTIGATIONS ......................... 5

III.    JURISDICTION AND VENUE ........................................................... 12

IV.     PLAINTIFFS ................................................................................. 13

V.      DEFENDANTS ............................................................................. 20

VI.     CO-CONSPIRATORS ..................................................................... 23

VII.    INTERSTATE AND INTRASTATE TRADE AND COMMERCE .............. 24

VIII.   BACKGROUND OF THE GENERIC DRUG INDUSTRY ....................... 24

        A.      Generic Drugs Are Commodity Products ................................ 24

        B.      Pricing in the U.S. Prescription Drug Industry ...................... 28

IX.     THE GENERIC CLOBETASOL CONSPIRACY .................................. 31

        A.      Congressional Responses to Generic Drug Price Increases ...... 31

        B.      The Clobetasol Market .................................................... 32

        C.      Clobetasol Price Increases .............................................. 34

        D.      Activities with Respect to the Clobetasol Conspiracy ............ 46

        E.      Defendants' Conspiracy .................................................. 48

        F.      Defendants' Own Acknowledgments of Lack of Generic Drug
                Competition .................................................................. 67

        G.      Defendants' Concerted Efforts to Increase Prices for Clobetasol Yielded
                Supracompetitive Profits ................................................. 68

        H.      Factors Increasing the Market's Susceptibility to Collusion ..... 71

                1.      Industry Concentration .......................................... 71

                2.      Barriers to Entry .................................................. 74

                3.      Demand Inelasticity .............................................. 75

i

|  | 4. | Lack of Substitutes | 77 |

       5.      Standardized Product with High Degree of Interchangeability ............... 78

       6.      Inter-Competitor Contacts and Communications .................................... 79

X.     THE STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS .......... 86

      A.     The Statutes of Limitations Did Not Begin to Run Because Plaintiffs Did Not and Could Not Discover Defendants' Unlawful Conspiracy ......................... 86

      B.     Fraudulent Concealment Tolled the Statutes of Limitations ............................... 88

       1.      Active Concealment of the Conspiracy .................................... 89

       2.      Plaintiffs Exercised Reasonable Diligence ................................ 90

XI.    CONTINUING VIOLATIONS .................................................................. 90

XII.   DEFENDANTS' ANTITRUST VIOLATIONS............................................... 91

XIII.  CLASS ACTION ALLEGATIONS ............................................................ 93

XIV.  CAUSES OF ACTION .......................................................................... 97

     FIRST COUNT:  Violation of Sections 1 and 3 of the Sherman Act (on behalf of Plaintiffs and the Nationwide Class) ............................................................ 97

     SECOND COUNT:  Violation of State Antitrust Statutes (on behalf of Plaintiffs and the Damages Class) ............................................................ 99

     THIRD COUNT:  Violation of State Consumer Protection Statutes (on behalf of Plaintiffs and the Damages Class) ............................................................ 121

     FOURTH COUNT:  Unjust Enrichment (on behalf of Plaintiffs and the Damages Class)............................................................................................. 157

XV.   PRAYER FOR RELIEF ...................................................................... 181

XVI.  JURY DEMAND ............................................................................... 183

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

## I.    <u>NATURE OF THE ACTION</u>

1.    This suit brings claims on behalf of indirect purchasers ("End-Payers" or "Plaintiffs") for injunctive relief and to recoup overcharges that resulted from an unlawful agreement among Defendants to allocate customers, rig bids, and fix, raise and/or stabilize the prices of generic versions of the prescription drug clobetasol propionate.

2.    Clobetasol is a high potency topical corticosteroid used for the treatment of a variety of skin conditions, including eczema, dermatitis, psoriasis, and vitiligo.  It is one of the most widely prescribed dermatological drugs in the United States.  Clobetasol propionate is available in several formulations.  At issue in this case are (1) topical cream 0.05% (15, 30, 45, or 60gm), (2) topical emollient cream 0.05% (15, 30, or 60gm), (3) topical ointment 0.05% (15, 30, 45, or 60gm), (4) topical gel 0.05% (15, 30, or 60gm), or (5) topical solution 0.05% (15 or 50ml) (collectively "Clobetasol").[1]

3.    For many years, competition among the small group of sellers of Clobetasol kept prices stable, at low levels.  But starting in June 2014, Defendants, who dominate the market for Clobetasol, abruptly and inexplicably raised prices.   The price increases were extreme and unprecedented.  During the summer of 2014, prices of Clobetasol increased by an average of 1,144%, and in some instances by more than 1,700%.  Prices remain at supracompetitive levels

---

[1] In addition to the above-referenced formulations, clobetasol propionate is also sold in foam, emollient foam, lotion, spray, and shampoo formulations. "Clobetasol" (with a capital "C") as used in this Complaint refers only to the cream, emollient cream, ointment, gel, and solution formulations at issue in this action.

today.  In fact, the U.S. Government Accountability Office ("GAO") identified Clobetasol as having "experienced an extraordinary price increase."[2]

4.      The price increases imposed by Defendant manufacturers of Clobetasol cannot be explained by supply shortages or any other market feature or shock.  Nor were they the result of unilateral business decisions.  Instead, the significant increases in the prices of Clobetasol were the result of an illegal agreement among Defendants to fix prices.

5.      The market for Clobetasol was highly conducive to collusion, as it was controlled almost exclusively by the Defendants and was subject to high barriers to entry, including substantial manufacturing costs and regulatory requirements.  Because Clobetasol is a medically necessary product for which reasonable substitutes are not available and demand is inelastic, Defendants were able to raise prices in concert without suffering corresponding losses in sales volume.  Federal regulations require Defendants' Clobetasol products to contain the same type and amount of active pharmaceutical ingredient and to be therapeutically equivalent to one another.  They are therefore interchangeable commodity products.  Interchangeability facilitates collusion, as cartel members can easily monitor and detect deviations from a price-fixing or market allocation agreement.  In addition, Sandoz facilitated Defendants' conspiracy by ensuring that potentially competing branded versions of Clobetasol were either more expensive than the price-fixed generics or were withdrawn from the market entirely.

6.      Because purchasers choose whose Clobetasol product to buy based primarily on price, and unilateral price increases generally result in loss of market share, it would have been economically irrational for any one Defendant to dramatically raise its prices without assurance

---

[2] GAO Report to Congressional Requesters, *Generic Drugs Under Medicare* (Aug. 12, 2016) ("GAO Report"), at Appx. III, *available at* http://www.gao.gov/products/GAO-16-706

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

that its competitors would do the same.  Defendants' attendance at trade association meetings, conferences, and workshops provided ample opportunities to agree on Clobetasol prices and allocate the market and customers for Clobetasol.

7.      As alleged below, Defendants implemented their conspiracy through numerous meetings and communications, including trade association meetings held by the Generic Pharmaceutical Association ("GPhA") (now the Association for Accessible Medicines), the National Association of Chain Drug Stores ("NACDS"), the Healthcare Distribution Management Association ("HDMA") (now the Healthcare Distribution Alliance), Efficient Collaborative Retail Marketing ("ECRM"), and the Minnesota Multistate Contracting Alliance for Pharmacy ("MMCAP"), among others.

8.      Defendants' unlawful and anticompetitive conduct with respect to Clobetasol is part of a larger conspiracy or series of conspiracies involving numerous generic pharmaceuticals and pharmaceutical manufacturers.

9.      Extreme and unprecedented price increases in the generic drug industry—like those imposed by the manufacturers of Clobetasol—have prompted close scrutiny of the industry by the U.S. Congress, federal and state enforcement agencies, and private litigants.

10.      An ongoing criminal investigation by the Antitrust Division of the U.S. Department of Justice ("DOJ") has, to date, resulted in price-fixing guilty pleas from two senior executives at Heritage Pharmaceuticals, Inc. relating to the sale of generic drugs doxycycline hyclate and glyburide.  But DOJ has made clear that its "investigation is ongoing"[3] and the evidence uncovered during the course of its investigation into those drugs also "implicates . . . a

---

[3] DOJ, Division Update Spring 2017 (Mar. 28, 2017), *available at* https://www.justice.gov/atr/division-operations/division-update-spring-2017/division-secures-individual-and-corporate-guilty-pleas-collusion-industries-where-products

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

significant number of the Defendants . . . [and] a significant number of the drugs at issue" in this Multidistrict Litigation.[4]

11.     The Attorney General for the State of Connecticut ("Connecticut AG"), whose office is leading a 45-state investigation of the generic drug industry parallel to that of DOJ, confirms that its price-fixing investigation extends "way beyond the two drugs and the six companies. Way beyond . . . . We're learning new things every day."[5] There is "compelling evidence of collusion and anticompetitive conduct across many companies that manufacture and market generic drugs in the United States . . . [and] evidence of widespread participation in illegal conspiracies across the generic drug industry."[6]

12.     Manufacturers of Clobetasol are implicated in these ongoing investigations; at least four of the Defendants named here, including Actavis, Perrigo, Sandoz, and Taro, have received subpoenas and/or been raided by the Department of Justice as part of the generic drug price-fixing investigations.

13.     As end payers in the chain of pharmaceutical distribution, Plaintiffs bear the brunt of Defendants' illegal conduct.  Plaintiffs have paid many millions of dollars more than they would have in a competitive market for Clobetasol.

14.     Plaintiffs bring this action against Defendants on account of their past and ongoing violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) and the state laws

---

[4] Intervenor United States' Motion to Stay Discovery at 1-2 (May 1, 2017) (ECF No. 279).

[5] *How Martinis, Steaks, and a Golf Round Raised Your Prescription Drug Prices*, Kaiser Health News (Dec. 21, 2016) *available at* http://www.thedailybeast.com/how-martinis-steaks-and-a-golf-round-raised-your-prescription-drug-prices

[6] Connecticut AG, Press Release (Dec. 15, 2016) *available at* http://www.ct.gov/ag/cwp/view.asp?Q=588538&A=234

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

set forth below.  Plaintiffs bring this action both individually and on behalf of (a) a national injunctive class of persons or entities in the United States and its territories who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price of Clobetasol manufactured by any Defendant, other than for resale, from June 2014 to the present ("Class Period"), and (b) a damages class of persons or entities in the states and territories identified herein who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price of Clobetasol manufactured by any Defendant, other than for resale, from June 2014 to the present.

## II.   ONGOING FEDERAL AND STATE INVESTIGATIONS

15.     Now in its third year, the federal criminal investigation into generic drug price fixing has begun to bear fruit.  On December 12 and 13, 2016, DOJ filed criminal charges against former Heritage executives Jeffrey Glazer (CEO) and Jason Malek (President). The government alleged that they conspired with others "to allocate customers, rig bids, and fix and maintain prices" of glyburide and doxycycline hyclate in violation of the Sherman Act (15 U.S.C. § 1).[7]

16.     On January 9, 2017, Glazer and Malek pleaded guilty to those charges.[8]  Deputy Assistant Attorney General Brent Snyder of the Justice Department's Antitrust Division explained: "These charges are an important step in correcting that injustice and in ensuring that generic pharmaceutical companies compete vigorously to provide these essential products at a

---

[7] Information ¶ 6, *United States v. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa. Dec. 12, 2016) (ECF No. 1); Information ¶ 6, *United States v. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa. Dec. 13, 2016) (ECF No. 1).

[8] *See* Tr. of Plea Hearing, *United States v. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa. Jan. 9, 2017) (ECF No. 24); *see also* Tr. of Plea Hearing, *United States v. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa. Jan. 9, 2017) (ECF No. 24).

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

price set by the market, not by collusion."[9]   As they await sentencing, Glazer and Malek are cooperating with DOJ's continuing investigation.   More criminal charges and guilty pleas are expected to follow.[10]

17.   Although initial public disclosures suggested that the federal and state investigations were focused on one or two drugs, it is now clear that both investigations are much, much broader.   The investigations reportedly cover two dozen drugs and more than a dozen manufacturers.[11]   Press reports indicate that "[t]he Department of Justice (DoJ) believes price-fixing between makers of generic pharmaceuticals is widespread."[12]

18.   According to one report, prosecutors see the investigation of the generic drug industry much like DOJ's antitrust probe of the auto parts industry, which has morphed into DOJ's largest criminal antitrust probe ever.   *See In re Automotive Parts Antitrust Litig.*, No. 2:12-md-02311 (E.D. Mich.).   As in that case, prosecutors expect "to move from one drug to another in a similar cascading fashion."[13]

---

[9] DOJ Press Release (Dec. 14, 2016) *available at* https://www.justice.gov/opa/pr/former-top-generic-pharmaceutical-executives-charged-price-fixing-bid-rigging-and-customer

[10] *See, e.g.,* Eric Kroh, *Generic Drug Price-Fixing Suits Just Tip Of The Iceberg*, Law360 (Jan. 6, 2017) ("'Once somebody starts cooperating, it leads to many more indictments.'"), *available at* https://www.law360.com/articles/877707/generic-drug-price-fixing-suits-just-tip-of-the-iceberg

[11] David McLaughlin & Caroline Chen, *U.S. Charges in Generic-Drug Probe to Be Filed by Year-End*, Bloomberg (Nov. 3, 2016) *available at* http://www.bloomberg.com/news/articles/2016-11-03/u-s-charges-in-generic-drug-probe-said-to-be-filed-by-year-end

[12] PaRR Report, *DoJ Believes Collusion over Generic Drug Prices Widespread* (June 26, 2015) ("PaRR Report"), *available at* http://www.mergermarket.com/pdf/DoJ-Collusion-Generic-Drug-Prices-2015.pdf

[13] *Id.*

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

19.     DOJ and a federal grand jury empaneled in the Eastern District of Pennsylvania have focused on at least seventeen generic drug manufacturers as part of the growing investigation, including Defendants here Actavis Holdco U.S., Inc. ("Actavis"), Perrigo New York, Inc. ("Perrigo"), Sandoz, Inc. ("Sandoz"), and Taro Pharmaceuticals USA, Inc. ("Taro"), as well as:  Aurobindo Pharma USA, Inc. ("Aurobindo"); Citron Pharma LLC ("Citron"); Dr. Reddy's Laboratories, Inc. ("Dr. Reddy's"); Heritage Pharmaceuticals, Inc. ("Heritage"); Impax Laboratories, Inc. ("Impax"); Lannett Company, Inc. ("Lannett"); Mayne Pharma, Inc. ("Mayne"); Mylan Inc. ("Mylan"); Par Pharmaceuticals, Inc. ("Par"); Sun Pharmaceutical Industries, Inc. ("Sun"); Teva Pharmaceuticals USA, Inc. ("Teva"); and Zydus Pharmaceuticals USA, Inc. ("Zydus").  And as recently as August 10, 2017, Pfizer, Inc. ("Pfizer") also disclosed that DOJ is investigating its Greenstone generics business.[14]

20.     The fact that these companies and/or their employees received subpoenas from a federal grand jury is significant.  DOJ does not empanel grand juries lightly.  The *Antitrust Division Manual* admonishes that "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution."  Accordingly, before a grand jury investigation proceeds, it requires a series of approvals, first by the relevant field chief, who then sends the request to the Antitrust Criminal Enforcement Division.  "The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal

---

[14] Further discussion of these generic drug manufacturers and their receipt of subpoenas or other inquiries from DOJ is included *infra* at ¶¶ 26-30, 206.

7

Enforcement will make a recommendation to the Assistant Attorney General[,]" who must give final approval and authorize all attorneys who will participate in the investigation.[15]

21.     As Mark Rosman, former assistant chief of the National Criminal Enforcement Section of DOJ's Antitrust Division, noted in an article on the "unusual" nature of the criminal subpoenas, "A DOJ investigation into the alleged exchange of pricing information in the pharmaceutical industry likely indicates that the agency anticipates uncovering criminal antitrust conduct in the form of price-fixing or customer allocation."[16]

22.     Another significant indication of criminal price fixing in the generic drug industry is that DOJ has received assistance from a privately-held company that came forward as a leniency applicant:  "It is understood that Heritage is cooperating with prosecutors in exchange for amnesty from criminal prosecution under DOJ's leniency program[.]"[17]  As explained on DOJ's website, an applicant for amnesty "must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes, before it will receive a conditional leniency letter." The applicant must also establish that "[t]he confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials."[18]

---

[15] DOJ, Antitrust Division Manual (5th ed. 2015) at Chapter III-81 to 83, *available at* http://www.justice.gov/atr/public/divisionmanual/chapter3.pdf

[16] Mark Rosman & Seth Silber, *DOJ's Investigation Into Generic Pharma Pricing Is Unusual,* Law360 (Nov. 12, 2014), *available at* https://www.wsgr.com/publications/PDFSearch/rosman-1114.pdf

[17] Richard Vanderford, *Generic Pharma Investigation Still Broad, Prosecutor Says,* mLex (Feb. 21, 2017).

[18] DOJ, *Frequently Asked Questions about the Antitrust Division's Leniency Program* (updated Jan. 26, 2017), *available a*t https://www.justice.gov/atr/page/file/926521/download

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

23.     In addition to the federal criminal investigation, the Connecticut AG began an investigation in July 2014 into the dramatic price increases in generic drugs.  Now joined by the Attorneys General of 43 other states and the District of Columbia, the Connecticut AG has filed a civil complaint in the U.S. District Court for the District of Connecticut alleging price fixing and customer allocation.[19]   Although the States' present complaint focuses on two drugs (doxycycline hyclate delayed release and glyburide), the States make clear that they have "uncovered wide-ranging conduct implicating numerous different drugs and competitors" and suggest that additional drugs and manufacturers will be added "at the appropriate time."[20]

24.     The publicly available version of the State AG Complaint is heavily redacted. Among the obscured portions are the contents of conspiratorial communications, which the Connecticut AG has described as "mind-boggling."[21]  The State AG Complaint explains that the generic drug industry is structured in a way that facilitates these types of collusive communications.  "Generic drug manufacturers operate, through their respective senior leadership and marketing and sales executives, in a manner that fosters and promotes routine and direct interaction among their competitors."  This affords them opportunities to "exploit their

---

[19] On August 3, 2017, the U.S. Judicial Panel on Multidistrict Litigation ("JPML") issued an order directing that the State AG case be transferred to this Court and coordinated as part of MDL 2724 (ECF No. 417).

[20] *State of Connecticut v. Aurobindo Pharma USA, Inc.*, No. 3:16-cv-2056 (VLB) (D. Conn.) (Doc. 168 at ¶ 9) (State AG Complaint) *available at* http://www.ct.gov/ag/lib/ag/press_releases/2016/20161215_gdms_complain.pdf.

[21] Mark Pazniokus, *How a small-state AG's office plays in the big leagues*, CT Mirror (Jan. 27, 2017), *available at* http://ctmirror.org/2017/01/27/how-a-small-state-ags-office-plays-in-the-big-leagues/

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

interactions at various and frequent industry trade shows, customer conferences and other similar events, to develop relationships and sow the seeds for their illegal agreements."[22]

25.     The criminal informations and guilty pleas relating to Glazer and Malek, the grand jury subpoenas, and evidence divulged in the State AG Complaint are merely the tip of the iceberg.   The government investigations have uncovered the existence of "a broad, well-coordinated and long-running series of schemes to fix the prices and allocate markets for a number of generic pharmaceuticals in the United States."[23]

26.     And at least four of the Defendants are targets of the federal antitrust investigation.   In its August 6, 2015 10-Q, Allergan (Actavis's former corporate parent) announced that on June 25, 2015, Actavis had "received a subpoena from the U.S. Department of Justice ('DOJ'), Antitrust Division seeking information relating to the marketing and pricing of certain of the Company's generic products and communications with competitors about such products."[24]

27.     On September 9, 2016, Taro's parent company, Taro Pharmaceutical Industries, Ltd., disclosed that Taro, "as well as two senior officers in its commercial team, received grand jury subpoenas from the United States Department of Justice, Antitrust Division, seeking documents relating to corporate and employee records, generic pharmaceutical products and pricing, communications with competitors and others regarding the sale of generic

---

[22] State AG Complaint ¶ 7.

[23] State AG Complaint ¶ 1.

[24] Allergan, SEC Form 10-Q at 64 (Aug. 6, 2015), *available at* https://www.sec.gov/Archives/edgar/data/1578845/000156459015006357/agn-10q_20150630.htm.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

pharmaceutical products, and certain other related matters."[25]  In a November 2016 earnings call, Taro's CEO Kal Sundaram noted that: "Our understanding is that the subpoenas relate to the same industry-wide investigations into the generic industry that have been going on since 2014." In an SEC filing dated June 22, 2017, Taro noted that "[c]ertain current and former officers in Taro U.S.A.'s commercial team have also received related subpoenas."[26]  Taro Pharmaceutical Industries, Ltd. also received a grand jury subpoena as part of DOJ's generics probe.[27]

28.     On May 2, 2017, Perrigo announced that the Antitrust Division had executed search warrants in a raid of its corporate offices as part of DOJ's ongoing drug pricing investigation.[28]

29.     In March 2016, Sandoz and Fougera Pharmaceuticals Inc. (a wholly-owned subsidiary of Sandoz) "received a subpoena from the Antitrust Division of the US Department of Justice (DoJ) requesting documents related to the marketing and pricing of generic pharmaceutical products . . . and related communications with competitors."[29]  Sandoz stated that it was cooperating with the investigation, which "it believes to be a part of a broader inquiry into industry practice."

---

[25] Taro, SEC Form 6-K (Sept. 9, 2016), *available at* https://www.sec.gov/Archives/edgar/data/906338/000115752316006685/a51417528.htm.

[26] Taro, SEC Form 20-F (June 22, 2017), available at https://www.sec.gov/Archives/edgar/data/906338/000156459017012807/taro-20f_20170331.htm

[27] David McLaughlin and Caroline Chen, *U.S. Charges in Generic Drug Probe to be Filed by Year-End*, BLOOMBERG (Nov. 3, 2016), *available at* https://www.bloomberg.com/news/articles/2016-11-03/u-s-charges-in-generic-drug-probe-said-to-be-filed-by-year-end

[28] Perrigo Press Release (May 2, 2017) *available at* http://perrigo.investorroom.com/2017-05-02-Perrigo-Discloses-Investigation

[29] Novartis 2016 Financial Report at 217, *available at* https://www.novartis.com/sites/www.novartis.com/files/ar-2016-financial-report-en.pdf

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

30.    Significantly, in a February 28, 2017 letter filed in this action prior to its transfer to this Court, DOJ confirmed that there are "significant overlaps between the companies and drugs that are being investigated criminally and the Defendants and drugs identified in plaintiffs' amended complaints in these civil actions [including the amended Clobetasol complaint]."[30]

31.    Plaintiffs do not yet have access to all of the information available to the government enforcement agencies.  What is known is that in light of all the evidence described above, the large and unprecedented price increases for Clobetasol cannot be explained by normal, competitive market forces.  The explanation is collusion.

### III.    JURISDICTION AND VENUE

32.    Plaintiffs bring Count One of this action under Section 16 of the Clayton Act (15 U.S.C. § 26) for injunctive relief and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiffs and the members of the Classes described herein by reason of the violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

33.    This action is also instituted under the antitrust, consumer protection, and common laws of various states and territories for damages and equitable relief, as described in Counts Two through Four below.

34.    Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1337 and by Section 16 of the Clayton Act (15 U.S.C. § 26). In addition, jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1332(d) and 1367.

35.    Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) & 22; 28 U.S.C §§ 1391(b)-(d) and 1407; and the MDL Order dated April 6, 2017 (ECF No. 291), and because, during the Class Period, Defendants resided, transacted business, were found, or had agents in

---

[30] *In re: Clobetasol Antitrust Litig.*, No. 1:16-mc-7229 (S.D.N.Y), ECF No. 58 at 1.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

this District, and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District. Venue is also proper in this District because the federal grand jury investigating the pricing of generic drugs is empaneled here and therefore it is likely that acts in furtherance of the alleged conspiracy took place here. According to DOJ guidelines, an "investigation should be conducted by a grand jury in a judicial district where venue lies for the offense, such as a district from or to which price-fixed sales were made or where conspiratorial communications occurred."[31]

36.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) sold Clobetasol throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; (d) was engaged in an illegal scheme and nationwide price-fixing conspiracy that was directed at, had the intended effect of causing injury to, and did cause injury to persons residing in, located in, or doing business throughout the United States, including in this District; and/or (e) took overt action in furtherance of the conspiracy in this District or conspired with someone who did, and by doing so could reasonably have expected to be sued in this District.   In addition, nationwide personal jurisdiction was authorized by Congress pursuant to the Clayton Act and by 28 U.S.C. § 1407.

## IV.     **PLAINTIFFS**

37.     Plaintiffs 1199SEIU National Benefit Fund, 1199SEIU Greater New York Benefit Fund, 1199SEIU National Benefit Fund for Home Care Workers, and 1199SEIU Licensed Practical Nurses Welfare Fund are jointly administered health and welfare funds (collectively, "1199SEIU Benefit Funds").   The 1199SEIU Benefit Funds are among the largest labor-

---

[31] DOJ, Antitrust Division Manual at III-83.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

management funds in the nation, providing comprehensive health benefits to hundreds of thousands of working and retired healthcare industry workers and their families.  They provide health and welfare benefits to 400,000 members, retirees, and their families, who reside in numerous locations in the United States.  During the Class Period, the 1199SEIU Benefit Funds indirectly purchased and paid for some or all of the purchase price for one or more Clobetasol prescriptions, other than for resale, manufactured by the Defendants.  Plaintiffs made such payments and/or reimbursements in Arizona, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Idaho, Indiana, Maryland, Massachusetts, Nevada, New Jersey, New Mexico, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Tennessee, Texas, Virginia, Washington, and Puerto Rico, thereby suffering injury to its business and property.  During the Class Period, the 1199SEIU Benefit Funds paid and reimbursed more for these products than they would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for those products.  As a result of the alleged conspiracy, the 1199SEIU Benefit Funds were injured in their business or property by reason of the violations of law alleged herein.  The 1199SEIU Benefit Funds intend to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

38.     Plaintiff American Federation of State, County and Municipal Employees District Council 37 Health & Security Plan ("DC 37") is a health and welfare benefit plan headquartered in New York, New York.  District Council 37 (the "Union") is New York City's largest public employee union.  The Union includes 51 local unions, representing public sector employees serving in thousands of job titles from Accountants to Zoo Keepers.  Members covered by DC 37's benefit plan work in almost every agency in New York City, including but not limited to the

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

City's police and fire departments, hospitals, schools, libraries, social service centers, water treatment facilities, and city colleges. DC 37 provides supplemental health benefits, including a prescription drug benefit, to approximately 313,000 individuals, including both active members and their families and 50,000 retirees, who reside in numerous locations in the United States. During the Class Period, DC 37 indirectly purchased and paid for some or all of the purchase price for one or more Clobetasol prescriptions, other than for resale, manufactured by the Defendants. Plaintiff made such payments and/or reimbursements in Alabama, California, Connecticut, Delaware, Florida, Georgia, Indiana, Iowa, Kansas, Louisiana, Maryland, Massachusetts, Nevada, New Jersey, New York, North Carolina, Pennsylvania, South Carolina, Tennessee, Texas, Virginia, Washington, West Virginia, and Puerto Rico thereby suffering injury to its business and property. During the Class Period, DC 37 paid and reimbursed more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for those products. As a result of the alleged conspiracy, DC 37 was injured in its business or property by reason of the violations of law alleged herein. DC 37 intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

39. Plaintiff Hennepin County is a political subdivision created and authorized under the laws of the State of Minnesota. It maintains a self-insured health and welfare plan that provides benefits, including prescription-drug benefits to approximately 17,000 plan members. During the Class Period, Hennepin County indirectly purchased and paid for some or all of the purchase price for one or more Clobetasol prescriptions, other than for resale, manufactured by the Defendants. Plaintiff made such payments and/or reimbursements in Colorado, Florida,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Illinois, Michigan, Minnesota, Missouri, New York, Texas, and Wisconsin, thereby suffering injury to its business and property. During the Class Period, Hennepin County paid and reimbursed more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for those products. As a result of the alleged conspiracy, Hennepin County was injured in its business or property by reason of the violations of law alleged herein. Hennepin County intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

40.      Plaintiff Louisiana Health Service & Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana and HMO Louisiana, Inc. (collectively, "BCBS-LA") is headquartered in Baton Rouge, Louisiana, and is Louisiana's oldest and largest domestic health insurer, with over 1 million members.  During the Class Period, BCBS-LA indirectly purchased, paid, and/or provided reimbursement on behalf of its members for some or all of the purchase price for one or more generic Clobetasol prescriptions, other than for resale, manufactured by the Defendants. Plaintiff made such payments and/or reimbursements in Alabama, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, Washington, West Virginia, Wisconsin, Wyoming and the District of Columbia, thereby suffering injury to its business and property. During the Class Period, BCBS-LA paid and reimbursed more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

markets and customers for those products.  As a result of the alleged conspiracy, BCBS-LA was injured in its business or property by reason of the violations of law alleged herein.  BCBS-LA intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

41.     Plaintiff Self-Insured Schools of California ("SISC") is a Joint Powers Authority under California law that serves the interests of California public school district members. It is headquartered in Bakersfield, California.  It provides health benefit plans to approximately 300,000 members who reside in numerous locations in the United States. During the Class Period, SISC indirectly purchased and paid for some or all of the purchase price for one or more Clobetasol prescriptions, other than for resale, manufactured by the Defendants. SISC made such payments and/or reimbursements in Arizona, California, Colorado, Florida, Georgia, Hawaii, Idaho, Illinois, Iowa, Massachusetts, Maryland, Michigan, Minnesota, Missouri, Montana, Nevada, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Utah, Virginia and Washington thereby suffering injury to its business and property. During the Class Period, SISC paid and reimbursed more for these products more than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for those products. As a result of the alleged conspiracy, SISC was injured in its business or property by reason of the violations of law alleged herein.  SISC intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

42.     Plaintiff Sergeants Benevolent Association of the Police Department of the City of New York Health and Welfare Fund (SBA Fund) is a citizen of the State of New York, and

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

has its principal place of business at 35 Worth Street, New York, New York.  SBA Fund is an

independent labor organization operating under Internal Revenue Code section 501(c)(5), and is

sponsored and administered by a Board of Trustees.  As such, SBA Fund is a legal entity entitled

to bring suit in its own name.  SBA Fund is an "employee welfare benefit plan" and an

"employee benefit plan" with membership of approximately 36,000 active and retired sergeants

of the New York City Police Department and their dependents.  It provides health care benefits,

including prescription drug benefits, to participants and their dependents.  During the Class

Period, SBA Fund indirectly purchased and paid for some or all of the purchase price for one or

more Clobetasol prescriptions, other than for resale, manufactured by the Defendants.  SBA

Fund made such payments and/or reimbursements in Alabama, Arizona, Arkansas, California,

Connecticut, Delaware, Florida, Georgia, Kansas, Maryland, Massachusetts, Michigan, New

Hampshire, New Jersey, New Mexico, New York, North Carolina, Pennsylvania, South

Carolina, Tennessee, Texas, Virginia and District of Columbia.  During the Class Period, SBA

Fund paid and reimbursed more for these products than it would have absent Defendants'

anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and

customers for these products.  As a result of the alleged conspiracy, SBA Fund was injured in its

business or property by reasons of the violations of law alleged herein.  SBA Fund intends to

continue paying and/or reimbursing for these drugs and will continue to be injured unless the

Defendants are enjoined from their unlawful conduct as alleged herein.

43.     Plaintiff Uniformed Fire Officers Association Family Protection Plan Local 854

("UFOAFPP") is a health and welfare benefit plan headquartered and with a principal place of

business in New, York, New York.  The UFOAFPP Fund administers the assets of a defined

contribution plan formed by a collective bargaining agreement between the City of New York

and the Uniformed Fire Officers Association to provide certain benefits including prescription drug benefits. They provide health and welfare benefits to approximately 10,000 individuals, including members and their families, throughout the United States.  During the Class Period, the UFOAFPP indirectly purchased and paid for some or all of the purchase price for one or more Clobetasol prescriptions, other than for resale, manufactured by the Defendants.  UFOAFPP made such payments and/or reimbursements in California, Connecticut, Delaware, Florida, Missouri, New Jersey, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Vermont, and Virginia.  During the Class Period, UFOAFPP paid and reimbursed more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for these products.  As a result of the alleged conspiracy, UFOAFPP was injured in its business or property by reasons of the violations of law alleged herein.  UFOAFPP intends to continue paying and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

44.     Plaintiff Unite Here Health ("UHH") is a multi-employer trust fund composed of union and employer representatives, whose mission is to provide health benefits that offer high quality, affordable healthcare to its participants at a better value and with a better service than is otherwise available in the market.  Headquartered in Aurora, Illinois, UHH has served union workers in the hospitality, food service, and gaming industries for the past several decades. During the Class Period, UHH indirectly purchased and paid for some or all of the purchase price for one or more Clobetasol prescriptions, other than for resale, manufactured by the Defendants. Plaintiff made such payments and/or reimbursements in California, Colorado, Connecticut, Florida, Hawaii, Illinois, Indiana, Iowa, Louisiana, Massachusetts, Michigan,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Minnesota, Mississippi, Missouri, Nevada, New Hampshire, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Rhode Island, Tennessee, Texas, Virginia, Washington, West Virginia, Wisconsin, and Washington, D.C.  During the Class Period, UHH purchased and paid more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for these products. As a result of the alleged conspiracy, Plaintiff UHH was injured in its business or property by reason of the violations of law alleged herein. UHH intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

## V.     DEFENDANTS

**Actavis Defendants**

44.     Defendant Actavis Holdco U.S., Inc. ("Actavis Holdco") is a Delaware corporation with its principal place of business in Parsippany, New Jersey.  In August 2016, Teva Pharmaceutical USA, Inc. acquired the Actavis Generics business of Allergan plc, including Actavis, Inc. Upon the acquisition, Actavis, Inc.—the acquired Allergan plc generics operating company (formerly known as Watson Pharmaceuticals)—was renamed Allergan Finance, LLC, which in turn assigned all of the assets and liabilities of the former Allergan plc generic business to the newly formed Actavis Holdco, including subsidiaries Actavis Pharma, Inc. and Actavis Elizabeth LLC (a research and development and manufacturing entity for Actavis generic operations), among others.  Actavis Holdco is a wholly owned subsidiary of Teva Pharmaceuticals USA, Inc., which is a Delaware corporation with its principal place of

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

business in North Wales, Pennsylvania.  Teva Pharmaceutical USA, Inc. is a wholly owned subsidiary of Teva Pharmaceutical Industries Ltd., an Israeli entity.

45.     Defendant Actavis Pharma, Inc. is Delaware corporation with its principal place of business in Parsippany, New Jersey.  It is a wholly owned subsidiary of Actavis Holdco and is a principal operating company in the U.S. for Teva's generic products acquired from Allergan plc.  It manufactures, markets, and/or distributes generic drugs, including Clobetasol. Actavis Pharma, Inc. is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

46.     Unless addressed individually, Actavis Holdco and Actavis Pharma, Inc. are collectively referred to herein as "Actavis."  During the Class Period, Actavis sold generic Clobetasol in this District and other locations in the United States.

**Hi-Tech Defendants**

47.     Defendant Akorn Inc. is a Louisiana corporation with its principal place of business in Lake Forest, Illinois.  It is the parent company of Hi-Tech Pharmacal Co., Inc. and Akorn Sales, Inc.

48.     Defendant Akorn Sales, Inc. is a Delaware corporation.  It is a wholly owned subsidiary of Akorn Inc.  It is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

49.     Defendant Hi-Tech Pharmacal Co., Inc. ("Hi-Tech") is a Delaware corporation with its principal place of business in Amityville, New York. It is a wholly owned subsidiary of Akorn, Inc.  Akorn Inc. acquired and integrated Hi-Tech into its operations in April 2014.

21

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

50.     Unless addressed individually, Akorn Inc., Akorn Sales, Inc. and Hi-Tech are collectively referred to herein as "Hi-Tech."  During the Class Period, Hi-Tech sold Clobetasol in this District and other locations in the United States.

**Perrigo**

51.     Defendant Perrigo New York, Inc. ("Perrigo") is a Delaware corporation with its executive offices in Allegan, Michigan and its primary business location in Bronx, NY. It is a subsidiary of Perrigo Company plc, an Irish company with its principal place of business in Dublin, Ireland.  Perrigo is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.  During the Class Period, Perrigo sold Clobetasol to customers in this District and other locations in the United States.

**Sandoz Defendants**

52.     Defendant Sandoz, Inc. is a Colorado corporation with its principal place of business in Princeton, New Jersey.  Sandoz Inc. is a subsidiary of Novartis AG, a global pharmaceutical company based in Basel, Switzerland.  Sandoz Inc. is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

53.     Defendant Fougera Pharmaceuticals Inc. ("Fougera") is a New York corporation with its principal place of business in Melville, New York.  Foguera is a wholly-owned subsidiary of Defendant Sandoz, Inc. In 2012, Sandoz acquired and integrated Fougera into its US-based generic pharmaceutical business.

54.     Unless addressed individually, Fougera and Sandoz Inc. are collectively referred to herein as "Sandoz."  During the Class Period, Sandoz sold Clobetasol in this District and other locations in the United States.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Taro**

55.    Defendant Taro Pharmaceuticals U.S.A., Inc. ("Taro") is a New York corporation with its principal place of business in Hawthorne, New York. Taro is a wholly-owned subsidiary of Taro Pharmaceutical Industries, Ltd., an Israeli entity, which in turn is majority owned by Sun Pharmaceutical Industries Ltd., and Indian entity. During the Class Period, Taro sold Clobetasol to customers in this District and other locations in the United States.

**Wockhardt Defendants**

56.    Defendant Wockhardt USA LLC ("Wockhardt") is a Delaware corporation with its principal place of business in Parsippany, New Jersey.  Wockhardt is a wholly owned subsidiary of Morton Grove Pharmaceuticals, Inc.

57.    Defendant Morton Grove Pharmaceuticals, Inc. ("Morton Grove") is a Delaware corporation with its principal place of business in Morton Grove, Illinois.  It is a wholly owned subsidiary of Wockhardt Ltd., a pharmaceutical and biotechnology company headquartered in Mumbai, India.  Morton Grove is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

58.    Unless addressed individually, Wockhardt and Morton Grove Pharmaceuticals, Inc. are collectively referred to herein as "Wockhardt."  During the Class Period, Wockhardt sold Clobetasol to customers in this District and other locations in the United States.

## VI.    CO-CONSPIRATORS

59.    Various other persons, firms, corporations and entities have participated as co-conspirators with Defendants in the violations and conspiracy alleged herein.  In order to engage in the violations alleged herein, these co-conspirators have performed acts and made statements

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

in furtherance of the antitrust violations and conspiracies alleged herein.  Plaintiffs may amend this Complaint to allege the names of additional co-conspirators as they are discovered.

## VII.   INTERSTATE AND INTRASTATE TRADE AND COMMERCE

60.     During the Class Period, Defendants sold and distributed Clobetasol in a continuous and uninterrupted flow of interstate commerce to customers throughout the United States, including in this District.

61.     Defendants' and their co-conspirators' conduct, including the marketing and sale of Clobetasol, took place within the United States and has had, and was intended to have, a direct, substantial, and reasonably foreseeable anticompetitive effect upon interstate commerce within the United States.

62.     Defendants' anticompetitive conduct occurred in part in trade and commerce within the states and territories set forth herein, and also had substantial intrastate effects in that, *inter alia*, retailers within each state and territory were foreclosed from offering less expensive Clobetasol to Plaintiffs inside each respective state and territory.  The foreclosure of these less expensive generic products directly impacted and disrupted commerce for Plaintiffs within each state and territory and forced Plaintiffs to pay supracompetitive prices.

## VIII.   BACKGROUND OF THE GENERIC DRUG INDUSTRY

### A.     Generic Drugs Are Commodity Products

63.     Approximately 88% of all pharmaceutical prescriptions in the United States are filled with a generic drug.[32]  In 2015, generic drug sales in the United States were estimated at $74.5 billion.[33]

---

[32] GPhA, *Generic Drug Savings in the U.S.* (2015) ("GPhA Report") at 1, *available at* http://www.gphaonline.org/media/wysiwyg/PDF/GPhA_Savings_Report_2015.pdf

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

64.     According to the U.S. Food & Drug Administration ("FDA"), a generic drug is "the same as a brand name drug in dosage, safety, strength, how it is taken, quality, performance, and intended use."[34] Once the FDA approves a generic drug as "therapeutically equivalent" to a brand drug, the generic version "can be expected to have equal effect and no difference when substituted for the brand name product."[35]

65.     In a competitive market, generic drugs cost substantially less than branded drugs. The U.S. Congressional Budget Office ("CBO") estimates that, "[o]n average, the retail price of a generic drug is 75 percent lower than the retail price of a brand-name drug."[36] And that may be conservative.  According to a Federal Trade Commission ("FTC") study, in a "mature generic market, generic prices are, on average, 85% lower than the pre-entry branded drug price."[37] Mature generic markets—like Clobetasol—typically have several manufacturers that compete for sales, hence keeping prices in check.

66.     Generic drug price competition provides enormous savings to consumers, pharmacies, and other drug purchasers, as well as to private health insurers, health and welfare funds, and state Medicaid programs.  Indeed, one study found that the use of generic medicines

---

[33] Connecticut AG, Press Release (Dec. 15, 2016), *available at* http://www.ct.gov/ag/cwp/view.asp?Q=588538&A=2341

[34] FDA Website, *available at* http://www.fda.gov/Drugs/InformationOnDrugs/ucm079436.htm#G

[35] *Id.*

[36] CBO, *Effects of Using Generic Drugs on Medicare's Prescription Drug Spending* (Sep. 15, 2010), *available at* https://www.cbo.gov/publication/21800

[37] FTC, *Pay-For-Delay: How Drug Company Pay-offs Cost Consumers Billions* (Jan. 2010), *available at* http://www.ftc.gov/os/2010/01/100112payfordelayrpt.pdf

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

saved the United States healthcare system $254 billion in 2014 alone, and $1.68 trillion between 2005 and 2014.[38]

67.     The significant cost savings provided by generic drugs motivated Congress to enact the Drug Price Competition and Patent Term Restoration Act of 1984, more commonly known as the "Hatch-Waxman Act" (Pub. L. No. 98-417, 98 Stat. 1585).  The Act streamlines the regulatory hurdles that generic drug manufacturers have to clear prior to marketing and selling generic drugs.  Generic drug manufacturers may obtain FDA approval in an expedited fashion through the filing of an Abbreviated New Drug Application ("ANDA") that establishes that its product is bioequivalent to the branded counterpart.

68.     Since passage of the Hatch-Waxman Act, every state has adopted substitution laws requiring or permitting pharmacies to substitute generic drug equivalents for branded drug prescriptions (unless the prescribing physician specifically orders otherwise by writing "dispense as written" or similar language on the prescription).

69.     Because each generic is readily substitutable for another generic of the same brand drug, pricing is the main differentiating feature.  As recognized by the FTC, "generic drugs are commodity products" and, as a consequence of that, are marketed "primarily on the basis of price."[39]   Taro Pharmaceutical Industries, Ltd. has explained in SEC filings that "the pharmaceutical industry in which we operate is intensely competitive. We are particularly subject to the risks of competition. For example, the competition we encounter may have a negative impact upon the prices we may charge for our products, the market share of our

---

[38] GPhA Report at 1.

[39] FTC, *Authorized Generic Drugs: Short-Term Effects and Long-Term Impact* (Aug. 2011), *available at* http://www.ftc.gov/os/2011/08/2011genericdrugreport.pdf

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

products and our revenue and profitability."  In a competitive market, generic manufacturers cannot significantly increase prices (or maintain high prices in the face of a competitor's lower price) without losing a significant volume of sales.

70.     It is well-established that competition among generic manufacturers drives down price.  Before generic drugs enter a market, the brand drug has a monopoly and captures 100% of sales.  When lower-priced generics become available, the brand drug quickly loses market share as purchasers switch to the less expensive alternatives.  Over time, the price of a generic drug approaches the manufacturers' marginal costs.  Taro Pharmaceutical Industries, Ltd. has emphasized that "[d]ue to increased competition from other generic pharmaceutical manufacturers as they gain regulatory approvals to market generic products, selling prices and related profit margins tend to decrease as products mature. . . .  These pricing pressures are inherent in the generic pharmaceutical industry."

71.     As illustrated in the following chart, the price of a generic drug tends to decrease as more generic drug manufacturers enter the market:



**Generic Competition and Drug Prices**

Source:  FDA analysis of retail sales data from IMS Health, IMS National Sales Perspective (TM), 1999-2004, extracted February 2005

27

72.     When new entrants join a competitive generic market, they typically will price their product below the prevailing market price in order to gain market share.   A recent government report confirmed this phenomenon in interviews with generic manufacturers: "manufacturers said that if a company is bringing a generic drug into an established drug market, it typically offers a price that is lower than the current market price in order to build its customer base.  Manufacturers also said that as each new manufacturer enters an established generic drug market the price of that generic will fall, with one manufacturer noting that it is typically a 20 percent price decline per entrant."[40]

73.     When there are multiple generic manufacturers in an established generic market—as with Clobetasol—prices should remain low and stable, and should not increase absent a market disruption or, as is the case here, anticompetitive conduct.

**B.     Pricing in the U.S. Prescription Drug Industry**

74.     In simple terms, the generic pharmaceutical supply chain flows as follows: Manufacturers sell drugs to wholesalers. Wholesalers sell drugs to pharmacies. Pharmacies dispense the drugs to consumers, who pay the full retail price if they are uninsured, or a portion of the retail price (*e.g.*, a co-pay or co-insurance) if they are insured.  The insured consumers' health plans then pay the pharmacies additional amounts that are specified in agreements between them and the pharmacies.  These agreements are sometimes arranged by middlemen known as Pharmacy Benefit Managers ("PBMs").

75.     Because the prices paid by purchasers of generic drugs differ at different levels of the market and most of the transactions occur between private parties according to terms that are not publicly disclosed, the price of a given drug is not always obvious.  Market wide pricing for a

---

[40] GAO Report at 23.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

given drug, however, may be observed through the Centers for Medicare & Medicaid Services ("CMS") survey of National Average Drug Acquisition Cost ("NADAC"). NADAC was "designed to create a national benchmark that is reflective of the prices paid by retail community pharmacies to acquire prescription . . . drugs."[41] "NADAC is a simple average of the drug acquisition costs submitted by retail pharmacies."[42] In effect, NADAC is "a single national average."[43] Thus, NADAC is one way to track general price trends in the marketplace.

76.     While NADAC provides the average price level across all manufacturers of a given drug, other prices are manufacturer specific. Drug manufacturers typically report benchmarks—like WACs (Wholesale Acquisition Costs)—for their drugs, which are then published in compendia used by participants in the pharmaceutical industry. The benchmarks are not actual transaction prices; rather, they are the manufacturer's reported list price. Accordingly, WAC prices do not take into account discounts that may be provided, *e.g.*, for volume sales.[44]

77.     The amount that an end-payer will pay a pharmacy for a generic drug typically is determined with reference to a benchmark or list price like a WAC. The end-payer pays the

---

[41] CMS, Methodology for Calculating the National Average Drug Acquisition Cost (NADAC) for Medicaid Covered Outpatient Drugs at 5, *available at* https://www.medicaid.gov/medicaid-chip-program-information/by-topics/prescription-drugs/ful-nadac-downloads/nadacmethodology.pdf.

[42] *Id.* at 15.

[43] *Id.*

[44] Average Wholesale Price ("AWP") is another benchmark price that is used in the pharmaceutical industry. And QuintilesIMS's National Sales Perspectives ("NSP") is another measure of manufacturer specific pricing. NSP data "captures 100% of the total U.S. pharmaceutical market, measuring sales at actual transaction prices rather than using an average wholesale price" and includes sales by manufacturers into various outlets. IMS Institute for Healthcare Informatics, HSRN Data Brief: National Sales Perspectives at 1, *available at* https://www.imshealth.com/files/web/IMSH%20Institute/NSP_Data_Brief-.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

pharmacy an amount based on the manufacturer's list price for the drug, plus a small mark-up or dispensing fee.  Over time, third-party payers and PBMs have learned that manufacturers' list prices for some generic drugs can be substantially higher than the actual costs incurred by certain pharmacies to acquire the drugs.  As a consequence, end-payers were paying more than simply the acquisition cost plus a small amount.

78.     To combat this, some third-party payers and PBMs have implemented their own proprietary benchmark prices—Maximum Allowable Costs ("MACs")—that set the amounts they will pay pharmacies for some generic drugs.  A MAC caps the amount that an end-payer will pay a pharmacy for a given strength and dosage of a generic drug, regardless of the pharmacy's acquisition costs.

79.     Third-party payers and PBMs set the MAC of a drug based on several factors, one of which is believed to be the lowest acquisition cost in the market for that generic drug.  So, for example, if there are three manufacturers offering the same generic drug at three different prices, a PBM or third-party payer might set the MAC price at or near the lowest of the three prices.  A pharmacy could elect to buy from a manufacturer with a higher price, but upon resale to a customer of the PBM or third-party payer, the pharmacy would only be paid the MAC price.

80.     Drug purchasers always should have an incentive to buy the least expensive available drug.  Because MAC prices further incentivize pharmacies to choose the lowest priced option, a generic manufacturer that increases its price for a drug should expect to lose sales to a competitor with a lower price. Consequently, in the absence of coordinated pricing activity among generic manufacturers, an individual manufacturer should not be able to significantly increase its price (or maintain a higher price in the face of a significantly lower competitor price)

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

without incurring the loss of a significant volume of sales.  A manufacturer can only raise its price if it knows its competitors will raise their prices, too, *e.g.*, if they are conspiring.

## IX.     THE GENERIC CLOBETASOL CONSPIRACY

### A.     Congressional Responses to Generic Drug Price Increases

81.     In addition to the investigations by DOJ and the Connecticut AG, Congress has raised concerns about the alarming price spikes for numerous generic pharmaceuticals.  These concerns were prompted by the very real hardship suffered by end-payers as a result of the unprecedented price increases.  As noted above, the GAO identified Clobetasol as one of the drugs that had experienced extraordinary price increases.

82.     In the Fall of 2014, Senator Bernie Sanders and Representative Elijah Cummings requested information from manufacturers of 10 drugs that had experienced extraordinary price increases.  Actavis plc (Actavis's parent company at the time) and Taro's affiliate Sun Pharmaceutical Industries, Inc. were among those manufacturers.  Six of the 10 drugs that Senator Sanders and Representative Cummings requested information about are now the subject of complaints in this MDL.[45]

83.     In November 2014, Senator Sanders conducted a hearing entitled, "Why Are Some Generic Drugs Skyrocketing in Price?" ("Senate Hearing"). Various witnesses discussed the price hikes for generic drugs, but none of the industry executives that were invited to testify appeared.[46]

---

[45] Sen. Sanders, Press Release, *Congress Investigating Why Generic Drug Prices Are Skyrocketing* (Oct. 2, 2014), *available at* https://www.sanders.senate.gov/newsroom/press-releases/congress-investigating-why-generic-drug-prices-are-skyrocketing

[46] Senate Hearing (Nov. 20, 2014), *available at* https://www.help.senate.gov/hearings/why-are-some-generic-drugs-skyrocketing-in-priced

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

84.     Senator Sanders and Representative Cummings followed up with a request to the Office of the Inspector General of the Department of Health & Human Services ("OIG"), asking it to investigate the effect that price increases of generic drugs have had on the Medicare and Medicaid programs.   The OIG issued its report in December 2015, confirming that price increases for numerous generic drugs far out-stripped inflation.[47]

85.     In response to another Congressional request—this one from Senators Susan Collins, Claire McCaskill, Bill Nelson and Mark Warner—the United States Government Accountability Office ("GAO") issued a report in August 2016 entitled "Generic Drugs Under Medicare: Part D Generic Drug Prices Declined Overall, but Some Had Extraordinary Price Increases."[48]  The GAO investigation confirmed that in a competitive market, generic drug prices decline and remain stable, absent shortages or other market disruptions.[49]  And this was the case for most generics.  But it identified numerous drugs that experienced "extraordinary" increases, which it defined as an increase of more than 100%.[50]   Each of the clobetasol propionate formulations at issue in this lawsuit were identified in the GAO Report as experiencing an "extraordinary price increase."[51]

**B.     The Clobetasol Market**

86.     Clobetasol is a widely prescribed topical corticosteroid used for the treatment of a variety of skin conditions.  It is sold throughout the United States and its territories.

---

[47] HHS OIG, *Average Manufacturer Prices Increased Faster than Inflation for Many Generic Drugs* (Dec. 2015), *available at* https://oig.hhs.gov/oas/reports/region6/61500030.pdf

[48] GAO Report.

[49] *Id.* at 23-25.

[50] *Id.* at 1 & Appendix III.

[51] *Id*. at Appendix III.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

87.     The market for Clobetasol is mature, and Defendants that operate in the market can only gain market share by competing on price.

88.     The clobetasol propionate products at issue in this case are the generic versions of the brand name drug Temovate (or Temovate E in the case of the emollient version of the cream), which was approved by the U.S. Food and Drug Administration in 1985 and 1994 (depending on the formulation).  Sandoz was the exclusive seller of Temovate,[52] and ███ ███████████████████████████████████████████████.  ████████████, Temovate cream and ointment accounted for less than ███ of total clobetasol propionate cream and ointment sales volume.  Sandoz discontinued the sale of Temovate cream and ointment on or before June 2015 and March 2016, respectively.

89.     Generic versions of clobetasol propionate have been available for purchase in the United States since the mid 1990's.[53]  Several manufacturers exited the Clobetasol market before Defendants' June 2014 price increases.  Renaissance and Teva discontinued their Clobetasol products, and G&W Labs ████████████████████████████████████ Actavis had ███ ██████ sales of some Clobetasol formulations prior to and during the initial price increases, but ███████████████████████████████████████████████████████████.  While

---

[52] Temovate was developed by Glaxo Wellcome (the predecessor to GlaxoSmithKline) and all formulations of Temovate were approved by the FDA prior to 1994.  The five clobetasol propionate formulations that are not at issue in this case (and which did not experience extraordinary price increases in June 2014) were developed by different companies under different brand names (Olux for foam, Olux-E for emollient foam, and Clobex for lotion, shampoo, and spray).  On September 30, 2005, GlaxoSmithKline sold its prescription dermatology business, including the rights to Temovate, to Altana, Inc., which became Fougera in 2011 and was acquired by Sandoz in 2012.

[53] *See*, *e.g*., Drugs@FDA Database, *available at* https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm, ANDA 074249 (cream); ANDA 075325 (emollient cream); ANDA 074221 (ointment); ANDA 075279 (gel); ANDA 074222 (solution).

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Tolmar received FDA approval to sell Clobetasol solution, ██████████████   Glenmark

Pharmaceuticals has ██████████████████████

90.     At all relevant times, Defendants have had substantial market power with respect

to Clobetasol.   Defendants exercised this power to maintain supracompetitive prices for

Clobetasol without losing so many sales as to make the elevated price unprofitable.

91.     Defendants sold Clobetasol at prices in excess of marginal costs, in excess of a

competitive price, and enjoyed high profit margins.

**C.     Clobetasol Price Increases**

92.     Competition for Clobetasol has caused prices to stabilize and remain relatively

low from at least January 2011 until Defendants raised prices in June 2014.  Defendants' June

2014 price increases represented a departure from the stable pricing of prior years and from

ordinary pricing practices, and are indicative of collusion.

93.     NADAC data for Clobetasol show the low and stable prices of Clobetasol that

were characteristic of the market prior to the Defendants' price hikes, as well as the huge spike in

price that occurred abruptly in June 2014.  Since that time, Defendants have continued to charge

supracompetitive prices.  Starting in June of 2014, the average price of Clobetasol increased by

approximately 1,144%, with certain formulations increasing as much as 1,738%.

94.     The market-wide Clobetasol price increases were the result of Defendants Hi-

Tech, Sandoz, Taro, and Wockhardt increasing their respective Clobetasol prices at substantially

the same time to substantially similar levels in the summer of 2014.   While Perrigo ██████

████████  the price of its Clobetasol gel product ████████████████, as explained below, it would

not have been rational for Perrigo to do so unless it had joined the anticompetitive agreement

among the other Defendants.  And when Actavis entered the Clobetasol cream market ████████

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

████████████████████████████████████████████████████████, it
sold both products at elevated prices and did not compete with the other sellers on price, which it
would not have done had it not also joined the conspiracy.

95.    The following graphs show the Defendants' WAC prices.  These graphs, which
use data from IMS Health, depict Defendants' collusive behavior: each raised their WAC prices
to essentially the same level at nearly the same time.



35





36
PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

96.    The following charts—which rely on WAC data from Gold Standard—similarly show Defendants coordinate WAC pricing:[54]

| Clobetasol Emollient Cream | | | | | | |
|---|---|---|---|---|---|---|
| Strength | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
| 15gm | Taro | 51672-1297-01 | $0.50 | $3.63 | 3-Jun-14 | 621% |
| | Sandoz | 00168-0301-15 | $1.20 | $3.63 | 18-Jul-14 | 203% |
| | Hi-Tech | 50383-0270-15 | $0.47 | $3.63 | 9-Aug-14 | 673% |
| 30gm | Taro | 51672-1297-02 | $0.38 | $3.63 | 3-Jun-14 | 864% |
| | Sandoz | 00168-0301-30 | $0.88 | $3.63 | 18-Jul-14 | 314% |
| | Hi-Tech | 50383-0270-30 | $0.33 | $3.63 | 9-Aug-14 | 1,001% |
| 60gm | Taro | 51672-1297-03 | $0.33 | $3.63 | 3-Jun-14 | 1,011% |
| | Sandoz | 00168-0301-60 | $0.80 | $3.63 | 18-Jul-14 | 356% |
| | Hi-Tech | 50383-0270-60 | $0.37 | $3.63 | 9-Aug-14 | 876% |

| Clobetasol Cream | | | | | | |
|---|---|---|---|---|---|---|
| Strength | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
| 15gm | Taro | 51672-1258-01 | $0.38 | $6.84 | 3-Jun-14 | 1684% |
| | Sandoz | 00168-0163-15 | $0.73 | $6.84 | 18-Jul-14 | 833% |
| | Hi-Tech | 50383-0267-15 | $0.37 | $6.84 | 9-Aug-14 | 1,732% |
| | Actavis | 00472-0400-15 | * | $6.84 | 10-Mar-15 | * |
| 30gm | Taro | 51672-1258-02 | $0.33 | $6.84 | 3-Jun-14 | 1,993% |
| | Sandoz | 00168-0163-30 | $0.50 | $6.84 | 18-Jul-14 | 1,268% |
| | Hi-Tech | 50383-0267-30 | $0.32 | $6.84 | 9-Aug-14 | 2,026% |
| | Actavis | 00472-0400-30 | * | $6.84 | 10-Mar-15 | * |
| 45gm | Taro | 51672-1258-06 | $0.33 | $6.84 | 3-Jun-14 | 1,971% |

---

[54] For ease of reference, WAC prices are rounded to the nearest cent, but the percentage increases are calculated on the actual reported WACs.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| Clobetasol Cream | | | | | | |
|---|---|---|---|---|---|---|
| **Strength** | **Defendant** | **NDC** | **Old WAC** | **New WAC** | **Date of Increase** | **Percentage Increase** |
| | Sandoz | 00168-0163-46 | $0.59 | $6.84 | 18-Jul-14 | 1,057% |
| | Hi-Tech | 50383-0267-45 | $0.31 | $6.84 | 9-Aug-14 | 2,138% |
| | Actavis | 00472-0400-45 | * | $6.84 | 10-Mar-15 | * |
| 60gm | Taro | 51672-1258-03 | $0.32 | $6.12 | 3-Jun-14 | 1,832% |
| | Sandoz | 00168-0163-60 | $0.50 | $6.12 | 18-Jul-14 | 1,124% |
| | Hi-Tech | 50383-0267-60 | $0.29 | $6.12 | 9-Aug-14 | 2,016% |
| | Actavis | 00472-0400-60 | * | $6.12 | 10-Mar-15 | * |

| Clobetasol Gel | | | | | | |
|---|---|---|---|---|---|---|
| **Strength** | **Defendant** | **NDC** | **Old WAC** | **New WAC** | **Date of Increase** | **Percentage Increase** |
| 15gm | Taro | 51672-1294-01 | $0.60 | $8.87 | 3-Jun-14 | 1,367% |
| | Sandoz | 00168-0293-15 | $1.16 | $8.87 | 18-Jul-14 | 665% |
| | Hi-Tech | 50383-0269-15 | $0.60 | $8.87 | 9-Aug-14 | 1,387% |
| 30gm | Taro | 51672-1294-02 | $0.42 | $7.41 | 3-Jun-14 | 1,667% |
| | Sandoz | 00168-0293-30 | $0.79 | $7.41 | 18-Jul-14 | 840% |
| | Hi-Tech | 50383-0269-30 | $0.39 | $7.41 | 9-Aug-14 | 1,809% |
| 60gm | Taro | 51672-1294-03 | $0.50 | $7.41 | 3-Jun-14 | 1,847% |
| | Sandoz | 00168-0293-60 | $0.73 | $7.41 | 18-Jul-14 | 922% |
| | Hi-Tech | 50383-0269-60 | $0.35 | $7.41 | 9-Aug-14 | 2,008% |

| Clobetasol Ointment | | | | | | |
|---|---|---|---|---|---|---|
| **Strength** | **Defendant** | **NDC** | **Old WAC** | **New WAC** | **Date of Increase** | **Percentage Increase** |
| 15gm | Taro | 51672-1259-01 | $0.38 | $8.29 | 3-Jun-14 | 2,063% |
| | Sandoz | 00168-0162-15 | $0.73 | $8.29 | 18-Jul-14 | 1,031% |
| | Hi-Tech | 50383-0268-15 | $0.37 | $8.29 | 9-Aug-14 | 2,121% |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| Clobetasol Ointment | | | | | | |
|---|---|---|---|---|---|---|
| Strength | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
| 30gm | Taro | 51672-1259-02 | $0.33 | $6.93 | 3-Jun-14 | 2,020% |
| | Sandoz | 00168-0162-30 | $0.50 | $6.93 | 18-Jul-14 | 1,285% |
| | Hi-Tech | 50383-0268-30 | $0.32 | $6.93 | 9-Aug-14 | 2,053% |
| 45gm | Taro | 51672-1259-06 | $0.33 | $7.38 | 3-Jun-14 | 2,135% |
| | Sandoz | 00168-0162-46 | $0.59 | $7.38 | 18-Jul-14 | 1,149% |
| | Hi-Tech | 50383-0268-45 | $0.31 | $7.38 | 9-Aug-14 | 2,316% |
| 60gm | Taro | 51672-1259-03 | $0.32 | $6.93 | 3-Jun-14 | 2,087% |
| | Sandoz | 00168-0162-60 | $0.50 | $6.93 | 18-Jul-14 | 1,285% |
| | Hi-Tech | 50383-0268-60 | $0.29 | $6.93 | 9-Aug-14 | 2,295% |

| Clobetasol Solution | | | | | | |
|---|---|---|---|---|---|---|
| Strength | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
| 25 ml | Taro | 51672-1293-02 | $0.50 | $3.30 | 3-Jun-14 | 562% |
| | Hi-Tech | 50383-0266-25 | $0.48 | $3.30 | 9-Aug-14 | 588% |
| | Morton Grove | 60432-0133-25 | $0.25 | $2.60 | 2-Sep-14 | 932% |
| | Actavis | 00472-0402-25 | * | $3.30 | 22-Jun-15 | * |
| 50ml | Taro | 51672-1293-03 | $0.48 | $3.30 | 3-Jun-14 | 587% |
| | Sandoz | 00168-0269-50 | $0.64 | $3.30 | 18-Jul-14 | 416% |
| | Hi-Tech | 50383-0266-50 | $0.46 | $3.30 | 9-Aug-14 | 618% |
| | Morton Grove | 60432-0133-50 | $0.25 | $2.60 | 2-Sep-14 | 953% |
| | Actavis | 00472-0402-50 | * | $3.30 | 22-Jun-15 | * |

97.     Defendants' increases in Clobetasol WAC prices were accompanied by corresponding increases in Defendants' NSP prices. On average, Hi-Tech, Sandoz, Taro, and

Wockhardt ███████████████████████████████████

███████████████████████████████████████

████████████████████  ███████████████████████

████████████████████  ███████████████████████

█████████████████████████

98.     The following graphs show the IMS NSP prices charged by Defendants for Clobetasol.



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



42
PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



43
PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

99.     Defendants' increases in the overall per-unit prices of Clobetasol resulted in corresponding price increases for different dosages of each formulation, *e.g.*, 15mg or 60mg tubes of cream, or 25ml or 50ml bottles of solution.

100.    Defendants' price increases for Clobetasol resulted in corresponding increases to the prices paid by Plaintiffs and members of the proposed Classes because increased WAC prices translate to increases in the transaction prices paid by End-Payers

101.    No competitive justifications explain these abrupt shifts in pricing conduct.

102.    The price increases cannot be attributed to the need to fund research and development.  Generic pharmaceutical firms do not incur the large research and development costs that brand firms absorb in developing new drugs.  Moreover, the costs associated with developing and obtaining FDA approval for Clobetasol were incurred more than 25 years ago when the drug was first introduced to the market.

103.    Changes in ingredient costs also do not explain Defendants' price increase; the prices for five formulations of clobetasol propionate not at issue in this case (foam, emollient foam, lotion, shampoo, and spray) remained comparatively stable, even though they have the same active ingredient as the formulations that experienced dramatic price increases.

104.    Defendants' enormous price increases were not due to supply disruptions.  With regard to drug shortages, federal law requires drug manufacturers to report potential shortages to the FDA, the reasons therefor, and the expected duration of the shortage.[55]  Clobetasol is not included on the FDA's list of Current and Resolved Drug Shortages and Discontinuations Reported to FDA.  Clobetasol has not appeared in the American Society of Health-System

---

[55] *See* FDA website, *available at* http://www.fda.gov/Drugs/DrugSafety/DrugShortages/ucm050796.htm#q

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Pharmacists Current Shortage Bulletins since July 3, 2012, and it does also not appear on the list of Resolved Shortage Bulletins (which includes drug shortages dating back to August 2010).

105.    There were also no significant decreases in Defendants' overall sales volume that might indicate a shortage in the availability of Clobetasol's active ingredient or evidence of lack of market-wide capacity.  During Hi-Tech's March 8, 2013 earnings call, for example, its CEO David Seltzer stated that the company "happen[ed] to be doing a significant amount of topicals than – compared to several years ago.  So we have the Clobetasol items that we pretty much brought all in-house on the manufacturing side."  He also explained that the company's addition of new machinery for "creams and ointments" would give the company "a tremendous amount of capacity going forward."

106.    Defendants' Clobetasol price increases are also not explained by the entry or exit of competitors from the marketplace.  No significant sellers entered or left the Clobetasol market between January 2011 and June 2014, and between the end of 2012 and June 2014 there was no significant shift in Defendants' relative market shares.  Prior to the price increases, the same group of manufacturers—the Defendants in this case—had been selling Clobetasol at the same relatively low prices for at least three years.

107.    Likewise, no unique features or circumstances of the topical corticosteroid market explain Defendants' price increases.  Prices for many other comparable topical corticosteroid products (including certain products manufactured by Defendants) remained stable while Clobetasol prices skyrocketed.  The price of halobetasol cream, for instance—which like Clobetasol is a Class I topical corticosteroid—has been stable since November 2013, ranging from an average of $2.97 and $3.38 per unit, and did not increase in June 2014.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

108.    Instead, anticompetitive activity explains the skyrocketing Clobetasol prices.  As Richard Evans at Sector & Sovereign Research recently wrote: "[a] plausible explanation [for price increases of generic drugs] is that generic manufacturers, having fallen to near historic low levels of financial performance, are cooperating to raise the prices of products whose characteristics – low sales due to either very low prices or very low volumes –accommodate price inflation."[56]

**D.    Activities with Respect to the Clobetasol Conspiracy**

109.    Defendants engaged in a conspiracy to raise, fix and stabilize the prices of Clobetasol.  Defendants' reached agreement to raise their prices, and beginning in June 2014 implemented the price hikes described above, with Actavis and Perrigo joining the conspiracy and agreeing to sell their products at the same elevated prices as their co-conspirators.  This pricing behavior marked a drastic departure from Defendants' previous pricing practices with respect to Clobetasol, and it had the intended and actual effect of causing Plaintiffs and the other members of the proposed Class to pay artificially inflated prices above prices that would have existed if a competitive market had determined prices for Clobetasol.

110.    The price increases closely followed Defendants' participation in a workshop hosted by the Generic Pharmaceutical Association (GPhA) in North Bethesda, Maryland on June 3 and June 4, 2014.  According to GPhA records, representatives of the following Defendants attended the June 2014 GPhA workshop: Actavis, Fougera Pharmaceuticals Inc., Sandoz Inc., Hi-Tech Pharmacal, Morton Grove Pharmaceuticals, Inc., Perrigo Company, and Taro Pharmaceuticals USA, Inc.  In the months prior to implementing their agreement, Defendants

---

[56] *See* Ed Silverman, *Generic Drug Prices Keep Rising, but is a Slowdown Coming?* Wall St. J. (Apr. 22, 2015), *available at* http://blogs.wsj.com/pharmalot/2015/04/22/generic-drug-prices-keep-rising-but-is-a-slowdown-coming.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

also attended the annual meetings of the GPhA in February 2014 and the National Association of Chain Drug Stores (NACDS) in April 2014.  Prior to selling their Clobetasol products at elevated prices, Actavis and Perrigo attended trade association meeting with the other Defendants, including GPhA meetings in February 2015, June 2015, and February 2016.

111.    In a competitive market, sellers have incentives to cut prices to maintain or increase market share.  It would be economically irrational for an individual seller to drastically increase prices without assurances that its rivals would do the same.  Absent such assurances, the seller would risk a loss of market share that would more than offset the higher prices it was charging.  Defendants knew that they would not lose market share, however, because they had agreed to each raise prices so that customers had no cheaper source of supply and had no choice but to pay the skyrocketing prices for Clobetasol.  As such, increasing prices would be economically irrational for a single Defendant, but increasing prices together as a result of collusion, however, proved extremely profitable for Defendants.  The same is true with respect to late market entrants like Actavis and Perrigo: in the absence of collusion, it would have been economically irrational for them to match the other Defendants' prices instead of competing on price to gain market share.

112.    Sandoz facilitated Defendants' price-fixing scheme by ensuring that its sales of Temovate—the brand name version of Defendants' Clobetasol products that are at issue in this case—did not impair Defendants' ability to increase the prices of their generic products.

113.    ███████████████████████████████████████████████

███████████████████████████████████ In the months before Defendants raised

Clobetasol prices in June 2014, ███████████████████████████████

███████████████████████████████████████████████

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████    ████████████████████

████████████████████████████████ Sandoz ensured that its branded

Temovate cream and ointment products would not undercut the supracompetitive prices for

generic Clobetasol cream and ointment that Defendants began charging in June 2014.

114.     In late 2014 and 2015, the sales volume for Temovate cream and ointment

████████████████████████████.  In response, rather than continuing to sell a competitor to

the cartel's price-fixed generic products, Sandoz notified the FDA that it was discontinuing its

sales of Temovate cream and ointment on or before June 2015 and March 2016, respectively,

and the products' sales volumes rapidly declined thereafter.

115.     Absent a price-fixing agreement, Sandoz's decision to discontinue its sales of

Temovate cream and ointment would have been against its economic self-interest.

**E.     Defendants' Conspiracy**[57]

116.     During the Class Period, Defendants conspired, combined, and contracted to fix,

raise, maintain, and stabilize prices, rid bids, and engage in market allocation for Clobetasol,

which had the intended and actual effect of causing Plaintiffs and the other members of the

proposed Class to pay artificially inflated prices above prices that would exist if a competitive

market had determined prices for Clobetasol.

---

[57] The allegations included in this section pertaining to the HDMA, ECRM, MMCAP, and NACDS are based in part upon documents produced to plaintiffs pursuant to subpoenas *duces tecum* issued in *In re Propranolol Antitrust Litigation*, No. 16-cv-9901 (S.D.N.Y.).

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

117.     Beginning in June 2014, Defendants collectively caused the price of Clobetasol to increase dramatically.  Defendants' conduct cannot be explained by normal competitive forces. It was the result of an agreement among Defendants to increase pricing and restrain competition for the sale of Clobetasol in the United States.  The agreement was furthered by discussions held at meetings and industry events hosted by the GPhA, HDMA, MMCAP, NACDS, and ECRM as well as other meetings and communications.

118.     To sustain a conspiracy, conspirators often communicate to ensure that all are adhering to the collective scheme.  Here, such communications occurred primarily through (1) trade association meetings and conferences, (2) private meetings, dinners, and outings among smaller groups of employees of various generic drug manufacturers, and (3) individual private communications between and among Defendants' employees through use of the phone, electronic messaging and similar means.

119.     These secret, conspiratorial meetings, discussions, and communications helped to ensure that all Defendants agreed to participate in, implement, and maintain an unlawful bid-rigging, price fixing, and market and customer allocation scheme.

120.     The industry intelligence-gathering reporting firm *Policy and Regulatory Report* has reportedly obtained information regarding the investigation of generic drug companies by DOJ, and has indicated that DOJ is investigating the extent to which trade associations and industry conferences have been used as forums for collusion among competing generic drug companies.[58]   The State AGs have similarly noted the centrality of trade associations and industry conferences in their investigation, stating that they have uncovered evidence that certain

---

[58] Eric Palmer, *Actavis gets subpoena as DOJ probe of generic pricing moves up food chain*, FIERCEPHARMA (Aug. 7, 2015), *available at* http://www.fiercepharma.com/story/actavis-gets-subpoena-doj-probe-generic-pricing-moves-food-chain/2015-08-07.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

generic drug companies "routinely coordinated their schemes through direct interaction with their competitors at industry trade shows, customer conferences, and other events, as well as through direct email, phone, and text message communications."[59]

121.    Defendants were members of numerous trade associations, which they used to facilitate their conspiratorial communications and implement their anticompetitive scheme to raise, maintain, and stabilize prices, rig bids, and engage in market allocation for Clobetasol, including, but not limited to, GPhA, the NACDS, and HDMA.  In addition, Defendants regularly attended industry events hosted by the MMCAP and the ECRM.

122.    The GPhA (now called the Association for Accessible Medicines) is the "leading trade association for manufacturers and distributors of generic prescription drugs."[60]  GPhA was formed in 2000 from the merger of three industry trade associations: the Generic Pharmaceutical Industry Association, the National Association of Pharmaceutical Manufacturers, and the National Pharmaceutical Alliance.

123.    GPhA's website touts, "[b]y becoming part of GPhA, you can participate in shaping the policies that govern the generic industry" and lists its "valuable membership services, such as business networking opportunities, educational forums, access to lawmakers and regulators, and peer-to-peer connections."[61]  GPhA's "member companies supply approximately 90 percent of the generic prescription drugs dispensed in the U.S. each year."

---

[59] Connecticut AG, Press Release, (Mar. 1, 2017), *available at* http://www.ct.gov/ag/cwp/view.asp?Q=590616&A=2341.

[60]GPhA website, *The Association*, *available at* http://web.archive.org/web/20150413013801/http://www.gphaonline.org:80/about/the-gpha-association.

[61]GPhA website, *Membership*, *available at* http://web.archive.org/web/20150413013008/http://www.gphaonline.org:80/about/membership/

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

124.    Defendants Actavis, Fougera, Perrigo, Sandoz, and Wockhardt were regular members of the GPhA during the Class Period.  Regular members "are corporations, partnerships or other legal entities whose primary United States business derives the majority of its revenues from sales of (1) finished dose drugs approved via ANDAs; (2) products sold as authorized generic drugs; (3) biosimilar/biogeneric products; or (4) DESI products."[62]

125.    Several of Defendants' high-ranking corporate officers have served on GPhA's Board of Directors before and during the Class Period:

a.    **2012 Board of Directors:** Don DeGolyer, President and CEO, Sandoz, Inc.; David Klaum, Senior Vice President & General Manager, Fougera; Doug Boothe, President & CEO of Actavis;

b.    **2013 Board of Directors:** Don DeGolyer, President and CEO, Sandoz, Inc.; Doug Boothe, Executive Vice President and General Manager, Perrigo Pharmaceuticals; Charlie Mayr, Chief Communications Officer – Global, Actavis, Inc.;

c.    **2014 Board of Directors:** Doug Boothe, then-Executive Vice President and General Manager, Perrigo Pharmaceuticals; Peter Goldschmidt, President Sandoz, US & Head, North America;

d.    **2015 Board of Directors:** Doug Boothe, Executive Vice President and General Manager, Perrigo Pharmaceuticals; Peter Goldschmidt, President Sandoz, U.S. Head, North America;

---

[62] *Id.*

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

e.    **2016 Board of Directors:** Richard Stec, VP, Prescription Business, Research,

Development, and Regulatory Affairs at Perrigo; Peter Goldschmidt, President

Sandoz, US & Head, North America.

126.    In addition, former Heritage CEO, Jeffrey Glazer, who pleaded guilty to federal

criminal charges relating to price fixing and other anticompetitive activity concerning generic

drugs, also served on GPhA's board of directors.

127.    The NACDS is a national trade association representing chain community

pharmacies.   Its members include generic drug manufacturers, wholesalers, and retail chain

pharmacies. NACDS holds regular industry events, including annual and regional conferences,

which Defendants and other generic drug manufacturers attended, including the annual Total

Store Expo.

128.    The HDMA is a national trade association that represents "primary

pharmaceutical distributors" which links the nation's drug manufacturers and more than 200,000

pharmacies, hospitals, long-term care facilities, and clinics.[63]   HDMA holds regular conferences

where its members, including generic drug manufacturers, meet to discuss various issues

affecting the pharmaceutical industry.   HDMA members during the Class Period have included

Defendants Actavis, Sandoz, and Wockhardt.

129.    According to its website, MMCAP is a "free, voluntary group purchasing

organization for government facilities that provide healthcare services.   MMCAP has been

delivering pharmacy and healthcare value to members since 1985.   MMCAP's membership

extends across nearly every state in the nation, delivering volume buying power.   Members

receive access to a full range of pharmaceuticals and other healthcare products and services; such

---

[63] HDA, About, *available at* https://www.healthcaredistribution.org/about.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

as, medical supplies, influenza vaccine, dental supplies, drug testing, wholesaler invoice auditing and returned goods processing."

130.    MMCAP's Charter provides that "[i]n 1989, the Minnesota Department of Administration, an agency of the State of Minnesota, began a cooperative purchasing venture program to procure pharmaceutical products at the best price possible for the benefit of any other state interested in participating in the program . . . In 1996, the cooperative purchasing venture was named Minnesota Multistate Contracting Alliance for Pharmacy . . . and currently provide healthcare-related contracting to state and local government members located across the United State of America.  Total purchasers by MMCAP member facilities for all MMCAP programs exceed $1 billion annually . . . ."

131.    According to its website, ECRM conducts Efficient Program Planning Sessions that are made up of one-on-one strategic meetings that connect decision makers in an effort to maximize time, grow sales, and uncover industry trends.

132.    At annual meetings organized by ECRM, generic drug manufacturers have scheduled meetings with generic drug buyers at chain drug stores, supermarkets, mass merchants, wholesalers, distributors, and buy groups for independents.

133.    Representatives of Defendants Actavis, Hi-Tech, Akorn, Sandoz, Perrigo, Taro, and Wockhardt, attended ECRM's Efficient Program Planning Sessions.

134.    As further set forth below, meetings and events hosted by the GPhA, HDMA, NACDS, MMCAP, and ECRM were frequently held during the Class Period and attended by high-level representatives from each Defendant, including employees with price-setting authority.

135.    For example, on April 20-23, 2013, NACDS held its 2013 Annual Meeting in Palm Beach, Florida.  NACDS's 2013 Annual Meeting was attended by at least Defendants Actavis, Perrigo, Sandoz, Taro, and Wockhardt, including at least the following key executives:

(a)    **Actavis:** Paul Bisaro, Board Member; Andrew Boyer, President and CEO, North America Generics; Sigurdur Olafsson, President and CEO, Global Generics Medicines; Robert Stewart, Chief Operating Officer; Michael Baker, EVP of Trade Sales and Development; Paul Reed, Sr. Director of Trade Sales and Development;

(b)    **Perrigo:** Joseph Papa, Chairman and CEO; Doug Boothe, President of Generics Division; John Wesolowski, Acting General Manager; Jim Tomshack, Sr. VP of Sales; Philip Willis, Innovation and Marketing Strategy;

(c)    **Sandoz:** Donald DeGolyer, CEO & Board Director; Jeff George, Global Head of Sandoz; Richard Tremonte, Sr. VP, Global Generic Pharmaceuticals;

(d)    **Taro**: Jim Kedrowski, Interim CEO; Michael Perfetto, Chief Commercial Officer for Generic RX/OTC, US and Canada; Ara Aprahamian, VP of Sales & Marketing; and

(e)    **Wockhardt:** Michael Craney, President of Sales & Marketing.

136.    On June 4-5, 2013, GPhA held a meeting in Bethesda, Maryland, which was attended by at least Defendants Actavis, Fougera, Hi-Tech, Morton Grove, Perrigo, Sandoz, and Taro, including at least the following key executives.

137.    On August 10-13, 2013, NACDS held its 2013 Total Store Expo at the Sands Expo Convention Center in Las Vegas, Nevada.  The 2013 NACDS Total Store Expo was

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

attended by at least Defendants Actavis, Akorn, Perrigo, Sandoz, Taro, and Wockhardt, including at least the following key executives:

(a) **Actavis:** Andrew Boyer, President and CEO, North America Generics; Michael Reed, Executive Director of Trade Relations; Anthony Giannone, Executive Director, Sales; Marc Falkin, Senior Vice President, Sales; Michael Baker, EVP of Trade Sales and Development; Richard Rogerson, Sr. Director of New Products, Business Analytics, and Systems; Napolean Clark, Vice President, Marketing; Michael Dorsey, Director, National Accounts; Maureen Meehan, Director, National Accounts;

(b) **Akorn:** John Sabat, Sr. VP of National Accounts; M. Tranter, National Accounts Manager, Sales and Marketing; Mick McCanna, Account Manager;

(c) **Perrigo:** H. James Booydegraaff, Associate Director, Marketing; Andrea Felix, National Account Executive; Kara Goodnature, Marketing Manager; Ori Gutwerg, National Account Executive; Pete Haakenstad, National Account Manager; Katie McCormack, National Account Manager; Richard McWilliams, Senior Vice President & General Manager; Tony Polman, National Account Executive;

(d) **Sandoz:** Peter Goldschmidt, President of Sandoz US and Head, North America; Christopher Bihari, Director, Key Customers; Steven Greenstein, Director, Key Customers; Armando Kellum, VP of Sales and Marketing; Paul Krauthauser, Sr. VP of Sales and Marketing; Della Lubke, National Account Executive;

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(e)     **Taro:** Ara Aprahamian, VP of Sales and Marketing; Howard Marcus, VP of Sales and Marketing; Michael Perfetto, Chief Commercial Officer Generic RX/OTC, US and Canada; Doug Statler, Sr. Director/Head of Sales; and

(f)     **Wockhardt:** Karen Andrus, Director of Sales; Michael Craney, President of Sales and Marketing; Sunil Khera, President, The Americas, Japan and Emerging Markets; Kevin Knarr, VP of Sales and Marketing; Scott Koenig, VP of Sales and Marketing, Generics; Bob Watson, VP of National Accounts.

138.    On February 19-21, 2014, GPhA held its Annual Meeting at the JW Marriott in Orlando, Florida that was attended by representatives from Defendants, including Actavis, Sandoz, Hi-Tech, Perrigo, Taro, and Wockhardt.

139.



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



140.    On April 26-29, 2014, NACDS held its 2014 annual meeting in Scottsdale, Arizona.  NACDS's 2014 annual meeting was attended by representatives from Defendants, including at least the following key executives for generic drug sales and pricing:

(a)    **Actavis**: Andrew Boyer, Senior Vice President (Generic Sales, Marketing, National Accounts); Marc Falkin, Vice President (Marketing, Pricing and Contracts); ); Paul Bisaro, Board Member; Robert Stewart, Chief Operating Officer; Michael Reed, Executive Director of Trade Relations; and Paul Reed, Senior Director of Trade Sales and Development;

(b)    **Perrigo**: Doug Boothe, President Generics Division; Tony Polman, National Account Executive; John Wesolowski, Acting General Manager;

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(c)     **Sandoz**: Peter Goldschmidt, President Sandoz, US & Head, North America; Steven Greenstein, Director, Key Customers; Anuj Hasija, Executive Director Key Customers; Armondo Kellum, Vice President, Sales and Marketing; Kirko Kirkov, Executive Director, Key Customers; Scott Smith, VP Sales & Marketing;

(d)     **Taro**: Ara Aprahamian, Vice President, Sales & Marketing; Michael Perfetto, Chief Commercial Officer Generic RX/OTC, US and Canada; Alex Likvornik, Senior Director, Strategic Pricing and Marketing; Michael Perfetto, Chief Commercial Officer for Generic RX/OTC; and

(e)     **Wockhardt**: Michael Craney, President of Sales & Marketing.

141.    On June 1-4, 2014, the HDMA held a BLC at the JW Marriott Desert Ridge in Phoenix, Arizona.  The June 1-4, 2014 BLC was attended by representatives from Defendants, including at least the following key executives for generic drug sales and pricing:

(a)     **Actavis**: Anthony Giannone, Executive Director, Sales; Marc Falkin, Senior Vice President Sales, U.S. Generics;

(b)     **Hi-Tech:** Jonathan Kafer, Senior Director;

(c)     **Sandoz:** Lisa Badura, Director National Accounts – Sales; Anuj Hasija, Key Account Executive Director; Kirko Kirkov, Executive Director, Key Accounts; Ryan Alan, Associate Director, National Accounts; Sean Walsh, Key Account Manager;

(d)     **Taro**: Anand Shah, Associate Director Sales Operations; and

(e)     **Wockhardt**: Karen Andrews, Director of Sales; Scott Koenig, Associate Vice President, Retail Generics.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

142.     On June 3-4, 2014, GPHA held a meeting at the Bethesda North Marriott Hotel in Bethesda, Maryland that was attended by representatives from all Defendants, including Actavis, Fougera, Perrigo, Sandoz, Hi-Tech, and Taro.

143.     On August 23-26, 2014, NACDS held its 2014 Total Store Expo at the Boston Convention Center in Boston, Massachusetts.  NACDS's August 2014 Total Store Expo was attended by representatives from all Defendants, including the following key executives for generic drug sales and pricing:

(a)     **Actavis**: Andrew Boyer, Senior Vice President (Generic Sales, Marketing, National Accounts); Marc Falkin, Vice President (Marketing, Pricing and Contracts); Richard Rogerson, Executive Director (Pricing & Business Analytics David Buchen, EVP of Commercial, North American Generic and International; Anthony Giannone, Executive Director of Sales; Napoleon Clark, Vice President of Marketing; Christina Koleto, Senior Manager of Pricing;

(b)     **Hi-Tech:** Ed Berrios, VP, Sales and Marketing - Hi-Tech Pharmacal Co., Inc.; Michael Corley, VP, National Accounts; Thomas Kronovich, VP, National Accounts; Bruce Kutinsky, Chief Operating Officer; Mick McCanna, Executive Director of National Accounts; Raj Rai Chief, Executive Officer; John Sabat, Senior Vice President of National Accounts; M. Tranter, National Accounts Manager, Sales & Marketing;

(c)     **Perrigo**: Doug Boothe, President Generics Division; H. James, Booydegraaff, Associate Director, Marketing; Ori Gutwerg, National Account Executive; Katie McCormack, National Account Manager; Richard McWilliams, Senior Vice President & General Manager; Kristine Norman, Account Executive; Tony

Polman, National Account Executive; John Wesolowski, Acting General Manager;

(d) **Sandoz**: Lisa Badura, Director, Key Customers; Christopher Bihari, Director, Key Customers; Steven Greenstein, Director, Key Customers; Anuj Hasija, Executive Director Key Customers; Armondo Kellum, Vice President, Sales and Marketing; Della Lubke, National Account Executive; Scott Smith, VP Sales & Marketing; Arunesh Verma, Executive Director Marketing; Sean Walsh, Director, Key Customers;

(e) **Taro**: Ara Aprahamian, Vice President, Sales & Marketing; Scott Brick, Manager, National Accounts; Kevin Kriel, Executive Director, Marketing & Business Development, US and Canada; Christopher Urbanski, Director, Corporate Accounts;

(f) **Wockhardt**: Karen Andrus, Director of Sales; Michael Craney, President of Sales & Marketing; Sunil Khera, President-The Americas, Japan & Emerging Markets; Scott Koenig, Vice President Sales and Marketing, Generics; Joe Niemi, Manager, National Accounts; Bob Watson, Vice President, National Accounts.

144.    On October 27-29, 2014, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Defendants Actavis, Sandoz, Fougera, Perrigo, Taro, and Wockhardt.

145.    On December 3, 2014, NACDS held its 2014 NYC Week and annual foundation dinner in New York City, which was attended by the following representatives from Defendants, who were key executives for generic drug sales and pricing:

(a)   **Actavis**: Andrew Boyer, Senior Vice President (Generic Sales, Marketing, National Accounts); Marc Falkin, Vice President (Marketing, Pricing and Contracts); Brent Saunders, President, CEO and Chairman;

(b)   **Sandoz:** Armando Kellum, VP, Sales & Marketing; Scott Smith, VP, Sales & Marketing;

(c)   **Perrigo:** Christopher Kapral, SVP, Consumer Healthcare Sales.

146.   Representatives from Defendants Actavis, Sandoz, Akorn, Perrigo, Taro, and Wockhardt also attended the GPhA Annual Meeting in Miami Beach, Florida on February 9-11, 2015.

147.



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(d) 

148.    On April 25-28, 2015, NACDS held its 2015 annual meeting at The Breakers, Palm Beach, Florida. NACDS's 2015 annual meeting was attended by representatives from all Defendants, including at least the following key executives for generic drug sales and pricing:

(a)     **Actavis**: Andrew Boyer, Senior Vice President (Generic Sales, Marketing, National Accounts); Marc Falkin, Vice President (Marketing, Pricing and Contracts);

(b)     **Akorn:** Rai Raj, CEO; Bruce Kutinsky, COO;

(c)     **Perrigo:** Doug Boothe, President Generic Division; Christopher Kapral, SVP, Consumer Healthcare Sales; Andy Kjellberg, VP Consumer Healthcare Sales; Mark, Walin, VP Consumer Healthcare Sales; Michael Yacullo, VP Consumer Healthcare Sales;

(d)     **Sandoz:** Peter Goldschmidt, President Sandoz US & Head, North America; Armando Kellum, VP, Sales & Marketing; Scott Smith, VP Sales & Marketing; Arunesh Verma, Executive Director, Marketing; Anuj Hasija, Executive Director, Ket Accounts; Kirko Kirkov, Executive Director, Key Customers;

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(e)     **Taro:** Ara Aprahamian, VP Sales & Marketing; and

(f)     **Wockhardt:** Michael Craney, President, Sales & Marketing; Sunil Khera, President, The Americas, Japan, and Emerging Markets.

149.   The June 7-10, 2015 HDMA BLC was held in San Antonio, Texas.  The June 2015 BLC included a networking event sponsored by Mylan.  The June 2015 BLC was attended by representatives from Defendants, including the key executives for generic drug sales and pricing:

(a)     **Actavis**: Andrew Boyer, Senior Vice President, Generic Sales and Marketing; Marc Falkin, Senior Vice President, U.S. Generics; Richard Rogerson, Executive Director, Pricing & Business Analytics, Sales Marketing Generics; Anthony J. Giannone, Executive Director, Sales;

(b)     **Sandoz:** Arunesh Verma, Executive Director, Marketing; Anuj Hasija, Executive Director, Key Accounts; Kirko Kirkov, Executive Director, Key Customers;

(c)     **Wockhardt:** Karen Andrus, Director of Sales.

150.   On June 9-10, 2015, GPHA held a meeting in Bethesda, Maryland that was attended by representatives from Defendants Actavis, Fougera, Sandoz, Perrigo, Taro, and Wockhardt.

151.   On August 22-25, 2015, NACDS held its 2015 Total Store Expo at the Denver Convention Center in Denver, Colorado.  NACDS's August 2015 Total Store Expo was attended by representatives from all Defendants, including the following key executives for generic drug sales and pricing:

(a)     **Actavis**: Andrew Boyer, Senior Vice President (Generic Sales, Marketing, National Accounts); Marc Falkin, Vice President (Marketing, Pricing and

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Contracts); Richard Rogerson, Executive Director (Pricing & Business Analytics);

(b) **Akorn:** Brett Novak, SVP Sales & Marketing; Jonathan Kafer, EVP, Sales & Marketing; Bruce Kutinsky, COO; Mick McCanna, Account Manager; Scott Tranter, National Account Manager, Sales & Marketing;

(c) **Perrigo:** Doug Boothe, President Generic Division; Christopher Kapral, SVP, Consumer Healthcare Sales; Andy Kjellberg, VP Consumer Healthcare Sales; Mark, Walin, VP Consumer Healthcare Sales; Michael Yacullo, VP Consumer Healthcare Sales;

(d) **Sandoz:** Scott Smith, VP Sales & Marketing; Arunesh Verma, Executive Director, Marketing; Anuj Hasija, Executive Director, Key Accounts; Kirko Kirkov, Executive Director, Key Customers;

(e) **Taro:** Ara Aprahamian, VP Sales & Marketing; Alex Likvornik, Sr. Director, Strategic Pricing & Marketing; and

(f) **Wockhardt:** Michael Craney, President, Sales & Marketing; Sunil Khera, President, The Americas, Japan, and Emerging Markets; Karen Andrews, Director of Sales; Scott Koenig, VP, Sales & Marketing, Generics; Joe Niemi, Manager, National Accounts.

152. In 2016, Defendants continued to regularly attend trade association meetings, conferences and events, including: i) the April 11-14, 2016, MMCAP National Member Conference in Bloomington, Minnesota at the Minneapolis Airport Marriott; ii) the June 12-15, 2016 HDA BLC at the Broadmoor Hotel Colorado Springs, Colorado; and iii) the August 19-22,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

2016, NACDS 2016 Total Store Expo at the San Diego Convention Center in San Diego, California.

153.    As uncovered in the State AGs' ongoing investigation, at these various conferences and trade shows, representatives from Defendants, as well as other generic drug manufacturers, discussed their respective businesses and customers.  These discussions would occur at social events, including lunches, cocktail parties, dinners, and golf outings, that usually accompanied these conferences and trade shows.  Defendants' employees used these opportunities to discuss and share upcoming bids, specific generic drug markets, pricing strategies and pricing terms in their contracts with customers.[64]

154.    In conjunction with meetings at conferences and trade shows, representatives of generic drug manufacturers get together separately, in more limited groups, allowing them to further meet face-to-face with their competitors and discuss their business.  In fact, high-level executives of many generic drug manufacturers get together periodically for what at least some of them refer to as "industry dinners."[65]

155.    A large number of generic drug manufacturers, including Defendants Actavis, Fougera, Sandoz, Taro, and Wockhardt are headquartered or have major offices in close proximity to one another in New Jersey, New York, and eastern Pennsylvania, giving them easier and more frequent opportunities to meet and collude.  For example, in January 2014, at a time when or shortly before the prices of a number of generic drug, including Amitriptyline, were soaring, at least thirteen high-ranking male executives, including CEOs, Presidents, and

---

[64] State AG Complaint at ¶¶ 50-52.

[65] *Id.* at ¶¶ 53-60.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Senior Vice Presidents of various generic drug manufacturers, met at a steakhouse in Bridgewater, New Jersey.

156.    Generic drug manufacturer employees also get together regularly for what is referred to as a "Girls' Night Out" ("GNO"), or alternatively "Women in the Industry" meetings and dinners.   During these GNOs, meetings and dinners, these employees meet with their competitors and discuss competitively sensitive information.  Several different GNOs were held in 2015, including: (1) in Baltimore, Maryland in May, and (2) at the NACDS conference in August.

157.    Through these various interactions, Defendants' employees are often acutely aware of their competition and, more importantly, each other's current and future business plans. This familiarity and opportunity often leads to agreements among competitors to fix prices or to allocate a given market so as to avoid competing with one another on price.

158.    Defendants also routinely communicate and share information with each other about bids and pricing strategy.  This can include forwarding bid packages received from a customer (*e.g.*, a Request for Proposal or "RFP") to a competitor, either on their own initiative, at the request of a competitor, or by contacting a competitor to request that the competitor share that type of information.

159.    Additionally, Defendants share information regarding the terms of their contracts with customers, including various terms relating to pricing, price protection, and rebates. Defendants use this information from their competitors to negotiate potentially better prices or terms with their customers, which could be to the ultimate detriment of consumers.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### F.      Defendants' Own Acknowledgments of Lack of Generic Drug Competition

160.    Generic pharmaceutical executives frequently spoke publicly about pricing and competition in the market.  Members of the industry publicly acknowledged that they saw competition as causing a problem that generally plagued the generic drug industry—namely, low prices.  They also recognized that extraordinary price increases were a deviation from this normal practice.

161.    Actavis's 10-K for the fiscal year ending December 31, 2014, for example, confirms that the "pharmaceutical industry is highly competitive" and that "price" is one of the "competitive factors in the pharmaceutical industry."  But on a May 11, 2015 earnings call for the first quarter of 2015, Actavis's CEO Brenton Saunders confirmed that not all of the company's products followed this basic tenant of generic drug pricing: "There are obviously a few products that go up.  But the model for generics price decreases as more competitors come into the market.  That's just the way the business works. . . . That being said, the environment has remained pretty stable and favorable.  So we don't expect that to change short term either." And during Actavis' October 29, 2013 earnings call, Actavis Director Sigurdur Olafsson stated: "But there's opportunities to take pricing increases, and that is what has changed since maybe five years ago when there wasn't an opportunity."

162.    After discussing the positive impact that price increases from Clobetasol would have, Akorn's CEO stated on its second quarter 2014 earnings call on August 5, 2014: "I think there is a general, we are seeing lot of price increases that are happening in the generic space and it affect some of our products as well. So, I would say overall, there is a healthier pricing environment than it was there, I would say six to eight months ago."

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

163.     On Akorn's third quarter 2014 earnings call on November 6, 2014, Akorn's CFO discussed its and its competitors' pricing of Clobetasol: "I mean, we did – we took the price increase they took for a reason."

164.     On May 7, 2014, Perrigo's Chairman and CEO Joseph C. Papa stated that he "absolutely agree[d] that there are some opportunities for us in different business segments."  On August 14, 2014, Mr. Papa stated during an earnings call that: "I think there are some opportunities on pricing in the Rx category."

**G.     Defendants' Concerted Efforts to Increase Prices for Clobetasol Yielded Supracompetitive Profits**

165.     Defendants' collusive price increases provided them with artificially inflated profits—profits that were funded in part by end-payers of Clobetasol.

166.     **Actavis**: According to IMS data, after entering the Clobetasol cream market █ ███████████████████████████████████████████████ ████████████████████████████ After entering the Clobetasol cream market █ ███████████████████████████████████████████████ ████████████████████████████.

167.     **Akorn**: According to IMS data, Akorn's sales of Clobetasol ████████ ███████████████████████████████████████████████ ██ ███████████████████████████████████████████ ████.

168.     In its 2014 10-K, Akorn reported a $2.7 million reduction in 2013 revenues attributable to price decreases.  In its 10-K for the year ended December 31, 2015, by contrast, Akorn reported a $109.7 million increase in 2015 revenues as compared to 2014 due to "price

changes." It reported that "Our gross profit increased by $334.7 million, an increase of 128.0% over gross profit of $261.4 million in 2014. Our overall gross profit margin was 60.5% in 2015 compared to 47.1% in 2014." According to the Wall Street Daily, "Akorn's clobetasol product contributed upwards of $100 million in total revenue for the company (*after the firm instituted a significant price increase in August 2014*)." (emphasis added).

169.    According to Akorn's February 2015 8-K, the company's "consolidated revenue for the fourth quarter was $227.8 million, an increase of 168 percent over fourth quarter 2013 revenue of $85.0 million . . .  The year-over-year increase was largely driven by . . . competitive pricing actions for products in the Akorn generic portfolio," among other things.

170.    **Perrigo**: According to IMS data, Perrigo had approximately ███████ in revenues from its sales of Clobetasol gel ████████     ████████████████████



███████████████████ Overall, according to its 2016 10-K, Perrigo's net sales attributable to pharmaceutical products increased by $41 million in 2016 as compared to 2015.

171.    **Sandoz**: According to IMS data, Sandoz's sales of Clobetasol ████████████

172.    In total, Sandoz had $9.6 billion in sales in 2014, a 7% increase over sales in 2013, with its U.S. sales increasing by 14%.[66]  Sandoz's operating income also increased, by 14%, to $1.1 billion in 2014.[67]  On July 21, 2015, Joe Jiminez—the CEO of Novartis, Sandoz's

---

[66] Novartis Q4 and FY 2014 Condensed Financial Report, *available at* https://www.novartis.com/sites/www.novartis.com/files/2015-01-interim-financial-report.pdf

[67] *Id.*

parent company—stated: "Sandoz delivered very strong financial results with sales and profit up double-digit; as you can see this is driven by the division increased focus on core markets particularly the U.S., which is up 23%."

173.    **Taro**: According to IMS data, Taro's sales of Clobetasol (ointment, solution, gel, cream, and emollient cream) ███████████████████████████████

███████████████████████████     ██████████████████████████████

███████████████████████████ .

174.    In an earnings call just a few months after increasing its Clobetasol prices, Taro's parent company reported that it was "realizing the benefits of the previous quarter's price adjustments in the current quarter," and in a 2016 20-F filing reported that its gross profits increased over $100 million between the fiscal years ending in March 2015 and March 2016— "primarily the result of the full year impact of prior year price adjustments on select products." And according to a September 13, 2016, report from the *The Economic Times*: "While Taro has been gaining approvals for its products, a significant portion of its revenue growth has come from price increases."[68]

175.    **Wockhardt**: According to IMS data, Wockhardt's sales of Clobetasol (solution only) ██████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████ .

---

[68] Divya Rajagopal, "\\*Taro Pharmaceutical Industries under anti-trust scanner for price hike*, The Economic Times (Sept. 13, 2016), *available at* http://economictimes.indiatimes.com/industry/healthcare/biotech/pharmaceuticals/taro-pharmaceutical-industries-under-anti-trust-scanner-for-price-hike/articleshow/54302910.cms.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

H.      **Factors Increasing the Market's Susceptibility to Collusion**

176.    Publicly available data on the Clobetasol market in the United States demonstrate that it is susceptible to cartelization by Defendants. Factors that make a market susceptible to collusion include: (1) a high degree of industry concentration; (2) significant barriers to entry; (3) inelastic demand; (4) the lack of available substitutes for the goods involved; (5) a standardized product with a high degree of interchangeability between the products of cartel participants; and (6) inter-competitor contacts and communication.

1.      **Industry Concentration**

177.    A high degree of concentration facilitates the operation of a cartel because it makes it easier to coordinate behavior among co-conspirators.

178.    Clobetasol propionate is available in ten different formulations.  Only five of the formulations (cream, emollient cream, ointment, gel, and solution) experienced dramatic price increases in June 2014 and are at issue in this case.  Sales of those formulations were controlled almost exclusively by Defendants at the time of the price increases, creating conditions favorable to an effective cartel:

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



179.    As the charts show, when Defendants implemented their price increases, Sandoz, Hi-Tech, and Taro collectively controlled ▮▮▮ of the emollient cream sales, over ▮▮▮ of the cream and ointment sales, and approximately ▮▮▮ of the gel sales.  Sandoz, Hi-Tech, Taro, and Wockhardt collectively controlled ▮▮▮ of the solution sales.   When Actavis entered the Clobetasol cream and solution markets, the Defendants similarly controlled each of those markets.   Likewise, before the Class Period, from December 2010 through May 2014, Defendants' sales made up about ▮▮▮ of the Clobetasol market.

180.    While the market for Clobetasol is sufficiently concentrated to facilitate collusion, the years of low and stable pricing in the market establish that the number of manufacturers in the market was sufficient to drive competition. Absent collusion, prices would have remained at competitive levels.

181.    No departures by manufacturers of Clobetasol can explain the price increases.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

182.    Defendants have been able to maintain supracompetitive prices for Clobetasol without significant loss of market share to non-conspirators.  Thus, Defendants have oligopolistic market power over Clobetasol.

183.    The magnitude of Defendants' price increases for Clobetasol distinguishes them from non-collusive oligopolistic pricing.  Non-collusive oligopolistic pricing would be expected to proceed incrementally, as manufacturers test the waters to see if competitors will follow a price increase.[69]  But here the increases are extreme – jumping as much as 1,700% in one fell swoop.  Such extreme pricing moves are not rational in the absence of advance knowledge that competitors will join the increase.

### 2.    Barriers to Entry

184.    Supracompetitive pricing in a market normally attracts additional competitors who want to avail themselves of the high levels of profitability that are available.  Where there are significant barriers to entry, however, this is more difficult and helps to facilitate the operation of a cartel.

185.    There are significant capital, regulatory, and intellectual property barriers to entry in the Clobetasol market that make entry time-consuming and expensive.  Among other things, prospective generic manufacturers must establish manufacturing processes sufficient to safely produce large amounts of bioequivalent product.  The manufacturing facilities must follow the FDA's rigorous Current Good Manufacturing Practice regulations.  These challenges can be

---

[69] Louis Kaplow, *Competition Policy and Price Fixing* (2013) at p.262 (discussing why, in the absence of cost or supply shocks, oligopolists resist "sudden and sharp" price increases, and noting, among other things, that "oligopolsits may increase prices in smaller steps because they do not fully trust each other"). *See also* Richard Posner, *Antitrust Law* (2d ed. 2001) at p.59 (discussing the various challenges faced by oligopolists when attempting to increase price and why rational economic behavior undermines the ability to effect large and parallel price increases).

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

particularly pronounced for dermatological products like Clobetasol.  As Kal Sundaram, former CEO of Taro's parent company, explained in the company's second quarter 2015 earnings call on November 4, 2015, the FDA's testing requirements for dermatological products "makes [their] development more expensive and also it takes more time."

186.   Start-up costs and regulatory oversight represent substantial barriers to entry in the generic Clobetasol market.

187.   In addition to the significant out-of-pocket costs required to bring a drug to market, the approval process for generic drugs takes significant time. As Kansas Senator Jerry Moran commented on September 21, 2016 during Congressional hearings on the FDA's role in the generic drug market, "there are more than 4,000 generic drug applications currently awaiting approval, and the median time it takes for the FDA to approve a generic is now 47 months or nearly four years."[70] In its 2014 10-K, Actavis's parent company (at the time) stated that "[t]he ANDA drug development and approval process generally takes three to four years."   This significant delay for new market entrants effectively precludes new competition from eroding the supracompetitive prices imposed by the conspiracy.

### 3.   Demand Inelasticity

188.   Price elasticity of demand is defined as the measure of responsiveness in the quantity demanded for a product as a result of change in price of the same product.  It is a measure of how demand for a product reacts to a change in price.  The basic necessities of life— food, water, and shelter—are examples of goods that experience nearly perfectly inelastic

---

[70] Sen. Moran, Statement (Sep. 21, 2016), *available at* http://www.appropriations.senate.gov/imo/media/doc/092116-Chairman-Moran-Opening-Statement.pdf

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

demand at or near the minimums necessary to sustain life.  In other words, a person on the verge of dying of thirst will pay almost anything for water.

189.    In order for a cartel to profit from raising prices above competitive levels, demand for the product must be sufficiently inelastic such that any loss in sales will be more than offset by increases in revenue on those sales that are made.  Otherwise, increased prices would result in declining sales, revenues, and profits as customers purchased substitute products or declined to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

190.    Demand for Defendants' Clobetasol products is inelastic largely because, while they are interchangeable with one another, they are not interchangeable with—and cannot be substituted for—other products given their pharmacological characteristics and regulatory status. When doctors prescribe generic Clobetasol, patients view it as necessary to their well-being. Because other products are not substitutes for Clobetasol, when Defendants increased their Clobetasol prices, consumers could not simply select less-expensive alternative products.

191.    As a result, Defendants' extraordinary price increases did not lead to corresponding decreases in sales volume that would have offset the price increases.  On Taro's second quarter 2014 earnings call on November 10, 2014, Taro's CEO stated, for example, "I don't think there will be any significant -- we have seen any significant impact of volume shifting because of price adjustments."

192.    This inelastic demand gave Defendants significant pricing power, as well as an incentive to collude.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

193.    In short, Clobetasol is an excellent candidate for cartelization because price increases will result in more revenue, rather than less, provided that most or all manufacturers participate.

### 4.    Lack of Substitutes

194.    Clobetasol is a Class I, super-high potency topical corticosteroid used to treat a wide variety of skin conditions, including eczema, psoriasis, dermatitis, and vitiligo.  It is one of the most widely used dermatological drugs on the market today.

195.    There are typically no substitute drugs that afford patients the same level of efficacy as Clobetasol.   As a Class I corticosteroid, Clobetasol is much stronger than corticosteroids in Classes II-VII.  There are at most three other corticosteroids in Class I, each of which has different active ingredients—and thus different therapeutic properties, benefits, and drawbacks—than Clobetasol.

196.    Clobetasol is also often the only effective medicine when indicated.  Patients prescribed Clobetasol by their doctor consider it a medical necessity that must be purchased without regard to an increase in price.

197.    Clobetasol is also differentiated from other drug products because of its regulatory status.  A generic drug is considered a therapeutic equivalent of—and AB-rated with respect to—the Reference Listed Drug (RLD) (often the brand name version of a drug). Defendants' Clobetasol products are not therapeutically equivalent to—or AB-rated with respect to—other drug products, even similar ones.  Thus, a patient prescribed Clobetasol could not purchase a different drug using his or her Clobetasol prescription, regardless of the respective prices of the drugs.   Clobetasol cream is not, for example, therapeutically equivalent to halobetasol cream, even though both are Class I topical corticosteroid creams.  As a result, a

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

patient for whom Clobetasol cream is prescribed could not purchase halobetasol cream with the Clobetasol prescription, regardless of the respective prices of the drugs.

198.    In addition, the branded version of Clobetasol does not serve as economic substitute for generic versions of Clobetasol.  Branded products generally maintain substantial price premiums over their generic counterparts, making them inapt substitutes even when generic prices soar.  With respect to Clobetasol, as noted above, prior to the price increases for the generic Clobetasol products Sandoz discontinued Temovate emollient cream, gel, and solution and ████████████████████████████████ Temovate was therefore not an economic substitute for Clobetasol.

199.    Thus, purchasers of Clobetasol are held captive to the supracompetitive prices that resulted from Defendants' conspiracy to fix prices and allocate markets and customers.

### 5.      Standardized Product with High Degree of Interchangeability

200.    A commodity-like product is one that is standardized across suppliers and allows for a high degree of substitutability among different suppliers in the market. When products offered by different suppliers are viewed as interchangeable by purchasers, it is easier for the suppliers to agree on prices for the goods in question and to monitor those prices effectively.

201.    Generic drugs of the same chemical composition are effectively commodity products because the primary mechanism through which they compete is price. When approving an ANDA, the FDA confirms that a generic drug product is bioequivalent to the branded version of the drug.  This allows pharmacists to substitute that generic for the branded counterpart, as well as for any other generic that also is bioequivalent to the branded product.

202.    For each formulation of Clobetasol, Defendants' Clobetasol products are bioequivalent generics of their branded counterparts, enabling pharmacists to substitute them

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(any of them) for branded products. Defendants' Clobetasol cream products are thus each interchangeable, as are Defendants' Clobetasol ointment, gel, and solution products.

203.    Moreover, because Clobetasol products are interchangeable, there is little utility in attempting to distinguish the products based on quality, branding or service. Accordingly, manufacturers generally spend little effort advertising or detailing (the practice of providing promotional materials and free samples to physicians) their generic compounds. The primary means for one generic manufacturer to differentiate its product from another's is through price competition.[71] The need to compete on price can drive producers of commodity products to conspire—as they did here—to fix prices.

### 6.    Inter-Competitor Contacts and Communications

204.    As detailed above, Defendants' representatives participated in conferences and meetings organized by trade association (such as the ECRM, GPhA, HDMA, and NACDS), private industry dinners, and similar events. Moreover, Defendants are members of and/or participants of the GPhA; thus, their representatives have many opportunities to meet and conspire at industry meetings. As noted in press reports, "[P]rosecutors are taking a close look at trade associations as part of their investigation as having been one potential avenue for facilitating the collusion between salespeople at different generic producers."[72]

205.    The State AG Complaint alleges that Defendants routinely coordinated their schemes through direct interaction with their competitors at industry trade shows, customer conferences, and other events. For example, Defendants Glazer and Malek admitted at their

---

[71] *See, e.g.,* GAO Report at 23 ("If another manufacturer offers a lower price to a customer, manufacturers we interviewed indicated that they are usually asked to match it or risk losing market share to the other manufacturer.").

[72] PaRR Report.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

guilty plea hearings to engaging in discussions and attending meetings with competitors, during which they reached agreements to allocate customers, rig bids and fix prices of doxycycline hyclate and glyburide.

206.    DOJ's and the Connecticut AG's investigations, and the grand jury subpoenas and investigative demands that have issued in conjunction with them, focus on inter-competitor communications.  These types of communications are not unique or isolated, but are rampant; "[g]eneric drug manufacturers operate, through their respective senior leadership and marketing and sales executives, in a manner that fosters and promotes routine and direct interaction among their competitors."[73] The sheer number of companies implicated in the investigations highlights the prevalence in the generic drug industry of the types of contacts and communications that facilitate collusion.  In addition to Actavis, Perrigo, Sandoz, and Taro, the following companies have also been identified as targets of government investigations:

(a)    **Aurobindo**: Aurobindo has disclosed receipt of a subpoena relating to DOJ's generic drug investigation.[74] The company stated that it "received a subpoena in Mar[ch] 2016 requesting non-product specific information."[75]

(b)    **Citron**:  In December 2016, Aceto Corporation (which purchased Citron's generic drugs assets) disclosed that DOJ "executed a search warrant against the Company and also served a subpoena requesting documents and other information concerning potential

---

[73] State AG Complaint ¶ 7.

[74] Zeba Siddiqui, *India's Aurobindo shares hit nine-month low on US price-fixing lawsuit,* Reuters (Dec 16, 2016), *available at* http://www.reuters.com/article/us-aurobindo-pharm-stocks-idUSKBN1450DV

[75] Aurobindo Pharma, Ltd., BSE Disclosure (Dec. 16, 2016), *available at* http://www.bseindia.com/xml-data/corpfiling/AttachHis/3C8E03C7_A46F_4792_AED5_197E6961A77E_125855.pdf

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

antitrust violations in the sale of Glyburide, Glyburide/Metformin, and Fosinopril HCTZ products." The Connecticut AG requested that Citron produce all documents produced to DOJ.[76]

      (c)    **Dr. Reddy's**:  In November 2016, Dr. Reddy's disclosed that it received subpoenas from DOJ and the Connecticut AG "seeking information relating to the marketing, pricing and sale of certain . . . generic products and any communications with competitors about such products."[77]

      (d)    **Heritage**:  As a private company, Heritage is not required to make public disclosures.  Nonetheless, in the wake of the criminal guilty pleas by two of its executives, Heritage confirmed that it is "fully cooperating" with DOJ[78] and press reports indicate that Heritage has applied to DOJ's leniency program seeking amnesty for a cartel violation.[79]

      (e)    **Impax**:  In July 2014, Impax disclosed that it received a subpoena from the Connecticut AG concerning sales of generic digoxin.[80]  In November 2014, Impax disclosed that an employee received a broader federal grand jury subpoena that requested testimony and documents about "any communication or correspondence with any competitor (or an employee

---

[76] Aceto Corp., SEC Form 8-K, Ex. 99.5, *available at* https://www.sec.gov/Archives/edgar/data/2034/000157104916020771/t1600804_ex99-5.htm

[77] Dr. Reddy's, SEC Form 6-K (Nov. 10, 2016), *available at* http://www.drreddys.com/investors/reports-and-filings/sec-filings/?year=FY17

[78] Tom Schoenberg, David McLaughlin & Sophia Pearson, *U.S. Generic Drug Probe Seen Expanding After Guilty Pleas*, Bloomberg (Dec. 14, 2016), *available at* https://www.bloomberg.com/news/articles/2016-12-14/u-s-files-first-charges-in-generic-drug-price-fixing-probe

[79] *See supra* ¶16.

[80] Impax SEC Form 8-K (July 15, 2014), *available at* https://www.sec.gov/Archives/edgar/data/1003642/000143774914012809/ipxl20140715_8k.htm

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

of any competitor) in the sale of generic prescription medications."[81] In February 2016, Impax disclosed that it received a DOJ subpoena requesting "information and documents regarding the sales, marketing, and pricing of certain generic prescription medications. In particular . . . digoxin tablets, terbutaline sulfate tablets, prilocaine/lidocaine cream, and calcipotriene topical solution."[82]

        (f)    **Lannett**: In July 2014, Lannett disclosed that it received a subpoena from the Connecticut AG relating to its investigation into the price fixing of digoxin.[83] On November 3, 2014, Lannett disclosed that a Senior Vice President of Sales and Marketing was served with a grand jury subpoena "relating to a federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act." The subpoena also requested "corporate documents of the Company relating to communications or correspondence with competitors regarding the sale of generic prescription medications, but is not specifically directed to any particular product and is not limited to any particular time period."[84]   On August 27, 2015, Lannett further explained that DOJ sought, among other things, "communications or correspondence with competitors regarding the sale of generic prescription medications, and the marketing, sale, or

---

[81] Impax SEC Form 8-K (Nov. 6, 2014), *available at* https://www.sec.gov/Archives/edgar/data/1003642/000119312514402210/d816555d8k.htm

[82] Impax, SEC 2015 Form 10-K (Feb. 22, 2016), at F-53, *available at* https://www.sec.gov/Archives/edgar/data/1003642/000143774916025780/ipxl20151231_10k.htm

[83] Lannett Press Release (July 16, 2014), *available at* http://lannett.investorroom.com/2014-07-16-Lannett-Receives-Inquiry-From-Connecticut-Attorney-General

[84] Lannett, SEC Form 10-Q (Nov. 6, 2014) at 16, *available at* https://www.sec.gov/Archives/edgar/data/57725/000110465914077456/a14-20842_110q.htm

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

pricing of certain products, generally for the period of 2005 through the dates of the subpoenas."[85]

(g)    **Mayne**:  On August 25, 2016, Mayne Pharma Group Limited (the parent of Mayne) disclosed that it was "one of numerous generic pharmaceutical companies to receive a subpoena . . . seeking information relating to marketing, pricing and sales of select generic products" and that it had received a subpoena from the Connecticut AG seeking similar information.[86]  On November 4, 2016, Mayne Pharma Group Limited issued a press release stating: "Previously on 28 Jun[e] 2016, Mayne Pharma Group Limited disclosed that it was one of several generic companies to receive a subpoena from the Antitrust Division of the US Department of Justice (DOJ) seeking information relating to the marketing, pricing and sales of select generic products. The investigation relating to Mayne Pharma is focused on doxycycline hyclate delayed-release tablets (generic) and potassium chloride powders."[87]

(h)    **Mylan**:   In February 2016, Mylan disclosed that it received a DOJ subpoena "seeking information relating to . . . generic Doxycycline" and a similar subpoena from the Connecticut AG seeking "information relating to . . . certain of the Company's generic products (including Doxycycline) and communications with competitors about such products."[88]  On November 9, 2016, Mylan disclosed that "certain employees and a member of senior

---

[85] Lannett, SEC Form 10-K (Aug. 27, 2015) at 18, available at http://www.sec.gov/Archives/edgar/data/57725/000110465915062047/a15-13005_110k.htm

[86] Mayne Pharma, 2016 Annual Report (Aug. 25, 2016), at 75, *available at* https://www.maynepharma.com/media/1788/2016-mayne-pharma-annual-report.pdf

[87] Mayne Pharma, Update on DOJ Investigation (Nov. 4, 2016), *available at* http://asxcomnewspdfs.fairfaxmedia.com.au/2016/11/04/01798874-137879061.pdf

[88] Mylan, SEC 2015 Form 10-K (Feb. 16, 2016), at 160, *available at* https://www.sec.gov/Archives/edgar/data/1623613/000162361316000046/myl10k_20151231xdoc.htm

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

management, received subpoenas from the DOJ seeking additional information relating to the marketing, pricing and sale of our generic Cidofovir, Glipizide-metformin, Propranolol and Verapamil products" and that "[r]elated search warrants also were executed" in connection with DOJ's investigation.[89]

      (i)    **Par**:  In March 2015, Par disclosed that it received subpoenas from the Connecticut AG and DOJ relating to digoxin and doxycycline.[90]   In November 2015, Endo International plc, the parent company of Par, elaborated: "In December 2014, our subsidiary, Par, received a Subpoena to Testify Before Grand Jury from the Antitrust Division of the DOJ and issued by the U.S. District Court for the Eastern District of Pennsylvania. The subpoena requests documents and information focused primarily on product and pricing information relating to Par's authorized generic version of Lanoxin (digoxin) oral tablets and Par's generic doxycycline products, and on communications with competitors and others regarding those products. Par is currently cooperating fully with the investigation."[91] Endo also disclosed that in December 2015 it "received Interrogatories and Subpoena Duces Tecum from the State of Connecticut Office of Attorney General requesting information regarding pricing of certain of its generic products,

---

[89] Mylan SEC Form 10-Q, at 58 (Nov. 9, 2016), *available at* https://www.sec.gov/Archives/edgar/data/1623613/000162361316000071/myl10q_20160930xdoc.htm

[90] Par Pharmaceuticals Companies, Inc., SEC 2014 Form 10-K (Mar. 12, 2015) at 37, *available at* https://www.sec.gov/Archives/edgar/data/878088/000087808815000002/prx-20141231x10k.htm

[91] Endo International plc, SEC Form 10-Q (March 31, 2016) at 30, *available at* https://www.sec.gov/Archives/edgar/data/1593034/000159303416000056/endp-3312016x10q.htm

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

including   Doxycycline   Hyclate,   Amitriptyline   Hydrochloride,   Doxazosin   Mesylate,
Methotrexate Sodium and Oxybutynin Chloride."[92]

(j)      **Pfizer:**      On August 10, 2017, Pfizer disclosed: "As of July 2017, the
U.S. Department of Justice's Antitrust Division is investigating our Greenstone generics
business. We believe this is related to an ongoing antitrust investigation of the generic
pharmaceutical industry. The government has been obtaining information from Greenstone."[93]

(k)      **Sun**: On May 27, 2016, Sun Pharmaceutical Industries, Ltd. (the parent of
Sun) stated in a filing with the National Stock Exchange of India that one of its U.S subsidiaries,
namely Sun, "received a grand jury subpoena from the United States Department of Justice,
Antitrust Division seeking documents . . . relating to corporate and employee records, generic
pharmaceutical products and pricing, communications with competitors and others regarding the
sale of generic pharmaceutical products, and certain other related matters."[94]

(l)      **Teva**:  In August 2016, Teva disclosed that it received subpoenas from
DOJ and the Connecticut AG seeking documents and other information "relating to the
marketing and pricing of certain of Teva USA's generic products and communications with
competitors about such products."[95]

---

[92] *Id.* at 31.

[93] Pfizer, SEC Form 10-Q (Aug. 10, 2017) at 37, *available at*
https://investors.pfizer.com/financials/sec-filings/sec-filings-
details/default.aspx?FilingId=12225193.

[94] Sun Pharmaceuticals Indus., Ltd., BSE Disclosure (May 27, 2016), *available at*
http://www.bseindia.com/xml-
data/corpfiling/AttachHis/8E568708_8D00_472E_B052_666C76A4263D_081648.pdf

[95] Teva, SEC Form 6-K at 25 (Aug. 4, 2016), *available at*
https://www.sec.gov/Archives/edgar/data/818686/000119312516671785/d187194d6k.htm

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(m) **Zydus**: Press reports have stated the Zydus is a target of DOJ's generic drugs price-fixing investigation.[96]

## X. THE STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS

### A. The Statutes of Limitations Did Not Begin to Run Because Plaintiffs Did Not and Could Not Discover Defendants' Unlawful Conspiracy

207. Plaintiffs had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until (at the earliest) Defendants' disclosures of the existence of the government investigations and subpoenas. Prior to that time, no information in the public domain or available to Plaintiffs suggested that any Defendant was involved in a criminal conspiracy to fix prices for Clobetasol. And indeed, Defendants' disclosures regarding the government investigations did not indicate Clobetasol specifically.

208. Plaintiffs are purchasers who indirectly purchased Clobetasol manufactured by one or more Defendants. They had no direct contact or interaction with any of the Defendants in this case and had no means from which they could have discovered Defendants' conspiracy.

209. Defendants repeatedly and expressly stated throughout the Class Period, including on their public Internet websites, that they maintained antitrust/fair competition policies which prohibited the type of collusion alleged in this Complaint. For example:

(a) Allergan's (former parent of Actavis) Code of Conduct states: "We support a free and open market, which is why we comply with competition laws everywhere we do business and strive to always compete fairly."[97]

---

[96] *See* Rupali Mukherjeel, *US polls, pricing pressure may hit Indian pharma cos*, The Times of India (Nov. 8, 2016), *available at* http://timesofindia.indiatimes.com/business/india-business/US-polls-pricing-pressure-may-hit-Indian-pharma-cos/articleshow/55301060.cms

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(b)     Akorn's Code of Ethics states: "Akorn's policy is to comply fully with both the letter and spirit of all of the United States of America antitrust laws."[98]

(c)     Perrigo's Code of Conduct provides: "We will succeed based on the quality and value of our products and not by illegal or otherwise improper business practices. Competition laws, also known as "antitrust" laws, generally prohibit agreements with competitors, suppliers or customers that could unfairly limit free and open competition."[99]

(d)     Novartis's (the parent of Sandoz and Fougera) Code of Conduct provides: "We are committed to fair competition and will not breach competition laws and regulations."[100]

(e)     Taro's Code of Conduct provides: "we do not discuss any of the following topics with our competitors: prices or price-fixing, customer or market allocation, bids or bid-rigging, any topic that seems to be about restricting competition.  If a competitor attempts to engage you in a discussion on any of these topics, make it clear that you do not wish to participate. Leave the conversation immediately, and report the matter to Corporate Compliance."[101]

(f)     Taro's parent company, Sun Pharmaceutical Industries, Ltd.'s Global Code of Conduct provides: "We seek to outperform our competition fairly and honestly. We seek competitive advantages through superior performance, never through unethical or illegal business practices." It goes on to state: "Sun Pharma shall compete only in an ethical and legitimate manner and prohibits all actions that are anti-competitive or otherwise contrary to applicable competition or anti-trust laws."[102]

---

[97] Allergan Code of Conduct, *available at* http://www.allergan.com/investors/corporate-governance/code-of-conduct

[98] Akorn Code of Ethics, *available at* http://investors.akorn.com/phoenix.zhtml?c=78132&p=irol-govhighlights.

[99] Perrigo Code of Conduct, *available at* http://perrigo.investorroom.com/download/Code+of+Conduct.pdf

[100] Novartis Code of Conduct, *available at* https://www.novartis.com/sites/www.novartis.com/files/code-of-conduct-english.pdf

[101] Taro Code of Conduct, *available at* http://www.taro.com/media/oMedia/TaroCOC.pdf

[102] Sun Pharma Global Code of Conduct, *available at* http://www.sunpharma.com/Shareholder-Information/Policies/93092/Global-Code-of-Conduct

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(g)     Wockhardt's Limited Code of Ethics for the Members of the Board and Senior Management provides: "Directors and Senior Management Personnel in their respective functions must abide by the laws, rules, and regulations of India and other countries, as well as the states, counties, cities, and other jurisdictions, applicable to either Company or its business."[103]

210.    It was reasonable for members of the Class to believe that Defendants were complying with their own antitrust policies.

211.    For these reasons, the statutes of limitations as to Plaintiffs' claims under the federal and state common laws identified herein did not begin to run, and have been tolled with respect to the claims that Plaintiffs have alleged in this Complaint.

**B.      Fraudulent Concealment Tolled the Statutes of Limitations**

212.    In the alternative, application of the doctrine of fraudulent concealment tolled the statutes of limitations on the claims asserted by Plaintiffs.  Plaintiffs had no knowledge of the combination or conspiracy alleged in this Complaint, or of facts sufficient to place them on inquiry notice of their claims, until Defendants disclosed the existence of government investigations and subpoenas. Prior to that time, no information in the public domain or available to Plaintiffs suggested that any Defendant was involved in a criminal conspiracy to fix prices for Clobetasol.

213.    Defendants actively concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Classes concerning Defendants' unlawful activities to

---

[103] Wockhardt Limited Code of Ethics, *available at* http://www.wockhardt.com/files/code-of-conduct.pdf

artificially inflate prices for Clobetasol. The concealed, suppressed, and omitted facts would have been important to Plaintiffs and members of the Classes as they related to the cost of Clobetasol they purchased. Defendants misrepresented the real cause of price increases and/or the absence of price reductions in Clobetasol. Defendants' false statements and conduct concerning the prices of Clobetasol were deceptive as they had the tendency or capacity to mislead Plaintiffs and members of the Classes to believe that they were purchasing Clobetasol at prices established by a free and fair market.

### 1.  Active Concealment of the Conspiracy

214.   Defendants engaged in an illegal scheme to fix prices, allocate customers and rig bids. Criminal and civil penalties for engaging in such conduct are severe.  Not surprisingly, Defendants took affirmative measures to conceal their conspiratorial conduct.

215.   Through their misleading, deceptive, false and fraudulent statements, Defendants effectively concealed their conspiracy, thereby causing economic harm to Plaintiffs and the Classes. Defendants' misrepresentations regarding their price changes were intended to lull Plaintiffs and the Classes into accepting the price hikes as a normal result of competitive and economic market trends rather than as the consequence of Defendants' collusive acts. The public statements made by Defendants were designed to mislead Plaintiffs and the Classes into paying unjustifiably higher prices for Clobetasol.

216.   As explained in the State AG complaint, the nature of the generic drug industry—which allows for frequent and repeated face-to-face meetings among competitors—means that "Most of the conspiratorial communications were intentionally done in person or by cell phone, in an attempt to avoid creating a record of their illegal conduct. The generic drug industry,

89

through the aforementioned opportunities to collude at trade shows, customer events and smaller more intimate dinners and meetings, allowed these communications to perpetuate."[104]

## 2.      Plaintiffs Exercised Reasonable Diligence

217.    Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Generic drugs are not exempt from antitrust regulation, and thus, before the disclosure of the government investigations, Plaintiffs reasonably considered the markets to be competitive. Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legitimacy of Defendants' prices before these disclosures.

218.    Because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to conceal their illicit conduct, Plaintiffs and the Classes could not have discovered the conspiracy at an earlier date by the exercise of reasonable diligence.

219.    Therefore, the running of any statutes of limitations has been tolled for all claims alleged by Plaintiffs and the Classes as a result of Defendants' anticompetitive and unlawful conduct. Despite the exercise of reasonable diligence, Plaintiffs and Members of the Classes were unaware of Defendants' unlawful conduct, and did not know that they were paying supracompetitive prices throughout the United States during the Class Period.

220.    For these reasons, Plaintiffs' claims are timely under all of the federal, state and common laws identified herein.

## XI.    CONTINUING VIOLATIONS

221.    This Complaint alleges a continuing course of conduct (including conduct within the limitations periods), and defendants' unlawful conduct has inflicted continuing and

---

[104] State AG Complaint ¶ 13.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

accumulating harm within the applicable statutes of limitations. Thus, Plaintiffs and the members of the Damages Class can recover for damages that they suffered during any applicable limitations period.

## XII.   **DEFENDANTS' ANTITRUST VIOLATIONS**

222.    During the Class Period, set forth below, Defendants engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to allocate customers, rig bids, and fix raise and/or stabilize prices for Clobetasol sold in the United States.

223.    In formulating and effectuating the contract, combination or conspiracy, Defendants identified above and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to allocate customers, rig bids and artificially fix, raise, maintain, and/or stabilize the price of Clobetasol sold in the United States. These activities included the following:

(a)    Defendants participated in meetings and/or conversations regarding the price of Clobetasol in the United States;

(b)    Defendants agreed during those meetings and conversations to charge prices at specified levels and otherwise to increase and/or maintain prices of Clobetasol sold in the United States;

(c)    Defendants agreed during those meetings and conversations to allocate customers, rig bids, and fix the price of Clobetasol; and

(d)    Defendants issued price announcements and price quotations in accordance with their agreements.

224.    Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described in this Complaint.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

225.   During and throughout the period of the conspiracy alleged in this Complaint, Plaintiffs and members of the Classes indirectly purchased Clobetasol at inflated and supracompetitive prices.

226.   Defendants' contract, combination and conspiracy constitutes an unreasonable restraint of trade and commerce in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) and the laws of various End-Payer Damages Jurisdictions enumerated below.

227.   As a result of Defendants' unlawful conduct, Plaintiffs and the other members of the Classes have been injured in their business and property in that they have paid more for Clobetasol than they would have paid in a competitive market.

228.   General economic principles recognize that any overcharge at a higher level of distribution generally results in higher prices at every level below. Moreover, the institutional structure of pricing and regulation in the pharmaceutical drug industry assures that overcharges at the higher level of distribution are passed on to end-payers such as Plaintiffs. Wholesalers and retailers passed on the inflated prices to Plaintiffs and members of the Class. The impairment of generic competition at the direct purchaser level similarly injured Plaintiffs who were equally denied the opportunity to purchase less expensive generic versions of Clobetasol.

229.   The unlawful contract, combination and conspiracy has had the following effects, among others:

(a)   price competition in the market for Clobetasol has been artificially restrained;

(b)   prices for Clobetasol sold by Defendants have been raised, fixed, maintained, or stabilized at artificially high and non-competitive levels; and

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(c)    end-payer purchasers of Clobetasol sold by Defendants have been deprived of the benefit of free and open competition in the market for Clobetasol.

## XIII.  CLASS ACTION ALLEGATIONS

230.  Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All persons and entities in the United States and its territories who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price for Defendants' Clobetasol products (generic clobetasol propionate topical cream 0.05% (15, 30, 45, or 60gm), topical emollient cream 0.05% (15, 30, or 60gm), topical ointment 0.05% (15, 30, 45, or 60gm), topical gel 0.05% (15, 30, or 60gm), or topical solution 0.05% (15 or 50ml)), other than for resale, from June 2014 through the present.

> This class excludes:   (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities except for cities, towns, municipalities, or counties with self-funded prescription drug plans; (c) all persons or entities who purchased Defendants' Clobetasol products for purposes of resale or directly from Defendants; (d) fully insured health plans (*i.e.*, health plans that purchased insurance covering 100% of their reimbursement obligation to members); (e) any "flat co-pay" consumers whose purchases of Defendants' Clobetasol products were paid in part by a third party payer and whose co-payment was the same regardless of the retail purchase price; (f) pharmacy benefit managers; and (g) any judges or justices involved in this action and any members of their immediate families.

231.  Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the common law of unjust enrichment and the state antitrust, unfair competition, and consumer

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

protection laws of the states and territories listed below (the "End-Payer Damages Jurisdictions")[105] on behalf of the following class (the "Damages Class"):

> All persons and entities in the End-Payer Damages Jurisdictions who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price for Defendants' Clobetasol products (generic clobetasol propionate topical cream 0.05% (15, 30, 45, or 60gm), topical emollient cream 0.05% (15, 30, or 60gm), topical ointment 0.05% (15, 30, 45, or 60gm), topical gel 0.05% (15, 30, or 60gm), or topical solution 0.05% (15 or 50ml)), other than for resale, from June 2014 through the present.

> This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities except for cities, towns, municipalities, or counties with self-funded prescription drug plans; (c) all persons or entities who purchased Defendants' Clobetasol products for purposes of resale or directly from Defendants; (d) fully insured health plans (i.e., health plans that purchased insurance covering 100% of their reimbursement obligation to members); (e) any "flat co-pay" consumers whose purchases of Defendants' Clobetasol products were paid in part by a third party payer and whose co-payment was the same regardless of the retail purchase price; (f) pharmacy benefit managers; and (g) any judges or justices involved in this action and any members of their immediate families.

232.    The Nationwide Class and the Damages Class are referred to herein as the "Classes."

233.    While Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are thousands of members in each Class.

234.    Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to

---

[105] The "End-Payer Damages Jurisdictions" consist of: all States (except Indiana and Ohio), the District of Columbia, Puerto Rico and the U.S. Virgin Islands.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

(a)      Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize prices of Clobetasol and/or engaged in market allocation for Clobetasol sold in the United States;

(b)      The identity of the participants of the alleged conspiracy;

(c)      The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)      Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Count;

(e)      Whether the alleged conspiracy violated state antitrust and unfair competition laws, and/or state consumer protection laws, as alleged in the Second and Third Counts;

(f)      Whether Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fourth Count;

(g)      Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

(h)      The effect of the alleged conspiracy on the prices of Clobetasol sold in the United States during the Class Period;

(i)      Whether the Defendants and their co-conspirators actively concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Classes

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

concerning Defendants' unlawful activities to artificially inflate prices for Clobetasol, and/or fraudulently concealed the unlawful conspiracy's existence from Plaintiffs and the other members of the Classes;

(j)     The appropriate injunctive and related equitable relief for the Nationwide Class; and

(k)     The appropriate class-wide measure of damages for the Damages Class.

235.    Plaintiffs' claims are typical of the claims of the members of the Classes. Plaintiffs and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for Clobetasol purchased indirectly from Defendants and/or their co-conspirators. Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.

236.    Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

237.    The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

238.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

239.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## XIV.   <u>CAUSES OF ACTION</u>

### FIRST COUNT

**Violation of Sections 1 and 3 of the Sherman Act**
**(on behalf of Plaintiffs and the Nationwide Class)**

240.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

241.    Defendants and their unnamed co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. § 1, 3).

242.    During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially allocate customers, rig bids and raise, maintain and fix prices for generic Clobetasol, thereby creating anticompetitive effects.

243.    The conspiratorial acts and combinations have caused unreasonable restraints in the market for generic Clobetasol.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

244. As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated End-Payers in the Nationwide Class who purchased generic Clobetasol have been harmed by being forced to pay inflated, supracompetitive prices for generic Clobetasol.

245. In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth herein.

246. Defendants' conspiracy had the following effects, among others:

(a) Price competition in the market for generic Clobetasol has been restrained, suppressed, and/or eliminated in the United States;

(b) Prices for generic Clobetasol provided by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

(c) Plaintiffs and members of the Nationwide Class who purchased generic Clobetasol indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

247. Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for generic Clobetasol purchased indirectly from Defendants and the co-conspirators than they would have paid and will pay in the absence of the conspiracy.

248. Defendants' contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

249.     Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the continuing violations alleged herein.

## SECOND COUNT

### Violation of State Antitrust Statutes[106]
### (on behalf of Plaintiffs and the Damages Class)

250.     Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

251.     During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of generic Clobetasol in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

252.     The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain the prices of generic Clobetasol and to allocate customers for generic Clobetasol in the United States.

253.     In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including: (a) participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price generic Clobetasol at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to generic Clobetasol provided in the United States; and (b)

---

[106] Statutory antitrust violations are alleged herein for the following jurisdictions: Arizona, California, Connecticut, District of Columbia, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia and Wisconsin.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

participating in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

254.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreement to allocate customers, rig bids, and fix prices for generic Clobetasol.

255.    Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the following state antitrust statutes.

256.    [INTENTIONALLY LEFT BLANK]

**Arizona**

257.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Arizona Revised Statutes, § 44-1401, *et seq*. Defendants' combination and conspiracy had the following effects: (1) price competition for generic Clobetasol was restrained, suppressed, and eliminated throughout Arizona; (2) generic Clobetasol prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clobetasol. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce. Defendants' violations of Arizona law were flagrant.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into an agreement in restraint of trade in violation of Ariz. Rev. Stat. § 44-1401, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. § 44-1401, *et seq*.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**California**

258.   Defendants have entered into an unlawful agreement in restraint of trade in violation of California Business and Professions Code § 16700 *et seq*. During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of California Business and Professions Code §16720. Defendants, and each of them, have acted in violation of § 16720 to fix, raise, stabilize, and maintain prices of generic Clobetasol at supracompetitive levels. The aforesaid violations of § 16720 consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of generic Clobetasol. For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth above and creating a price floor, fixing, raising, and stabilizing the price of generic Clobetasol. The combination and conspiracy alleged herein has had, *inter alia*, the following effects: (1) price competition for generic Clobetasol has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for generic Clobetasol provided by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California; and (3) those who purchased generic Clobetasol indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property in that they paid more for generic Clobetasol than they otherwise would have paid in the absence of Defendants' unlawful conduct. During the Class Period,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Defendants' illegal conduct substantially affected California commerce. As a result of Defendants' violation of § 16720, Plaintiffs and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to California Business and Professions Code § 16750(a).

### Connecticut

258(a). Defendants have entered into an unlawful agreement in restraint of trade in violation of the Connecticut Antitrust Act, Conn. Gen. Stat. § 35-35, *et seq*. Defendants' combinations and conspiracy had the following effects: (1) price competition for generic Clobetasol was restrained, suppressed, and eliminated throughout Connecticut; (2) generic Clobetasol prices were raised, fixed, maintained and stabilized at artificially high levels throughout Connecticut; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clobetasol. During the Class Period, Defendants' illegal conduct substantially affected Connecticut commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into an agreement in restraint of trade in violation of Conn. Gen. Stat. § 35-35, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Connecticut law.

### District of Columbia

259. Defendants have entered into an unlawful agreement in restraint of trade in violation of District of Columbia Code Annotated § 28-4501, *et seq*. Defendants' combination and conspiracy had the following effects: (1) generic Clobetasol price competition was

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

restrained, suppressed, and eliminated throughout the District of Columbia; (2) generic Clobetasol prices were raised, fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic Clobetasol in the District of Columbia that were shipped by Defendants or their co-conspirators into the District of Columbia, were deprived of free and open competition, including in the District of Columbia; and (4) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic Clobetasol in the District of Columbia that were shipped by Defendants or their co-conspirators, paid supracompetitive, artificially inflated prices for generic Clobetasol, including in the District of Columbia. During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of District of Columbia Code Ann. § 28-4501, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. § 28-4501, *et seq*.

**Hawaii**

260.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Hawaii Revised Statutes Annotated § 480-1, *et seq*. Defendants' unlawful conduct had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) generic Clobetasol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

the Damages Class paid supracompetitive, artificially inflated prices for generic Clobetasol. During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Hawaii Revised Statutes Annotated § 480-4, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Hawaii Revised Statutes Annotated § 480-4, *et seq*.

**Illinois**

261.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1, *et seq*.) Defendants' combination or conspiracy had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout Illinois; (2) generic Clobetasol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clobetasol. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under the Illinois Antitrust Act.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Iowa**

262.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code § 553.1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout Iowa; (2) generic Clobetasol prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clobetasol. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Iowa Code § 553.1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code § 553, *et seq*.

**Kansas**

263.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Kansas Statutes Annotated, § 50-101, *et seq*. Defendants' combined capital, skills or acts for the purposes of creating restrictions in trade or commerce of generic Clobetasol, increasing the prices of generic Clobetasol, preventing competition in the sale of generic Clobetasol, or binding themselves not to sell generic Clobetasol, in a manner that established the price of generic Clobetasol and precluded free and unrestricted competition among themselves in the sale of generic Clobetasol, in violation of Kan. Stat. Ann. § 50-101, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Clobetasol price competition

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

was restrained, suppressed, and eliminated throughout Kansas; (2) generic Clobetasol prices were raised, fixed, maintained and stabilized at artificially high levels throughout Kansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clobetasol. During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Kansas Stat. Ann. § 50-101, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. § 50-101, *et seq*.

**Maine**

264.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Maine Revised Statutes (Maine Rev. Stat. Ann. 10, § 1101, *et seq*.) Defendants' combination or conspiracy had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout Maine; (2) generic Clobetasol prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maine; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clobetasol. During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

an agreement in restraint of trade in violation of Maine Rev. Stat. Ann. 10, § 1101, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, § 1101, *et seq*.

**Maryland**

264(a). Defendants have entered into an unlawful agreement in restraint of trade in violation of the Maryland Antitrust Act, Maryland Code, Com. Law § 11-204, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout Maryland; (2) generic Clobetasol prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maryland; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clobetasol.  During the Class Period, Defendants' illegal conduct substantially affected Maryland commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of the Maryland Antitrust Act. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maryland law.

**Michigan**

265.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Michigan Compiled Laws Annotated § 445.771, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout Michigan; (2) generic Clobetasol prices were raised,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

fixed, maintained and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clobetasol. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Michigan Comp. Laws Ann. § 445.771, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. § 445.771, *et seq.*

**Minnesota**

266.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Minnesota Annotated Statutes § 325D.49, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) generic Clobetasol prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clobetasol. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Minnesota Stat. § 325D.49, *et seq.*

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minnesota Stat. § 325D.49, *et seq*.

**Mississippi**

267.     Defendants have entered into an unlawful agreement in restraint of trade in violation of Mississippi Code Annotated § 75-21-1, *et seq*. Trusts are combinations, contracts, understandings or agreements, express or implied when inimical to the public welfare and with the effect of, *inter alia*, restraining trade, increasing the price or output of a commodity, or hindering competition in the production and sale of a commodity. Miss. Code Ann. § 75-21-1. Defendants' combination or conspiracy was in a manner inimical to public welfare and had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) generic Clobetasol prices were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clobetasol. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Mississippi Code Ann. § 75-21-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. § 75-21-1, *et seq*.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Nebraska**

268.     Defendants have entered into an unlawful agreement in restraint of trade in violation of Nebraska Revised Statutes § 59-801, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) generic Clobetasol prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clobetasol. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Nebraska Revised Statutes § 59-801, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes § 59-801, *et seq*.

**Nevada**

269.     Defendants have entered into an unlawful agreement in restraint of trade in violation of Nevada Revised Statutes Annotated § 598A.010, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout Nevada; (2) generic Clobetasol prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Clobetasol. During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Nevada Rev. Stat. Ann. § 598A.010, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. § 598A.010, *et seq*.

**New Hampshire**

270.    Defendants have entered into an unlawful agreement in restraint of trade in violation of New Hampshire Revised Statutes § 356:1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) generic Clobetasol prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clobetasol. During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of New Hampshire Revised Statutes § 356:1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes § 356:1, *et seq*.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**New Mexico**

271.    Defendants have entered into an unlawful agreement in restraint of trade in violation of New Mexico Statutes Annotated § 57-1-1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) generic Clobetasol prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clobetasol. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of New Mexico Stat. Ann. § 57-1-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Mexico Stat. Ann. § 57-1-1, *et seq*.

**New York**

272.    Defendants have entered into an unlawful agreement in restraint of trade in violation of New York's Donnelly Act, New York General Business Law § 340, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout New York; (2) generic Clobetasol prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

supracompetitive, artificially inflated prices for generic Clobetasol that were higher than they would have been absent Defendants' illegal acts. During the Class Period, Defendants' illegal conduct substantially affected New York commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of the New York's Donnelly Act, New York General Business Law § 340, *et seq*. The conduct set forth above is a *per se* violation of the Act. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York Gen. Bus. Law § 340, *et seq*.

**North Carolina**

273.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes § 75-1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) generic Clobetasol prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clobetasol. During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of North Carolina Gen. Stat. § 75-1, *et*

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

*seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina Gen. Stat. § 75-1, *et. seq*.

**North Dakota**

274.    Defendants have entered into an unlawful agreement in restraint of trade in violation of North Dakota Century Code § 51-08.1-01, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) generic Clobetasol prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clobetasol. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of North Dakota Cent. Code § 51-08.1-01, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Dakota Cent. Code § 51-08.1-01, *et seq*.

**Oregon**

275.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Oregon Revised Statutes § 646.705, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout Oregon; (2) generic Clobetasol prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon; (3) Plaintiffs and members of the

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clobetasol. During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Oregon Revised Statutes § 646.705, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Oregon Revised Statutes § 646.705, *et seq*.

**Rhode Island**

276.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Rhode Island Antitrust Act, Rhode Island General Laws § 6-36-1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) generic Clobetasol prices were raised, fixed, maintained and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clobetasol. During the Class Period, Defendants' illegal conduct had a substantial effect on Rhode Island commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property on or after July 15, 2013, and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Rhode Island General Laws § 6-36-1, *et seq*. Accordingly,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Plaintiffs and members of the Damages Class seek all relief available under Rhode Island General Laws § 6-36-1, *et seq*.

**South Dakota**

277.    Defendants have entered into an unlawful agreement in restraint of trade in violation of South Dakota Codified Laws § 37-1-3.1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) generic Clobetasol prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clobetasol. During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of South Dakota Codified Laws Ann. § 37-1-3.1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. § 37-1-3.1, *et seq*.

**Tennessee**

278.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Tennessee Code Annotated § 47-25-101, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) generic Clobetasol prices were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clobetasol. During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Tennessee Code Ann. § 47-25-101, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Tennessee Code Ann. § 47-25-101, *et seq*.

**Utah**

279.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout Utah; (2) generic Clobetasol prices were raised, fixed, maintained and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clobetasol. During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101, *et seq*. Accordingly, Plaintiffs and

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

members of the Damages Class seek all relief available under Utah Code Annotated § 76-10-3101, *et seq.*

**Vermont**

280.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Vermont Stat. Ann. 9 § 2453, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout Vermont; (2) generic Clobetasol prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clobetasol. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Vermont Stat. Ann. 9 § 2453, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Vermont Stat. Ann. 9 § 2453, *et seq.*

**West Virginia**

281.    Defendants have entered into an unlawful agreement in restraint of trade in violation of West Virginia Code § 47-18-1, *et seq.* Defendants' anticompetitive acts described above were knowing, willful, and constitute violations or flagrant violations of West Virginia Antitrust Act. Defendants' combination or conspiracy had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout West

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Virginia; (2) generic Clobetasol prices were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clobetasol. During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of West Virginia Code § 47-18-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under West Virginia Code § 47-18-1, *et seq*.

**Wisconsin**

282.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes § 133.01, *et seq*. Defendants' and their co-conspirators' anticompetitive activities have directly, foreseeably and proximately caused injury to Plaintiffs and members of the Classes in the United States. Specifically, Defendants' combination or conspiracy had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) generic Clobetasol prices were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clobetasol.  During the Class Period, Defendants' illegal conduct had a substantial effect on the people of Wisconsin and Wisconsin commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured

in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Wisconsin Stat. § 133.01, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. § 133.01, *et seq*.

**As to All Jurisdictions Above**

283.    Plaintiffs and members of the Damages Class in each of the above jurisdictions have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement. Plaintiffs and members of the Damages Class have paid more for generic Clobetasol than they otherwise would have paid in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

284.    In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of Plaintiffs and members of the Damages Class.

285.    Accordingly, Plaintiffs and members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

## THIRD COUNT

### Violation of State Consumer Protection Statutes[107]
### (on behalf of Plaintiffs and the Damages Class)

286.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

287.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

**Alaska**

288.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Alaska Statute § 45.50.471, *et seq*.   Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Clobetasol were sold, distributed, or obtained in Alaska and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.  The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Alaska law.  Defendants' unlawful conduct had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout Alaska; (2) generic Clobetasol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Alaska; (3) Plaintiffs and members of the Damages Class were

---

[107] Statutory consumer protection violations are alleged herein for the following jurisdictions: Alaska, Arkansas, California, Colorado, Delaware, District of Columbia, Florida, Georgia, Hawaii, Massachusetts, Michigan, Minnesota, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Rhode Island, South Carolina, South Dakota, Utah, Vermont, Virginia, West Virginia, Wisconsin and the U.S. Virgin Islands.

deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clobetasol. During the Class Period, Defendants' illegal conduct substantially affected Alaska commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Alaska Stat. § 45.50.471, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Arkansas**

289.    Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101, *et seq*. Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Clobetasol were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10). Defendants' unlawful conduct had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) generic Clobetasol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clobetasol. During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

and consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**California**

290.    Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq*. During the Class Period, Defendants manufactured, marketed, sold, or distributed generic Clobetasol in California, and committed and continue to commit acts of unfair competition, as defined by § 17200, *et seq*. of the California Business and Professions Code, by engaging in the acts and practices specified above. This claim is instituted pursuant to §§ 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated § 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law. Defendants' conduct as alleged herein violated § 17200. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code §17200, *et seq*., including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of § 16720, *et seq*. of the California Business and Professions Code, set forth above. Defendants' acts, omissions, misrepresentations, practices,

and non-disclosures, as described above, whether or not in violation of § 16720, *et seq.* of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent; (3) Defendants' acts or practices are unfair to purchasers of generic Clobetasol in the State of California within the meaning of § 17200, California Business and Professions Code; and (4) Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code. Plaintiffs and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that have been obtained by Defendants as a result of such business acts or practices. During the Class Period, Defendants' illegal conduct substantially affected California commerce and consumers. The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future. The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiffs and members of the Damages Class to pay supracompetitive and artificially-inflated prices for generic Clobetasol. Plaintiffs and members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition. The conduct of Defendants as alleged in this Complaint violates § 17200 of the California Business and Professions Code. As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, §§17203 and 17204.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Colorado**

291.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Colorado Consumer Protection Act, Colorado Rev. Stat. § 6-1-101, *et seq*.  Defendants engaged in an unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiffs as actual or potential consumers of the Defendants' goods and which caused Plaintiffs to suffer injury. Defendants took efforts to conceal their agreements from Plaintiffs. Defendants' unlawful conduct had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout Colorado; (2) generic Clobetasol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Colorado; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clobetasol. During the Class Period, Defendants' illegal conduct substantially affected Colorado commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colorado Rev. Stat. § 6-1-101, *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute and as equity demands.

**Delaware**

292.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Delaware Consumer Fraud Act, 6 Del. Code § 2511, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in Delaware, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

levels, the prices at which generic Clobetasol were sold, distributed, or obtained in Delaware. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Clobetasol. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Clobetasol prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout Delaware; (2) generic Clobetasol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Delaware; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clobetasol. During the Class Period, Defendants' illegal conduct had a substantial effect on Delaware commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Clobetasol, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Clobetasol at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of 6 Del. Code § 2511, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**District of Columbia**

293.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which generic Clobetasol were sold, distributed or obtained in the District of Columbia. During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce and consumers. The foregoing conduct constitutes "unlawful trade practices," within the meaning of D.C. Code § 28-3904. Plaintiffs and members of the Damages Class were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. Defendants had the sole power to set that price and Plaintiffs and members of the Damages Class had no power to negotiate a lower price. Moreover, Plaintiffs and members of the Damages Class lacked any meaningful choice in purchasing generic Clobetasol because they were unaware of the unlawful overcharge, and there was no alternative source of supply through which Plaintiffs and members of the Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of generic Clobetasol, including their illegal conspiracy to secretly fix the price of generic Clobetasol at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs and members of the Damages Class. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for purchasers so that there was a gross disparity between the price paid and the value received for generic Clobetasol. Defendants' unlawful conduct had the following effects: (1) generic

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Clobetasol price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) generic Clobetasol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clobetasol. As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Florida**

294.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq*. Defendants' unlawful conduct had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout Florida; (2) generic Clobetasol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clobetasol. During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq.*, and,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Georgia**

295.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Georgia Uniform Deceptive Trade Practices Act, Georgia Code § 10-1-370, *et seq*. and the Georgia Fair Businesses Practices Act, Georgia Code Ann. § 10-1-390, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in Georgia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Clobetasol were sold, distributed, or obtained in Georgia. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Clobetasol. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Clobetasol prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout Georgia; (2) generic Clobetasol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Georgia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clobetasol. During the Class Period, Defendants' illegal conduct had a substantial effect on Georgia commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above and are threatened with further injury. That loss was caused by

129

Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Clobetasol, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Clobetasol at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of Georgia law, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.

**Hawaii**

296.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Hawaii Revised Statutes Annotated § 480-1, *et seq*. Defendants' unlawful conduct had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) generic Clobetasol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clobetasol. During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Hawaii Rev. Stat. § 480-1 *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Massachusetts**

297. Defendants have engaged in unfair competition or unlawful, unfair, unconscionable, or deceptive acts or practices in violation of the Massachusetts Gen. Laws, Ch 93A, § 1, *et seq*. Defendants were engaged in trade or commerce as defined by G.L. 93A. Defendants, in a market that includes Massachusetts, agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Clobetasol were sold, distributed, or obtained in Massachusetts and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," in violation of Massachusetts Gen. Laws, Ch 93A, § 2, 11. Defendants' unlawful conduct had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout Massachusetts; (2) generic Clobetasol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Massachusetts; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clobetasol. During the Class Period, Defendants' illegal conduct substantially affected Massachusetts commerce and consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Massachusetts Gen. Laws, Ch 93A, § 2, 11, that were knowing or willful, and,

accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute, including multiple damages.

**Michigan**

298.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Michigan Consumer Protection Statute, Mich. Compiled Laws § 445.903, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in Michigan, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Clobetasol were sold, distributed, or obtained in Michigan. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Clobetasol. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Clobetasol prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout Michigan; (2) generic Clobetasol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clobetasol. During the Class Period, Defendants' illegal conduct had a substantial effect on Michigan commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

misrepresentations and omissions concerning the price of generic Clobetasol, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Clobetasol at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of Mich. Compiled Laws § 445.903, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

### Minnesota

299.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq*.  Defendants engaged in an unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiffs as actual or potential consumers of the Defendants' goods and which caused Plaintiffs to suffer injury. Defendants took efforts to conceal their agreements from Plaintiffs. Defendants' unlawful conduct had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) generic Clobetasol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clobetasol. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325D.43, *et seq*., and, accordingly,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Plaintiffs and members of the Class seek all relief available under that statute and as equity demands.

**Missouri**

300.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq*. Plaintiffs and members of the Damages Class purchased generic Clobetasol for personal or family purposes. Defendants engaged in the conduct described herein in connection with the sale of generic Clobetasol in trade or commerce in a market that includes Missouri. Defendants agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which generic Clobetasol were sold, distributed, or obtained in Missouri, which conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive and unscrupulous, and caused substantial injury to Plaintiffs and members of the Damages Class. Defendants concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Clobetasol. The concealed, suppressed, and omitted facts would have been important to Plaintiffs and members of the Damages Class as they related to the cost of generic Clobetasol they purchased. Defendants misrepresented the real cause of price increases and/or the absence of price reductions in generic Clobetasol by making public statements that were not in accord with the facts. Defendants' statements and conduct concerning the price of generic Clobetasol were deceptive as they had the tendency or capacity to mislead Plaintiffs and members of the Damages Class to believe that they were purchasing generic Clobetasol at prices established by a free and fair market. Defendants' unlawful conduct had the following effects: (1) generic

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Clobetasol price competition was restrained, suppressed, and eliminated throughout Missouri; (2) generic Clobetasol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clobetasol. The foregoing acts and practices substantially affected Missouri commerce and consumers and constituted unlawful practices in violation of the Missouri Merchandising Practices Act. As a direct and proximate result of the above-described unlawful practices, Plaintiffs and members of the Damages Class suffered ascertainable loss of money or property. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020, which prohibits "[t]he act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce . . . ", as further interpreted by the Missouri Code of State Regulations, 15 CSR 60-7.010, *et seq.*, 15 CSR 60-8.010, *et seq.*, and 15 CSR 60-9.010, *et seq.*, and Mo. Rev. Stat. § 407.025.

**Montana**

301.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code, § 30-14-103, *et seq.*, and § 30-14-201, *et seq.* Defendants' unlawful conduct had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout Montana; (2) generic Clobetasol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3)

Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clobetasol. During the Class Period, Defendants marketed, sold, or distributed generic Clobetasol in Montana, and Defendants' illegal conduct substantially affected Montana commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code, § 30-14-103, *et seq.*, and § 30-14-201, *et. seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Nebraska**

302.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601, *et seq.*   Defendants' unlawful conduct had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) generic Clobetasol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clobetasol. During the Class Period, Defendants marketed, sold, or distributed generic Clobetasol in Nebraska, and Defendants' illegal conduct substantially affected Nebraska commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et*

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

*seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Nevada**

303.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 598.0903, *et seq.*   Defendants agreed to, and did in fact, act in restraint of trade or commerce in Nevada, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Clobetasol were sold, distributed, or obtained in Nevada. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Clobetasol. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Clobetasol prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout Nevada; (2) generic Clobetasol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clobetasol. During the Class Period, Defendants' illegal conduct had a substantial effect on Nevada commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

omissions concerning the price of generic Clobetasol, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Clobetasol at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of Nev. Rev. Stat. § 598.0903, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**New Hampshire**

304.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et seq*.  Defendants' unlawful conduct had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) generic Clobetasol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clobetasol. During the Class Period, Defendants marketed, sold, or distributed generic Clobetasol in New Hampshire, and Defendants' illegal conduct substantially affected New Hampshire commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**New Jersey**

305.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Jersey Consumer Fraud Act, N.J. Statutes § 56:8-1, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in New Jersey, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Clobetasol were sold, distributed, or obtained in New Jersey. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Clobetasol. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Clobetasol prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout New Jersey; (2) generic Clobetasol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Jersey; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clobetasol. During the Class Period, Defendants' illegal conduct had a substantial effect on New Jersey commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Clobetasol, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

generic Clobetasol at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of N.J. Statutes § 56:8-1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**New Mexico**

306.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Clobetasol were sold, distributed or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable trade practices," in violation of New Mexico Stat. § 57-12-3, in that such conduct, *inter alia*, resulted in a gross disparity between the value received by Plaintiffs and members of the Damages Class and the prices paid by them for generic Clobetasol as set forth in New Mexico Stat. § 57-12-2E. Plaintiffs and members of the Damages Class were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. Defendants had the sole power to set that price, and Plaintiffs and members of the Damages Class had no power to negotiate a lower price. Moreover, Plaintiffs and members of the Damages Class lacked any meaningful choice in purchasing generic Clobetasol because they were unaware of the unlawful overcharge, and there was no alternative source of supply through which Plaintiffs and members of the Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of generic Clobetasol, including their illegal conspiracy to secretly fix the price of generic Clobetasol at supracompetitive levels and overcharge consumers, was substantively unconscionable because it

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs and members of the Damages Class. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for generic Clobetasol. Defendants' unlawful conduct had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) generic Clobetasol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clobetasol. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**New York**

307.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which generic Clobetasol were sold, distributed or obtained in New York and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. Defendants and their co-conspirators made public

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

statements about the prices of generic Clobetasol that either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for generic Clobetasol; and Defendants alone possessed material information that was relevant to consumers, but failed to provide the information. Because of Defendants' unlawful trade practices in the State of New York, New York class members who indirectly purchased generic Clobetasol were misled to believe that they were paying a fair price for generic Clobetasol or the price increases for generic Clobetasol were for valid business reasons; and similarly situated consumers were affected by Defendants' conspiracy. Defendants knew that their unlawful trade practices with respect to pricing generic Clobetasol would have an impact on New York consumers and not just Defendants' direct customers. Defendants knew that their unlawful trade practices with respect to pricing generic Clobetasol would have a broad impact, causing consumer class members who indirectly purchased generic Clobetasol to be injured by paying more for generic Clobetasol than they would have paid in the absence of Defendants' unlawful trade acts and practices. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of consumers in New York State in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout New York; (2) generic Clobetasol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Clobetasol. During the Class Period, Defendants marketed, sold, or distributed generic Clobetasol in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers. During the Class Period, each of Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed generic Clobetasol in New York. Plaintiffs and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349(h).

### North Carolina

308.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which generic Clobetasol were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation and maintenance of Defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-concealing actions, of which Plaintiffs and members of the Damages Class could not possibly have been aware. Defendants and their co-conspirators publicly provided pretextual and false justifications regarding their price increases. Defendants' public statements concerning the price of generic Clobetasol created the illusion of competitive pricing controlled by market forces rather than supracompetitive pricing driven by Defendants' illegal conspiracy. Moreover, Defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge the existence of the conspiracy to outsiders. The conduct of Defendants described herein

constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) generic Clobetasol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clobetasol. During the Class Period, Defendants marketed, sold, or distributed generic Clobetasol in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers. During the Class Period, each of Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed generic Clobetasol in North Carolina. Plaintiffs and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**North Dakota**

309.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the North Dakota Unlawful Sales or Advertising Practices Statute, N.D. Century Code § 51-15-01, *et seq*.  Defendants agreed to, and did in fact,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

act in restraint of trade or commerce in North Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Clobetasol were sold, distributed, or obtained in North Dakota. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Clobetasol. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Clobetasol prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) generic Clobetasol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clobetasol. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Clobetasol, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Clobetasol at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of N.D. Century Code § 51-15-01, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Rhode Island**

310.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act, R.I. Gen. Laws § 6-13.1-1, *et seq*. Members of the Damages Class purchased generic Clobetasol for personal, family, or household purposes. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Rhode Island, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Clobetasol were sold, distributed, or obtained in Rhode Island. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Clobetasol. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Clobetasol prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) generic Clobetasol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clobetasol. Defendants' illegal conduct substantially affected Rhode Island commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Clobetasol, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Clobetasol at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Clobetasol they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws. § 6-13.1-1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**South Carolina**

311.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) generic Clobetasol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clobetasol. During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

or deceptive acts or practices in violation of S.C. Code Ann. § 39-5-10, *et seq*., and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

**South Dakota**

312.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the South Dakota Deceptive Trade Practices and Consumer Protection Statute, S.D. Codified Laws § 37-24-1, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in South Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Clobetasol were sold, distributed, or obtained in South Dakota. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Clobetasol. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Clobetasol prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) generic Clobetasol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clobetasol. Defendants' illegal conduct substantially affected South Dakota commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants'

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

deception, including their affirmative misrepresentations and omissions concerning the price of generic Clobetasol, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Clobetasol at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Clobetasol they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Codified Laws § 37-24-1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Utah**

313.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Utah Consumer Sales Practices Act, Ut. Stat. § 13-11-1, *et seq.*  Members of the Damages Class purchased generic Clobetasol for personal, family, or household purposes. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Utah, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Clobetasol were sold, distributed, or obtained in Utah. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Clobetasol. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Clobetasol prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout Utah; (2) generic Clobetasol

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clobetasol. Defendants' illegal conduct substantially affected Utah commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above and are threatened with further injury. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Clobetasol, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Clobetasol at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Clobetasol they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ut. Stat. § 13-11-1 *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.

**Vermont**

314.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont Statutes § 2451, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Clobetasol were sold, distributed, or obtained in Vermont. Defendants

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Clobetasol. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Clobetasol prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout Vermont; (2) generic Clobetasol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clobetasol. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Clobetasol, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Clobetasol at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of 9 Vt. Stat. § 2451, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Virginia**

315.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Virginia Consumer Protection Act of 1977, Va. Code § 59.1-196, *et seq*.  Members of the Damages Class purchased generic Clobetasol to be used for personal, family, or household purposes. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Virginia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Clobetasol were sold, distributed, or obtained in Virginia. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Clobetasol. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Clobetasol prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout Virginia; (2) generic Clobetasol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Virginia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clobetasol. Defendants' illegal conduct substantially affected Virginia commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Clobetasol, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Clobetasol at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Clobetasol they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Va. Code § 59.1-196, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**West Virginia**

316.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the West Virginia Consumer Credit and Protection Act, W.Va. Code § 46A-6-101, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes West Virginia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Clobetasol were sold, distributed, or obtained in West Virginia. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Clobetasol. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' generic Clobetasol prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) generic Clobetasol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clobetasol.

Defendants' illegal conduct substantially affected West Virginia commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Clobetasol, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Clobetasol at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Clobetasol they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of W.Va. Code § 46A-6-101, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Wisconsin**

317.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Wisconsin Consumer Protection Statutes, Wisc. Stat. § 100.18, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Wisconsin, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Clobetasol were sold, distributed, or obtained in Wisconsin. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' generic Clobetasol prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) generic

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Clobetasol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clobetasol. Defendants' illegal conduct substantially affected Wisconsin commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations concerning the price of generic Clobetasol, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Clobetasol at prices set by a free and fair market. Defendants' affirmative misrepresentations constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Clobetasol they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wisc. Stat. § 100.18, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**U.S. Virgin Islands**

318.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the U.S. Virgin Islands Consumer Fraud and Deceptive Business Practices Act, 12A V.I.C. §§ 102, 301-35, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes U.S.V.I., by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

generic Clobetasol were sold, distributed, or obtained in U.S.V.I. Defendants deliberately failed

to disclose material facts to Plaintiffs and members of the Damages Class concerning

Defendants' unlawful activities and artificially inflated prices for generic Clobetasol. Defendants

affirmatively misrepresented to all purchasers during the Class Period that Defendants' generic

Clobetasol prices were competitive and fair. Defendants' unlawful conduct had the following

effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated

throughout U.S.V.I.; (2) generic Clobetasol prices were raised, fixed, maintained, and stabilized

at artificially high levels throughout U.S.V.I.; (3) Plaintiffs and members of the Damages Class

were deprived of free and open competition; and (4) Plaintiffs and members of the Damages

Class paid supracompetitive, artificially inflated prices for generic Clobetasol. Defendants'

illegal conduct substantially affected U.S.V.I. commerce and consumers. As a direct and

proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class

suffered an ascertainable loss of money or property as a result of Defendants' use or employment

of unconscionable and deceptive commercial practices as set forth above and are threatened with

further injury. That loss was caused by Defendants' willful and deceptive conduct, as described

herein. Defendants' deception, including their affirmative misrepresentations and omissions

concerning the price of generic Clobetasol, likely misled all purchasers acting reasonably under

the circumstances to believe that they were purchasing generic Clobetasol at prices set by a free

and fair market. Defendants' affirmative misrepresentations and omissions constitute information

important to Plaintiffs and members of the Damages Class as they related to the cost of generic

Clobetasol they purchased. Defendants have engaged in unfair competition or unfair or deceptive

acts or practices in violation of 12A V.I.C. §§ 102, 301-35, *et seq*., and, accordingly, Plaintiffs

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

and members of the Damages Class seek all relief available under that statute and as equity demands.

## FOURTH COUNT

### Unjust Enrichment[108]
### (on behalf of Plaintiffs and the Damages Class)

319.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

320.    To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint.

321.    Defendants have unlawfully benefited from their sales of Clobetasol because of the unlawful and inequitable acts alleged in this Complaint. Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clobetasol at prices that were more than they would have been but for Defendants' unlawful actions.

322.    Defendants' financial benefits resulting from their unlawful and inequitable acts are traceable to overpayments by Plaintiffs and the Damages Class.

323.    Plaintiffs and the Damages Class have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiffs and the Damages Class.

324.    Defendants have been enriched by revenue resulting from unlawful overcharges for Clobetasol while Plaintiffs and the Damages Class have been impoverished by the

---

[108] Unjust enrichment claims are alleged herein under the laws of all States (except Ohio and Indiana) as well as the District of Columbia, Puerto Rico and the U.S. Virgin Islands.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

overcharges they paid for Clobetasol imposed through Defendants' unlawful conduct. Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.

325.    There is no justification for Defendants' retention of, and enrichment from, the benefits they received, which caused impoverishment to Plaintiffs and the Damages Class, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

326.    Plaintiffs and the Damages Class did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.

327.    The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of Clobetasol.

328.    The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to their unlawful overcharges of Clobetasol are ascertainable by review of sales records.

329.    It would be futile for Plaintiffs and the Damages Class to seek a remedy from any party with whom they have privity of contract. Defendants have paid no consideration to any other person for any of the unlawful benefits they received indirectly from Plaintiffs and the Damages Class with respect to Defendants' sales of Clobetasol.

330.    It would be futile for Plaintiffs and the Damages Class to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased Clobetasol, as the intermediaries are not liable and cannot reasonably be expected to compensate Plaintiffs and the Damages Class for Defendants' unlawful conduct.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

331.    The economic benefit of overcharges and monopoly profits derived by Defendants through charging supracompetitive and artificially inflated prices for Clobetasol is a direct and proximate result of Defendants' unlawful practices.

332.    The financial benefits derived by Defendants rightfully belong to Plaintiffs and the Damages Class, because Plaintiffs and the Damages Class paid supracompetitive prices during the Class Period, inuring to the benefit of Defendants.

333.    It would be inequitable under unjust enrichment principles under the laws of all States (except Ohio and Indiana) and of the District of Columbia, Puerto Rico and the U.S. Virgin Islands, for Defendants to be permitted to retain any of the overcharges for Clobetasol derived from Defendants' unlawful, unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

334.    Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiffs and the Damages Class. Defendants consciously accepted the benefits and continue to do so as of the date of this filing.

335.    Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiffs and the Damages Class all unlawful or inequitable proceeds they received from their sales of Clobetasol.

336.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to indirect purchases of Clobetasol by Plaintiffs and the Damages Class.

337.    Plaintiffs and the Damages Class have no adequate remedy at law.

338.    By engaging in the foregoing unlawful or inequitable conduct depriving Plaintiffs and the Damages Class of the opportunity to purchase lower-priced generic versions of

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Clobetasol and forcing them to pay higher prices for Clobetasol, Defendants have been unjustly enriched in violation of the common law of various states, as outlined below:

**Alabama**

339.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clobetasol in Alabama at prices that were more than they would have been but for Defendants' actions.  Defendants received money from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges, and have retained this money. Defendants have benefitted at the expense of Plaintiffs and the Damages Class from revenue resulting from unlawful overcharges for Clobetasol.  It is inequitable for Defendants to accept and retain the benefits received without compensating Plaintiffs and the Damages Class.

**Alaska**

340.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clobetasol in Alaska at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefits bestowed upon them by Plaintiffs and the Damages Class. Defendants accepted and retained the benefits bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Arizona**

341.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clobetasol in Arizona at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for Clobetasol. Plaintiffs and the Damages Class have been impoverished by the overcharges for Clobetasol resulting from Defendants' unlawful conduct.   Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.  There is no justification for Defendants' receipt of the benefits causing their enrichment and Plaintiffs' and the Damages Class's impoverishment, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.  Plaintiffs and the Damages Class have no remedy at law.

**Arkansas**

342.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clobetasol in Arkansas at prices that were more than they would have been but for Defendants' actions.  Defendants received money from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges, and have retained this money. Defendants have paid no consideration to any other person in exchange for this money.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**California**

343.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clobetasol in California at prices that were more than they would have been

161

but for Defendants' actions. Defendants have received a benefit from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges. Defendants retained the benefits bestowed upon them under inequitable and unjust circumstances at the expense of Plaintiffs and the Damages Class.

### Colorado

344.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clobetasol in Colorado at prices that were more than they would have been but for Defendants' actions. Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants. Defendants have benefitted at the expense of Plaintiffs and the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

### Connecticut

345.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clobetasol in Connecticut at prices that were more than they would have been but for Defendants' actions. Defendants were benefitted in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class. Defendants have paid no consideration to any other person in exchange for this benefit. Defendants retained the benefits bestowed upon them under inequitable and unjust circumstances at the expense of Plaintiffs and the Damages Class.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Delaware**

346.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clobetasol in Delaware at prices that were more than they would have been but for Defendants' actions.  Defendants have been enriched by revenue resulting from unlawful overcharges for Clobetasol.  Plaintiffs and the Damages Class have been impoverished by the overcharges for Clobetasol resulting from Defendants' unlawful conduct.   Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.  There is no justification for Defendants' receipt of the benefits causing their enrichment, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.  Plaintiffs and the Damages Class have no remedy at law.

**District of Columbia**

347.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clobetasol in the District of Columbia at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants retained the benefit bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits.

**Florida**

348.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clobetasol in Florida at prices that were more than they would have been but

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefits bestowed upon them by Plaintiffs and the Damages Class.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

### Georgia

349.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clobetasol in Georgia at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

### Hawaii

350.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clobetasol in Hawaii at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Idaho**

351.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clobetasol in Idaho at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit conferred upon them by Plaintiffs and the Damages Class.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Illinois**

352.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clobetasol in Illinois at prices that were more than they would have been but for Defendants' actions. Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.  It is against equity, justice, and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

**Iowa**

353.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clobetasol in Iowa at prices that were more than they would have been but for Defendants' actions.  Defendants have been enriched by revenue resulting from unlawful overcharges for Clobetasol, which revenue resulted from anticompetitive prices paid by Plaintiffs

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

and the Damages Class, which inured to Defendants' benefit.  Defendants' enrichment has occurred at the expense of Plaintiffs and the Damages Class.  Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Kansas**

354.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clobetasol in Kansas at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Kentucky**

355.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clobetasol in Kentucky at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit conferred upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Louisiana**

356.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clobetasol in Louisiana at prices that were more than they would have been but for Defendants' actions.  Defendants have been enriched by revenue resulting from unlawful overcharges for Clobetasol.  Plaintiffs and the Damages Class have been impoverished by the overcharges for Clobetasol resulting from Defendants' unlawful conduct.  Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.  There is no justification for Defendants' receipt of the benefits causing their enrichment, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.  Plaintiffs and the Damages Class have no other remedy at law.

**Maine**

357.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clobetasol in Maine at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Maryland**

358.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clobetasol in Maryland at prices that were more than they would have been

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

but for Defendants' actions. Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class. Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Massachusetts**

359.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clobetasol in Massachusetts at prices that were more than they would have been but for Defendants' actions. Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class. Defendants were aware of or appreciated the benefit conferred upon them by Plaintiffs and the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Michigan**

360.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clobetasol in Michigan at prices that were more than they would have been but for Defendants' actions. Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants. Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Plaintiffs and the Damages Class.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Minnesota**

361.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clobetasol in Minnesota at prices that were more than they would have been but for Defendants' actions.   Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.   Defendants appreciated and knowingly accepted the benefits bestowed upon them by Plaintiffs and the Damages Class.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Mississippi**

362.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clobetasol in Mississippi at prices that were more than they would have been but for Defendants' actions.   Defendants received money from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges.   Defendants retain the benefit of overcharges received on the sales of Clobetasol, which in equity and good conscience belong to Plaintiffs and the Damages Class on account of Defendants' anticompetitive conduct.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Missouri**

363.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clobetasol in Missouri at prices that were more than they would have been

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

but for Defendants' actions.   Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.   Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.   Defendants accepted and retained the benefit bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.

**Montana**

364.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clobetasol in Montana at prices that were more than they would have been but for Defendants' actions.   Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Nebraska**

365.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clobetasol in Nebraska at prices that were more than they would have been but for Defendants' actions.   Defendants received money from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges, and have retained this money. Defendants have paid no consideration to any other person in exchange for this money.   In justice and fairness, Defendants should disgorge such money and remit the overcharged payments back to Plaintiffs and the Damages Class.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Nevada**

366.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clobetasol in Nevada at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants in the nature of revenue resulting from unlawful overcharges for Clobetasol.  Defendants appreciated the benefits bestowed upon them by Plaintiffs and the Damages Class, for which they have paid no consideration to any other person.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**New Hampshire**

367.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clobetasol in New Hampshire at prices that were more than they would have been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants.   Under the circumstances, it would be unconscionable for Defendants to retain such benefits.

**New Jersey**

368.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clobetasol in New Jersey at prices that were more than they would have been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants.  The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

unlawful overcharges arising from arising from unlawful overcharges to Plaintiffs and the Damages Class. Defendants have paid no consideration to any other person for any of the unlawful benefits they received from Plaintiffs and the Damages Class with respect to Defendants' sales of Clobetasol. Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**New Mexico**

369. Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clobetasol in New Mexico at prices that were more than they would have been but for Defendants' actions. Defendants have knowingly benefitted at the expense of Plaintiffs and the Damages Class from revenue resulting from unlawful overcharges for Clobetasol. To allow Defendants to retain the benefits would be unjust because the benefits resulted from anticompetitive pricing that inured to Defendants' benefit and because Defendants have paid no consideration to any other person for any of the benefits they received.

**New York**

370. Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clobetasol in New York at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for Clobetasol, which revenue resulted from anticompetitive prices paid by Plaintiffs and the Damages Class, which inured to Defendants' benefit. Defendants' enrichment has occurred at the expense of Plaintiffs and the Damages Class. It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**North Carolina**

371.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clobetasol in North Carolina at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Plaintiffs and the Damages Class did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.  The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from arising from unlawful overcharges to Plaintiffs and the Damages Class.  The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to unlawful overcharges are ascertainable by review of sales records.  Defendants consciously accepted the benefits conferred upon them.

**North Dakota**

372.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clobetasol in North Dakota at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for Clobetasol.  Plaintiffs and the Damages Class have been impoverished by the overcharges for Clobetasol resulting from Defendants' unlawful conduct.  Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.  There is no justification for Defendants' receipt of the benefits causing their enrichment, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.  Plaintiffs and the Damages Class have no remedy at law.  Under the circumstances,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

it would be unjust for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

### Oklahoma

373.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clobetasol in Oklahoma at prices that were more than they would have been but for Defendants' actions.  Defendants received money from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges, and have retained this money. Defendants have paid no consideration to any other person in exchange for this money.  Plaintiffs and the Damages Class have no remedy at law.  It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

### Oregon

374.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clobetasol in Oregon at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

### Pennsylvania

375.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clobetasol in Pennsylvania at prices that were more than they would have been but for Defendants' actions. Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit

bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be

inequitable for Defendants to retain such benefits without compensating Plaintiffs and the

Damages Class.

### Puerto Rico

376.    Defendants unlawfully overcharged End-payers, who made purchases of or

reimbursements for Clobetasol in Puerto Rico at prices that were more than they would have

been but for Defendants' actions.  Defendants have been enriched by revenue resulting from

unlawful overcharges for Clobetasol.  Plaintiffs and the Damages Class have been impoverished

by the overcharges for Clobetasol resulting from Defendants' unlawful conduct.  Defendants'

enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.  There is no

justification for Defendants' receipt of the benefits causing their enrichment and Plaintiffs' and

the Damages Class's impoverishment, because Plaintiffs and the Damages Class paid

supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for

Defendants to retain any revenue gained from their unlawful overcharges.  Plaintiffs and the

Damages Class have no remedy at law.

### Rhode Island

377.    Defendants unlawfully overcharged End-payers, who made purchases of or

reimbursements for Clobetasol in Rhode Island at prices that were more than they would have

been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic

benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the

economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit

bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**South Carolina**

378.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clobetasol in South Carolina at prices that were more than they would have been but for Defendants' actions.  The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from arising from unlawful overcharges to Plaintiffs and the Damages Class.  Defendants realized value from the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**South Dakota**

379.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clobetasol in South Dakota at prices that were more than they would have been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants.  Defendants were aware of the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits without reimbursing Plaintiffs and the Damages Class.

**Tennessee**

380.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clobetasol in Tennessee at prices that were more than they would have been

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.  It would be futile for Plaintiffs and the Damages Class to seek a remedy from any party with whom they have privity of contract. Defendants have paid no consideration to any other person for any of the unlawful benefits they received indirectly from Plaintiffs and the Damages Class with respect to Defendants' sales of Clobetasol.  It would be futile for Plaintiffs and the Damages Class to exhaust all remedies against the entities with which Plaintiffs and the Damages Class have privity of contract because Plaintiffs and the Damages Class did not purchase Clobetasol directly from any Defendant.

**Texas**

381.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clobetasol in Texas at prices that were more than they would have been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants.  Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  The circumstances under which Defendants have retained the benefits bestowed upon them by Plaintiffs and the Damages Class are inequitable in that they result from Defendants' unlawful overcharges for Clobetasol.  Plaintiffs and the Damages Class have no remedy at law.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Utah**

382.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clobetasol in Utah at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Vermont**

383.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clobetasol in Vermont at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants accepted the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Virginia**

384.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clobetasol in Virginia at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

economic detriment of Plaintiffs and the Damages Class. Defendants were aware of the benefit bestowed upon them. Defendants should reasonably have expected to repay Plaintiffs and the Damages Class. The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of Clobetasol. Defendants have paid no consideration to any other person for any of the benefits they have received from Plaintiffs and the Damages Class.

**Washington**

385.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clobetasol in Washington at prices that were more than they would have been but for Defendants' actions. Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class. Defendants were aware of or appreciated the benefit conferred upon them by Plaintiffs and the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**West Virginia**

386.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clobetasol in West Virginia at prices that were more than they would have been but for Defendants' actions. Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class. Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class. Under the

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Wisconsin**

387.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clobetasol in Wisconsin at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Wyoming**

388.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clobetasol in Wyoming at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants accepted, used and enjoyed the benefits bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**U.S. Virgin Islands**

389.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clobetasol in the United States Virgin Islands at prices that were more than

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

they would have been but for Defendants' actions.  Defendants have been enriched by revenue resulting from unlawful overcharges for Clobetasol, which revenue resulted from anticompetitive prices paid by Plaintiffs and the Damages Class, which inured to Defendants' benefit. Defendants' enrichment has occurred at the expense of Plaintiffs and the Damages Class. Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.  Plaintiffs and the Damages Class have no remedy at law.

## XV.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment for the following relief:

1.      The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable Notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

2.      That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed: (a) an unreasonable restraint of trade or commerce in violation of Sections 1 and 3 of the Sherman Act; (b) a *per se* violation of Sections 1 and 3 of the Sherman Act; (c) an unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and (d) acts of unjust enrichment by Defendants as set forth herein.

3.      Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed under such state laws, and that a judgment in favor of Plaintiffs and members of

the Damages Class be entered against Defendants jointly and severally in an amount to be trebled to the extent such laws permit;

4.      Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully obtained;

5.      Plaintiffs and members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment, and the Court establish of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and members of the Damages Class may make claims on a *pro rata* basis;

6.      Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

7.      Plaintiffs and members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate;

8.      Plaintiffs and members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

9.      Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

## XVI.  JURY DEMAND

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil

Procedure, of all issues so triable.


April 1, 2019                                                    Respectfully submitted,


                                                                Roberta D. Liebenberg, Esquire
                                                                Fine, Kaplan and Black, R.P.C.
                                                                One South Broad Street, 23rd Floor
                                                                Philadelphia, PA  19107
                                                                (215) 567-6565
                                                                rliebenberg@finekaplan.com

                                                                **Lead Counsel for the End-Payer Plaintiffs**


Gregory S. Asciolla, Esquire                    Michael M. Buchman, Esquire
Labaton Sucharow LLP                            Motley Rice LLC
140 Broadway                                    600 Third Avenue, Suite 2101
New York, NY  10005                             New York, NY  10016
(212) 907-0700                                  (212) 577-0040
gasciolla@labaton.com                           mbuchman@motleyrice.com


Elizabeth J. Cabraser, Esquire                  James R. Dugan, II, Esquire
Lieff Cabraser Heimann & Bernstein LLP          The Dugan Law Firm, APLC
275 Battery Street, 29th Floor                  365 Canal Street, Suite 1000
San Francisco, CA  94111-3339                   New Orleans, LA 70130
(415) 956-1000                                  (504) 648-0180
ecabraser@lchb.com                              jdugan@dugan-lawfirm.com


Jayne A. Goldstein, Esquire                     Mindee J. Reuben, Esquire
Shepherd Finkelman Miller & Shah, LLP           Lite DePalma Greenberg, LLC
1625 N. Commerce Parkway, Suite 320             1835 Market Street, 27th Floor
Fort Lauderdale, FL 33326                       Philadelphia, PA  19103
(886) 849-7545                                  (267) 314-7980
jgoldstein@sfmslaw.com                          mreuben@litedepalma.com


Joseph R. Saveri, Esquire                       Dena C. Sharp, Esquire
Joseph Saveri Law Firm, Inc.                    Girard Sharp LLP

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

555 Montgomery Street, Suite 1210
San Francisco, CA  94111
(415) 500-6800
jsaveri@saverilawfirm.com

Heidi M. Silton, Esquire
Lockridge Grindal Nauen P.L.L.P.
100 Washington Avenue South
Suite 2200
Minneapolis, MN  55401
(612) 339-6900
hmsilton@locklaw.com

Adam J. Zapala, Esquire
Cotchett, Pitre & McCarthy, LLP
840 Malcolm Road, Suite 200
Burlingame, CA  94010
(650) 697-6000
azapala@cpmlegal.com

601 California Street, Suite 1400
San Francisco, CA 94108
(415) 981-4800
chc@girardsharp.com

Bonny E. Sweeney, Esquire
Hausfeld LLP
600 Montgomery Street, Suite 3200
San Francisco, CA  94111
(415) 633-1908
bsweeney@hausfeld.com

### End-Payer Plaintiffs' Steering Committee

Audrey A. Browne, Esquire
American Federation of State, County and
    Municipal Employees District Council 37
    Health & Security Plan
125 Barclay Street, Rm. 313
New York, NY 10007
(212) 815-1304
abrowne@dc37.net

**Attorneys for Plaintiff American
Federation of State, County and
Municipal Employees District
Council 37 Health & Security Plan**

Dan Drachler, Esquire
Zwerling Schachter & Zwerling, LLP
41 Madison Avenue
New York, NY 10010
(212) 223-3900
ddrachler@zsz.com

Peter Safirstein, Esquire
Safirstein Metcalf LLP
1250 Broadway, 27th Floor
New York, NY 10001
(212) 201-2845
psafirstein@safirsteinmetcalf.com

Lee Albert, Esquire
Glancy Prongay & Murray, LLP
122 East 42nd Street, Suite 2920
New York, NY 10168
(212) 682-5340
lalbert@glancylaw.com

### Additional End-Payer Plaintiffs' Counsel

184

CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of April, 2019, the foregoing Consolidated Amended End-Payer Class Action Complaint was filed with the Clerk of Court who will electronically enter this filing on the docket.  Thereafter, via ECF notifications, the filing will be served on all interested parties registered for electronic filing and be available for viewing and downloading from the Court's ECF system.

Roberta D. Liebenberg