**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION** | **MDL NO. 2724**<br>**16-md-2724** |
| ***IN RE: CLOBETASOL CASES*** | **EPP CASE: 16-CB-27242** |
| ***IN RE: CLOMIPRAMINE CASES*** | **EPP CASE: 16-CM-27242** |
| **THIS DOCUMENT APPLIES TO:**<br>***EPP BELLWETHER ACTIONS*** | |

<u>**OPINION**</u>

**Rufe, J.**                                                    **March 7, 2025**

This multidistrict antitrust litigation ("MDL") concerns alleged price-fixing schemes involving numerous generic drugs and generic drug manufacturers. The Court selected initial bellwether cases from the proposed class actions brought by End-Payer Plaintiffs ("EPPs") and Direct Purchaser Plaintiffs ("DPPs") as to two generic drugs, clomipramine and clobetasol. This Opinion considers EPPs' motion to certify class in the bellwether actions for clomipramine and clobetasol.

I.    **BACKGROUND**

Clobetasol is a potent topical corticosteroid that is prescribed for various inflammatory skin conditions, in one of five formulations: cream, ointment, emollient cream, solution, and gel.[1] Clomipramine is an oral medication used to treat obsessive compulsive disorder ("OCD").[2] EPPs

---

[1] Consolidated Class Action Compl. [Clobetasol], No. 16-CB-27241 ¶¶ 1-2 [Doc. No. 92].

[2] Consolidated Class Action Compl. [Clomipramine], No. 16-CM-27242 ¶ 2 [Doc. No. 74].

contend that Defendants colluded in violation of federal antitrust laws to raise the price of clomipramine beginning in 2013 and clobetasol beginning in 2014.[3]

EPPs moved for class certification in the Clobetasol and Clomipramine cases. EPPs sought to certify the following classes of end payer plaintiffs who allege injury arising from the allegedly anticompetitive actions by Defendants:

For Clomipramine:

**<u>Antitrust Damages Class:</u>**
All Third-Party Payers who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price for Defendants' generic Clomipramine products (generic clomipramine hydrochloride 25, 50, or 75 mg capsules) purchased in the Antitrust Damages Jurisdictions at retail or via mail-order, for personal use by their members, enrollees or beneficiaries and not for resale, from August 1, 2013 through December 31, 2018.

**<u>Consumer Protection and Unfair Competition Damages Class:</u>**
All Third-Party Payers who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price for Defendants' generic Clomipramine products (generic clomipramine hydrochloride 25, 50, or 75 mg capsules) purchased in the Consumer Protection Damages Jurisdictions at retail or via mail-order, for personal use by their members, enrollees or beneficiaries and not for resale, from August 1, 2013 through December 31, 2018.

**<u>Unjust Enrichment Class:</u>**
All Third-Party Payers who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price for Defendants' generic Clomipramine products (generic clomipramine hydrochloride 25, 50, or 75 mg capsules) purchased in the Unjust Enrichment Jurisdictions at retail or via mail-order, for personal use by their members, enrollees or beneficiaries and not for resale, from August 1, 2013 through December 31, 2018.

**<u>Exclusions</u>**
Excluded from each of the three Classes are: (a) Defendants, their subsidiaries, and affiliates; (b) all federal governmental entities; (c) all state governmental entities; and (d) Third-Party Payers for purchases made pursuant to any Medicaid plan, whether fee-for-service or Managed Medicaid.

---

[3] Further information on allegations in the bellwether cases may be found in the Court's Opinion of December 3, 2024. *In re Generic Pharms. Pricing Antitrust Litig.*, 2024 WL 4980784 (E.D. Pa. Dec. 3, 2024). The Court assumes familiarity with its *Daubert* opinion that analyzed the opinions of the experts upon which EPPs rely in seeking class certification.

For the avoidance of doubt, the Classes do not include: (a) natural person consumers; (b) Pharmacy Benefit Managers [("PBMs")]; or (c) purchases made other than via retail or mail order. The Classes do include: cities, towns, municipalities, or counties with self-funded prescription drug plans.[4]

For Clobetasol:

**Antitrust Damages Class:**
All Third-Party Payers who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price for Defendants' generic Clobetasol products (generic clobetasol propionate cream, emollient cream, ointment, solution and gel) purchased in the Antitrust Damages Jurisdictions at retail or via mail-order, for personal use by their members, enrollees or beneficiaries and not for resale, from September 1, 2014 through December 31, 2018.

**Consumer Protection and Unfair Competition Damages Class:**
All Third-Party Payers who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price for Defendants' generic Clobetasol products (generic clobetasol propionate cream, emollient cream, ointment, solution and gel) purchased in the Consumer Protection Damages Jurisdictions at retail or via mail-order, for personal use by their members, enrollees or beneficiaries and not for resale, from September 1, 2014 through December 31, 2018.

**Unjust Enrichment Class:**
All Third-Party Payers who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price for Defendants' generic Clobetasol products (generic clobetasol propionate cream, emollient cream, ointment, solution and gel) purchased in the Unjust Enrichment Jurisdictions at retail or via mail-order, for personal use by their members, enrollees or beneficiaries and not for resale, from September 1, 2014 through December 31, 2018.

**Exclusions**
Excluded from each of the three Classes are: (a) Defendants, their subsidiaries, and affiliates; (b) all federal governmental entities; (c) all state governmental entities; and (d) Third-Party Payers for purchases made pursuant to any Medicaid plan, whether fee-for-service or Managed Medicaid.
For the avoidance of doubt, the Classes do not include: (a) natural person consumers; (b) Pharmacy Benefit Managers; or (c) purchases made other than via retail or mail order. The Classes do include: cities, towns, municipalities, or counties with self-funded prescription drug plans.[5]

---

[4] EPPs' Mot. Class Certif. [Clomipramine], No. 16-CM-27242 ¶ 1 [Doc. No. 180] (footnotes and emphasis omitted).

[5] EPPs' Mot. Class Certif. [Clobetasol], No. 16-CB-27242 ¶ 1 [Doc. No. 236] (footnotes and emphasis omitted).

EPPs propose the following class representatives for each class for **Clomipramine**:

- American Federation of State, County and Municipal Employees District Council 37 Health & Security Plan ("DC37");
- The City of Providence, Rhode Island ("City of Providence");
- Louisiana Health Service & Indemnity Co. d/b/a Blue Cross and Blue Shield of Louisiana and HMO Louisiana, Inc. ("BCBS-LA");
- Self-Insured Schools of California ("SISC");
- Uniformed Fire Officers Association and Family Protection Plan Local 854 ("UFOA"); and
- United Food & Commercial Workers and Employers Arizona Health and Welfare Trust ("UFCW-AZ").

EPPs propose the following class representatives for each class for **Clobetasol**:

- 1199SEIU National Benefit Fund, 1199SEIU Greater New York Benefit Fund, 1199SEIU National Benefit Fund for Home Care Workers, and 1199SEIU Licensed Practical Nurses Welfare Fund are jointly administered health and welfare funds (collectively, "1199SEIU");
- DC37;
- Hennepin County, Minnesota ("Hennepin County");
- BCBS-LA;
- SISC;
- Sergeants Benevolent Association of the Police Department of the City of New York Health and Welfare Fund ("SBA"); and
- UFOA.

As a necessary prelude to class certification, the Court ruled on motions to exclude the opinions of several experts whose opinions have bearing on class certification. In EPPs' cases, the Court: (1) granted EPPs' motions to partially exclude the opinions of Dr. James Hughes, Dr. Erin Trish, and Dr. Laura Happe; (2) granted, in part, EPPs' motion to exclude the opinions of Dr. Richard Gilbert; and (3) denied Defendants' motions to exclude the opinions of Dr. James McClave, Dr. Russell Lamb, Ms. Laura Craft, and Mr. Eric Miller.[6] The Court denied each motion for exclusion related to those experts on all other bases. The parties presented oral argument on

---

[6] *In re Generic Pharms. Pricing Antitrust Litig.*, 2024 WL 4980784 at *34.

class certification on December 17, 2024, after the Court ruled on the motions to exclude. Subsequently, Defendants submitted a motion to reconsider the partial exclusion of two experts, Dr. Erin Trish and Dr. James Hughes, as well as a motion to, in the alternative, submit additional expert briefing for those experts. Upon evaluation of the parties' briefs, the Court granted Defendants' motion for reconsideration as it pertains to opinions by Dr. Erin Trish that directly respond to EPPs' experts on the issue of spread pricing—but not as to Dr. Trish's assertions that spread pricing was a cause of inflated end payer prices. The Court denied the motion as it pertained to all other arguments made in favor of reconsideration and further denied Defendants' motion to permit additional expert reports.[7]

## II.  LEGAL STANDARD

For class certification to be granted, Plaintiff must first demonstrate that the four elements of Federal Rule of Civil Procedure 23(a) have been met. These elements are: (1) numerosity—the class is so numerous that joinder of all members is impracticable; (2) commonality—there are questions of law or fact common to the class; (3) typicality—the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) adequate representation—the representative parties will fairly and adequately protect the interests of the class.[8]

In addition, a class action must satisfy at least one of the three elements of Rule 23(b)(1), (2), or (3) before a class can be certified.[9] In the Third Circuit, Rule 23(b)(3) also requires that class be "currently and readily ascertainable based on objective criteria."[10] The Third Circuit has

---

[7] *In re Generic Pharms. Pricing Antitrust Litig.*, 2025 WL 478178 (E.D. Pa. Feb. 12, 2025).

[8] *See* Fed. R. Civ. P. 23(a). *See Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 590-91 (3d Cir. 2012).

[9] *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011) (citations omitted).

[10] *In re Niaspan Antitrust Litigation*, 67 F.4th 118, 129-30 (3d Cir. 2023).

reaffirmed its holding that Rule 23 contains a heightened ascertainability requirement under which class plaintiffs must plead and prove an administratively feasible mechanism for identifying class members in *In re Niaspan Antitrust Litigation*,[11] which denied class certification on administrative-feasibility grounds. This ascertainability requirement is two-fold: "(1) the class is defined with reference to objective criteria; and (2) there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition."[12]

The party seeking class certification has the burden as to all elements,[13] and the Court must conduct "a 'rigorous analysis' of the evidence and arguments put forth."[14] The Court may be required to resolve factual or legal disputes relevant to class certification, and factual determinations must be made by a preponderance of the evidence.[15]

## III.   DISCUSSION

Plaintiffs must meet the requirements of both Rule 23(a) and 23(b) for classes to be certified. Defendants oppose EPPs' motion for class certification on the grounds that they cannot satisfy either Rule 23(a) or Rule 23(b), particularly given that the payment chain between Defendants and EPPs involves multiple levels of numerous individually negotiated contracts. Defendants argue that recent cases have denied certification for end-payers.

---

[11] 67 F.4th 118.

[12] *Id*. at 130.

[13] *In re Modafinil Antitrust Litig.*, 837 F.3d 238, 248 (3d Cir. 2016), *as amended* (Sept. 29, 2016) (quoting *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 591 (3d Cir. 2012)).

[14] *Marcus*, 687 F.3d at 591 (quoting *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 316 (3d Cir. 2008), *as amended* (Jan. 16, 2009)).

[15] *Hydrogen Peroxide*, 552 F.3d at 307.

### A.      Rule 23(a)

EPPs argue that each proposed class satisfies the requirements under Rule 23(a): numerosity, commonality, typicality, and adequacy. Here, numerosity and adequacy are not disputed; Defendants argue that EPPs fail to establish commonality and typicality.

#### 1.      Numerosity

The numerosity requirement "prevents putative class representatives and their counsel, when joinder can be easily accomplished, from unnecessarily depriving members of a small class of their right to a day in court to adjudicate their own claims."[16] EPPs' experts opine that each of the proposed classes is estimated to include thousands of members.[17] This number is plainly sufficient to satisfy this element of Rule 23(a).

#### 2.      Commonality

EPPs argue that commonality is established because the named Plaintiffs all share at least one question of law or fact. Commonality is satisfied where the class members share even a "single" common question capable of class wide resolution.[18] The Third Circuit has indicated that the bar to satisfy the commonality requirement is low.[19]

---

[16] *Marcus*, 687 F.3d at 594-95 (citation omitted).

[17] EPPs rely on findings from multiple experts: "Craft Rep. Table 8 (identifying more than 1 million Clomipramine prescriptions paid by TPPs); Miller Decl. ¶ 20 (noting thousands of TPPs typically file claims in cases like this one)." EPPs' Mem. Supp. Mot. Certif. Class [Clomipramine] at 33-34, No. 16-CM-27242 [Doc. No. 183]; "Brod Report ¶ 10 (three million Clobetasol prescriptions filled per year by nearly two million patients); Craft Report Table 8 (noting more than 14 million prescriptions filled during Class Period); Miller Decl. ¶ 20 (noting thousands of TPPs typically file claims in cases like this one)." EPPs' Mem. Supp. Mot. Certif. Class [Clobetasol] at 31, No. 16-CB-27242 [Doc. No. 240]. Throughout the discussion, after first reference, where the discussion pertains to both Clomipramine and Clobetasol documents, the Court cites the relevant Clomipramine document.

[18] *See Wal-Mart*, 564 U.S. at 359.

[19] *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 182-83 (3d Cir. 2001), as amended (Oct. 16, 2001) (collecting cases).

EPPs argue that they satisfy the commonality requirement because, at trial, classes will seek to prove the existence, scope, and effectiveness of an agreement among Defendants to increase prices for the bellwether drugs. Both sides, they maintain, will devote a majority of trial to litigating the facts and law of this conspiracy.[20] But Defendants argue that the Supreme Court's decision in *Wal-Mart v. Dukes* dictates that EPPs must demonstrate that class members have "suffered the same injury," not just that they have all suffered a violation of the same provision of law.[21] Defendants argue that EPPs are incapable of doing so because the purported class includes individuals who Defendants contend suffered no antitrust injury.[22]

As explained above, the Third Circuit has established a low threshold of analysis on commonality. The parties dispute whether certain class members suffered antitrust injury, but *Wal-Mart v. Dukes* asks a Court to consider no more than whether the plaintiffs' claims "depend upon a common contention."[23] It does not require that a court determine at this stage in its analysis whether each class member has actually incurred a specific type of injury, but only that the named plaintiffs and class members *contend* that their injury arises from a common question capable of class wide resolution. EPPs satisfy that requirement because they propose to use common evidence to demonstrate that class members sustained injury resulting from the same alleged anticompetitive behavior by Defendants.

---

[20] EPPs' Mem. Supp. Mot. Certif. Class [Clomipramine] at 34-35, 16-CM-27242, [Doc. No. 184].

[21] Defs.' Opp'n Class Certif. [Clomipramine] at 18-19, 16-CM-27242 [Doc. No. 211].

[22] *Id*. 19-20.

[23] *Wal-Mart*, 564 U.S. at 350.

### 3. Typicality

The typicality requirement is related to the commonality requirement, although courts analyze each separately.[24] Typicality requires that the "claims or defenses of the representative parties are typical of the claims or defenses of the class," centering on whether the individual circumstances of the named plaintiffs are markedly different from claims of all other class members.[25] Where the claims involve the same conduct by the defendants and there is similarity between the classes of legal theory and claims, typicality is satisfied even if there are factual differences among purported class members.[26] As with commonality, the threshold for satisfying the typicality requirement is low.[27]

EPPs allege that Defendants engaged in a common scheme that affected all members of the proposed classes, and that the named Plaintiffs pursue claims under that scheme that are typical of all subclasses.[28] Defendants, however, argue that to determine whether typicality is met courts evaluate whether the class representatives are sufficiently similar to the rest of the class in terms of their legal claims, factual circumstances, and stake in the litigation.[29] Defendants argue that certain facts, including the nature of the class representatives' business, their purchasing habits, funding, contracts with PBMs, and whether they had GER guarantees,[30] would be relevant to a court in determining whether they are typical of the class as a whole.

---

[24] *Newton*, 259 F.3d at 182-83 (3d Cir. 2001), as amended (Oct. 16, 2001).

[25] *Id*. at 182.

[26] *Id*. at 182-84; *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 597-98 (3d Cir. 2009).

[27] *Newton*, 259 F.3d at 182-83 (3d Cir. 2001), as amended (Oct. 16, 2001) (collecting cases).

[28] EPPs' Mem. Supp. Mot. Certif. Class [Clomipramine] at 35, No. 16-CM-27242, [Doc. No. 183].

[29] Defs.' Opp'n Class Certif. [Clomipramine] at 21, No. 16-CM-27242 [Doc. No. 211].

[30] A commitment made by a PBM to ensure that the average cost of generic drugs dispensed by pharmacies remains below a certain threshold.

EPPs have met the low threshold for typicality in this matter. Facts about the named Plaintiffs, including their funding and contractual particularities, are irrelevant in the Court's assessment of typicality. What is pertinent to this analysis is whether the class representatives are third party payers, whether they paid for the bellwether drugs during the applicable time period, and whether they seek recovery under the same legal theories as the whole class for the same wrongful conduct. Whether there are slight factual variations in the circumstances between class members, between named plaintiffs, or between named plaintiffs and the entirety of the classes is immaterial in evaluating typicality. EPPs have provided sufficient detail that named representatives are typical of the class and that their claims arise out of the same legal theories as the other proposed class members.[31]

### 4. Adequacy

Adequacy turns on whether conflicts of interest exist between the named parties and the classes that they represent.[32] In addition, class counsel must be qualified, experienced, and fully capable of litigating the class members' claims.[33] EPPs contend the interests of the class representatives are aligned with the absent class members because they share a common goal of establishing that Defendants engaged in an anticompetitive conspiracy.[34] The requirement that class representatives pass a low threshold of knowledge and commitment is satisfied, according

---

[31] Defendants suggest that funding is relevant because one named plaintiff, AFSCME DC 37 ("DC37"), was fully funded by New York City and, accordingly, could not have suffered damages, which would have been paid for by the city. Defs.' Opp'n Class Certif. [Clomipramine] at 21 n.11, No. 16-CM-27242 [Doc. No. 211]. EPPs clarify that New York City did not reimburse DC37 for drug purchases, but rather contributed to the entity's welfare fund. Defendants do not dispute that DC37 paid for the drugs at issue, but amended their argument in further briefing to contend that reimbursement by the city presents the potential for unique defenses, which they argue defeats typicality. Defs.' Sur-Reply in Opp'n Class Certif. [Clomipramine] at 50, No. 16-CM-27242 [Doc. No. 272]. But whether or not DC37 was reimbursed for the bellwether drugs, their claims are typical to the proposed classes.

[32] *In re Suboxone (Buprenorphine Hydrochlorine & Naloxone) Antitrust Litig.*, 967 F.3d 264, 272 (3d Cir. 2020).

[33] *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 532 (3d Cir. 2004).

[34] EPPs' Mem. Supp. Mot. Certif. Class [Clomipramine] at 35-36, No. 16-CM-27242, [Doc. No. 184]

to EPPs, where named representatives speak with lawyers, review the complaint, and review collected documents. EPPs note that this requirement has been well-satisfied since the inception of this litigation because class representatives have responded to multiple discovery requests, produced large volumes of data, and sat for multiple depositions.

Defendants do not challenge certification on the basis of adequacy. The Court is satisfied with EPPs' evidence regarding the degree of involvement from class representatives in this litigation.[35]  The Court concludes they are adequate class representatives. Further, there is no dispute that class counsel is well qualified as required by Rule 23(e)(2)(A). EPPs have met their burden of satisfying the requirements for class certification under Rule 23(a).

### B.    Rule 23(b)

As EPPs meet the requirements under Rule 23(a) for class certification, the Court turns to Rule 23(b). A class action also must satisfy at least one of the three requirements listed in Rule 23(b).[36] EPPs proceed under Rule 23(b)(3), which provides that certification is appropriate if Rule 23(a) is satisfied and if:

> the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> (D) the likely difficulties in managing a class action.[37]

---

[35] *Id.* (including that each class representative has participated in multiple discovery requests, produced significant documents and data, and have sat for multiple depositions).

[36] *Wal-Mart Stores*, 564 U.S. at 345 (2011) (citations omitted).

[37] Fed. R. Civ. P. 23(b)(3).

In addition, the Third Circuit has held that "Rule 23(b)(3) has an implicit requirement that class members be ascertainable."[38] Ascertainability requires EPPs to show that "(1) the class is defined with reference to objective criteria; and (2) there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition."[39]

EPPs contend that they meet the requirements under Rule 23(b) that (1) common questions of law or fact predominate over individual questions, (2) a class action is the superior method of adjudication, and (3) under Third Circuit law, the proposed classes are "currently and readily ascertainable." But Defendants challenge each of those arguments. Defendants contend that the Third Circuit's holding in *In re Niaspan Antitrust Litigation* forecloses class-wide treatment because EPPs' classes are not ascertainable. Defendants say that, here, EPPs offer "similar" class definitions and the "same" data as experts as was offered in *Niaspan*. Defendants argue that (1) EPPs have not demonstrated that the classes are ascertainable, the bulk of their argument, (2) EPPs have not demonstrated predominance, and (3) EPPs have failed to demonstrate that a class action is the superior mode of adjudication. The Court addresses each factor below.

1. Predominance

To certify a class under Rule 23(b)(3), "a district court must find that 'questions of law or fact common to class members predominate over any questions affecting only individual members.'"[40] "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where

---

[38] *In re Niaspan Antitrust Litig.*, 67 F.4th at 133.

[39] *Lewis v. Gov't Emps. Ins. Co.*, 98 F.4th 452, 462 (3d Cir. 2024) (internal citation omitted).

[40] *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 454 (2016).

'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'"[41] Class treatment is inefficient where each class member would need to offer individual evidence or testimony.[42] A plaintiff need not prove that each element of their claim is susceptible to class wide proof, but rather that common questions "predominate over any questions affecting only individual [class] members."[43]

EPPs argue that they meet their burden for predominance and that a Clobetasol or Clomipramine trial will address the same primary questions of fact:[44]

- Did Defendants Conspire to inflate the price of [Clobetasol/Clomipramine]?
- Did Defendants' conspiracy cause Plaintiffs to pay higher prices for [Clobetasol/Clomipramine] than they otherwise would have paid?
- How much more did Plaintiffs pay because of the alleged conspiracy?

EPPs argue that each question can be answered through evidence common to the classes. EPPs also argue that common questions of law predominate in this matter and that, although they assert various antitrust, consumer protection, and unjust enrichment claims in 51 jurisdictions, the pervasive and pertinent question is whether any difference in those laws is relevant to their price fixing claims. Here, EPPs argue that evidence proving the core, factual questions above will establish liability in every jurisdiction. Defendants in turn present three arguments that EPPs do not satisfy the predominance requirement: (1) that plaintiffs fail to establish class-wide anticompetitive impact, (2) that plaintiffs fail to establish class-wide damages, and (3) that plaintiffs fail to establish predominance as to questions of law.[45]

---

[41] *Id*. at 453.

[42] *In re Niaspan Antitrust Litig.*, 464 F. Supp. 3d 678, 708-09 (E.D. Pa. June 2, 2020).

[43] *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 469 (2013).

[44] EPPs' Mem. Supp. Mot. Certif. Class [Clomipramine] at 38-41, No. 16-CM-27242, [Doc. No. 183].

[45] Defs.' Opp'n Class Certif. [Clomipramine] at 38-48, No. 16-CM-27242 [Doc. No. 211].

*Common Evidence: Impact*

"In an antitrust class action, 'impact often is critically important for the purpose of evaluating Rule 23(b)(3)'s predominance requirement because it is an element of the claim that may call for individual, as opposed to common, proof.'"[46] This requires a "rigorous assessment of the available evidence and the method or methods by which plaintiffs propose to use the evidence to prove impact at trial."[47] Thus, EPPs must be able to demonstrate through common evidence that class members suffered injury due to Defendants' alleged conspiracy.[48] Defendants argue that EPPs have not satisfied their burden on predominance because the need for individual inquiry overwhelms. Defendants put forth that, because EPPs are indirect purchasers, they must demonstrate that there are multiple levels of impact capable of proof and that direct purchasers were overcharged and then passed those overcharges on to EPPs to establish class-wide anticompetitive impact. To do so, EPPs must provide a reliable model and common evidence to support that the class suffered antitrust impact.

Proof of antitrust impact is distinct from proof of antitrust damages and courts apply the standard that even one overcharge is sufficient to establish injury.[49] Class members sustain antitrust injury at the moment they were overcharged, regardless of their ability to later offset those overcharges through damage calculation adjustments.[50] EPPs contend that the record reflects abundant common evidence that they will draw on to prove class-wide impact and

---

[46] *Modafinil*, 837 F.3d at 262 (internal quotation marks and citation omitted).

[47] *Hydrogen Peroxide,* 552 F.3d at 312.

[48] *See In re Flonase Antitrust Litig.,* 284 F.R.D. 207, 221-22 (E.D. Pa. 2012).

[49] *See In re Niaspan Antitrust Litig.,* 464 F. Supp. 3d at 709-11.

[50] *See id.* at 711.

injury. First, EPPs point to several instances of documentary evidence that they argue show that end-payers paid higher prices because of Defendants' conduct:[51]

> (1) Defendants' list price increases that applied to all customers; (2) customer price announcements and contract price increases sent to all or nearly all customers; (3) Defendants' transactional data confirming price increases to all or nearly all customers; (4) PBM data encompassing approximately 95% of TPP transactions confirming price increases to all or nearly all TPPs; (5) documents (Defendants' and industry) confirm the existence of market features that facilitated the conspiracy; (6) documents (Defendants' and industry) confirming the existence of market features that made Defendants' price increases likely to have widespread effect throughout the supply chain; and (7) customer complaints (direct purchasers and end-payers) about Defendants' price increases.

Further, EPPs contend that testimonial evidence from participants in the alleged conspiracy and Defendants' Rule 30(b)(6) experts provides sufficient common evidence of causation and class-wide impact, which they use to confirm:[52]

> (1) Defendants' list prices applied to all customers; (2) list price increases were implemented to increase contract prices; (3) the purposes of inter-Defendant communications were to increase prices and keep them high; and (4) the conspiracy successfully increased prices for all or nearly all customers.

This documentary and testimonial evidence is detailed in EPPs' memoranda in support of their motion for class certification, in which EPPs set forth conversations between high-level executives employed by Defendants to support their assertion that those manufacturers colluded to violate antitrust laws.[53]

EPPs also provide expert reports from Dr. James T. McClave and Dr. Russel L. Lamb to establish that common evidence can be used to establish class-wide impact. The Court has found the testimony of both experts to be reliable under the *Daubert* standard and the analyses of both

---

[51] EPPs' Reply Mem. Supp. Mot. Class Certif. [Clomipramine] at 5, No. 16-CM-27242 [Doc. No. 233].

[52] *Id.* at 5-6.

[53] *See* EPPs' Mem. Supp. Mot. Class Certif. [Clomipramine] at 14-32, No. 16-CM-27242, [Doc. No. 184]

experts are summarized in detail in the Court's *Daubert* decision.[54] In short, EPPs present Dr. McClave as an expert to opine on class-wide impact, as well as damages, which the Court will address below.[55] Dr. McClave conducted a multiple regression analysis to find that all, or nearly all, of class members in EPPs' classes experienced at least one overcharge due to Defendants' alleged price increases.[56] Dr. McClave's regression analysis functions as follows:[57]

First, Dr. McClave performed analyses that utilized aggregated, averaged data:

- In Step 1, Dr. McClave tested, at a high level, whether manufacturer list prices such as the Wholesale Acquisition Price ("WAC") exhibit a correlative relationship with other prices in the clobetasol and clomipramine supply chains.

- In Step 2, Dr. McClave analyzed whether there was any correlation between pharmacy reimbursements and end-payer costs.

After determining that broad trends indicate a high correlative between list prices and actual prices paid by end payers, Dr. McClave performed individualized analyses to assess actual impact and damages:

- In Step 3, Dr. McClave assessed pharmacy acquisition costs encompassed in Defendants' data to compare prices that pharmacies paid during his "Benchmark Period"[58] to the prices that the pharmacy paid for the product from each defendant during his "Class Period." Dr. McClave found that more than 99 percent of pharmacies experienced a price increase for each product.

- In Step 4, Dr. McClave used the same data to analyze price increases for end-payers using PBM data, finding that 99 percent of end-payers experienced a price increase for both drugs during the Class Period.

- In Step 5, to calculate damages, Dr. McClave conducted Stage 1 of his multiple regression analysis, which controlled-at a transactional level-for innocent market forces to estimate "but for" prices for each pharmacy. Here, Dr.

---

[54] *In re Generic Pharms. Pricing Antitrust Litig.,* 2024 WL 4980784 at *4-10, *18-22.

[55] *See* McClave Corrected Expert Report [Clomipramine], Bank Decl. Ex. 1 at 1-2, No. 16-CM-27242 [Doc. No. 201-3] (hereinafter "McClave Clomipramine Rep.").

[56] *See id.* at 22, 29, 33.

[57] *In re Generic Pharms. Pricing Antitrust Litig.,* 2024 WL 4980784 at *4-5 (citations omitted).

[58] For Clomipramine, the Benchmark Period is January 1, 2009 through February 28, 2013. *See* McClave Clomipramine Rep. at 20. For Clobetasol, the Benchmark Period is January 1, 2009 through May 31, 2014. *See id.* at 29.

McClave found that more than 99 percent of pharmacies paid elevated prices for both drugs during the Class Period.

- In Step 6, Dr. McClave conducted Stage 2 of his multiple regression analysis and utilized PBM data during the Benchmark period to account for innocent market features in order to determine competitive end-payer drug costs at a transactional level. Here, Dr. McClave compared end-payer drug costs to the output of Stage 1 of his multiple regression analysis to estimate a "passthrough" ratio that Dr. McClave then uses to estimate a "but for" price for each end payer, for each product, in each month of the Class Period.

EPPs offer Dr. Lamb to opine on whether common evidence can be used to establish the existence of the alleged conspiracy and that class members were impacted by supracompetitive prices.[59] Like Dr. McClave, Dr. Lamb performed a multiple regression analysis and found that EPPs incurred a 89 to 95 percent increase in drug costs for clomipramine[60] and a 55 to 82 percent increase in drug costs for clobetasol.[61] Dr. Lamb makes two primary findings: (1) that common economic evidence—including structural characteristics of the market and the economic performance of the generic drugs—is consistent with the existence of the alleged conspiracy and is inconsistent with a market free of anticompetitive behavior; and (2) that common evidence and analysis shows that nearly all members of the proposed classes were injured as a result of the conspiracy.[62] EPPs argue that they can use Dr. Lamb's report and his analysis of the following categories of common proof to establish predominance: (1) common economic proof, "including Defendants' market dominance, the presence of high barriers to entry, the commodity nature of the products, the inelasticity of demand, and the lack of close substitutes," (2) common evidence of industry and third-party payer price trends, including price

---

[59] Lamb Corrected Expert Report [Clomipramine], Bank Decl., Ex. 1, ¶¶ 1-5 No. 16-CM-27242 [Doc. No. 199-4] (hereinafter "Lamb Clomipramine Rep.").

[60] *Id*. at ¶ 40.

[61] Lamb Correct Expert Report [Clobetasol], Bank Decl., Ex. 14, at ¶ 44.

[62] *In re Generic Pharms. Pricing Antitrust Litig.,* 2024 WL 4980784 at *18.

charts and analysis by Dr. Lamb, (3) common economic proof that changes in supply, demand, and cost do not explain the price increases of the bellwether drugs, (4) and Dr. Lamb's multiple regression analysis, which EPPs argue demonstrates a highly correlated statistically significant relationship between list price increases and end-payer drug costs.[63]

Defendants, however, argue that EPPs' fail to meet their burden and that, due to the highly individualized character of the generic drugs pricing market, common evidence cannot demonstrate impact. Defendants also argue that EPPs do not conduct the appropriate analysis to demonstrate that increased list prices "passed through" multiple layers of the generic drug supply chain to raise end-payer prices.[64] Defendants make two primary points to support their argument: (1) that economic evidence cannot show a common basis for impact because individual issues predominate in the generic drug industry and (2) that EPPs' classes include uninjured class members that they have provided no method to remove if necessary.[65]

*Economic Impact*

Defendants argue that EPPs fail to present a reliable model, backed by common evidence, that demonstrates that each member of the class suffered antitrust economic impact. At this stage of litigation, EPPs' burden is not to prove the element of antitrust impact but to put forth a reliable means to demonstrate that the impact element is capable of proof through common evidence.[66] "Deciding this issue calls for the district court's rigorous assessment of the available evidence and the method or methods by which plaintiffs propose to use the evidence to prove

---

[63] EPPs' Reply Mem. Supp. Mot. Certif. Class [Clomipramine] at 6-7, No. 16-CM-27242 [Doc. No. 233].

[64] Defs.' Opp'n Class Certif. [Clomipramine] at 2, 43, No. 16-CM-27242 [Doc. No. 211].

[65] Defs.' Sur-Reply in Opp'n Class Certif. [Clomipramine] at 27-41, No. 16-CM-27242 [Doc. No. 272].

[66] *Hydrogen Peroxide*, 552 F.3d at 311-12.

impact at trial."[67] The Court has already determined that EPPs' experts have put forth reliable models under the *Daubert* standard.[68] Here, Defendants dispute that those models actually demonstrate common economic impact. Namely, Defendants take issue with the following aspects of EPPs' experts' models: the use of list price increases to demonstrate end-payer impact, the role of intermediaries, and individual variation in class members' experiences.[69]

Defendants challenge EPPs' impact analysis because they argue that EPPs failed to prove that changes in Defendants' Wholesale Acquisition Costs ("WAC")[70] caused increased prices for end-payers.[71] The primary issue, according to Defendants, is that list prices do not have a consistent relationship with reimbursement rates or the amounts that end-payers ultimately pay for drugs.[72] Instead, Defendants argue that transaction prices varied extensively between customers due to the nature of the drug supply chain and the role that intermediaries, such as PBMs, play in setting the ultimate price for end-payers.[73]

Defendants argue that an expert's analysis of pricing structure alone cannot be proof of impact common to the class.[74] But EPPs' experts performed more than a simple pricing structure analysis and their analyses do not rely on list price increases alone to demonstrate impact throughout the class. Defendants further argue that analyses of list increases cannot provide class-wide impact at the indirect purchaser level and that predominance is not satisfied where an

---

[67] *Id.* at 312.

[68] *See generally In re Generic Pharms. Pricing Antitrust Litig.,* 2024 WL 4980784.

[69] Defs.' Sur-Reply in Opp'n Class Certif. [Clomipramine] at 39-42, No. 16-CM-27242 [Doc. No. 272].

[70] A drug manufacturer's publicly announced list price for wholesalers or other direct purchasers.

[71] Defs.' Sur-Reply in Opp'n Class Certif. [Clomipramine] at 27, No. 16-CM-27242 [Doc. No. 272].

[72] *Id.* at 37.

[73] *Id.*

[74] Defs.' Opp'n Class Certif. [Clomipramine] at 40, No. 16-CM-27242 [Doc. No. 211] (quoting "[an expert's] pricing structure analysis cannot serve as proof of impact common to the class members." *In re Plastics Additives Antitrust Litig.,* 2010 WL 3431837 at *55 (E.D. Pa. Aug. 31, 2010)).

expert oversimplifies a complex distribution channel.[75] EPPs include a litany of testimonial evidence from Defendants suggesting that list prices were intended to result in higher prices, including testimony from Defendants' corporate witnesses admitting that the purpose of the price increases was to increase prices paid by customers and testimonial and documentary evidence that customers and end-payers paid higher prices because of those price increase.[76]

Buttressing the testimonial evidence, EPPs' expert Dr. McClave analyzed individual pharmacy purchase transactions and determined that virtually all of pharmacies he observed paid elevated prices for the bellwether drugs.[77] Further, Dr. McClave used Defendants' same data to evaluate the pass through of injury and determined that, similarly, virtually all of end-payers experienced price increases for both drugs during the class Period.[78] His analysis encompasses nearly all transactions in the Class Period and accounts for variations in detail, rather than relying on a vast oversimplification of the market that has been found lacking.[79]

Similarly, Dr. Lamb's regression analysis demonstrated a high correlation between Defendants' list price increases and end-payers and then, evaluating record evidence, he concluded that "list prices are a material determinant of pharmacy acquisition costs and end-payer drug costs."[80] Regarding the variation in prices for each transaction, Defendants contend

---

[75] Defs.' Opp'n Class Certif. [Clomipramine] at 39-40, No. 16-CM-27242 [Doc. No. 211].

[76] *See* EPPs' Further Reply Supp. Mot. Certif. Class [Clomipramine] at 4-5, No. 16-CM-27242 [Doc. No. 275] (citing *See, e.g.*, Sandoz 30(b)(6) Tr. at 75:7-76:13; Mylan 30(b)(6) Deposition at 86:24-88-6; *see, e.g.*, Lubke Tr. at 530:13-532:20; *see, e.g.*, Exs. 150 & 151, TARO_000141653 & 54 (ECF 186-145 & 186-146); Ex. 126, MYLGP0005897594 (ECF 186-126); Ex. 152, SDZMDL-004577256 (ECF 186-147); *see, e.g.*, Government Accountability Office, *Generic Drugs Under Medicare: Part D Generic Drug Prices Declined Overall, but Some Had Extraordinary Price Increases*, GAO-16-706 (Aug 12, 2016), available at https://www.gao.gov/assets/gao-16-706.pdf).

[77] EPPs' Reply Mem. Supp. Mot. Certif. Class [Clomipramine] at 15, No. 16-CM-27242 [Doc. No. 233].

[78] *See* McClave Clomipramine Rep. at § 3.3.

[79] *See* EPPs' Reply Mem. Supp. Mot. Certif. Class [Clomipramine] at 17, No. 16-CM-27242 [Doc. No. 233].

[80] *Id*. at 16.

that impact requires that the Court assess the claims of each member individually and analyze whether their individual transactions bear out that they suffered harm. This analysis, according to Defendants, would defeat predominance because transaction prices vary extensively by customer based on individualized negotiations between end-payers and intermediaries in the supply chain.[81] But even where there is significant price variation, the question for injury is whether class members paid artificially high prices, regardless of differences between the class members. Defendants argue that where "prices did not behave similarly" for the products, price variation defeats predominance.[82] But here, EPPs' models show that the prices *did* behave similarly. As described above, Dr. McClave's model uses common proof to support his findings that nearly every end-payer and pharmacy purchaser of the drugs did, in fact, experience an increase in prices at approximately the same time—even if some of those entities paid more than others. This is unlike the case relied upon by Defendants in which the court found that plaintiffs' expert had not demonstrated any coordination or significant similarity between the price movements of various purchasers.[83] Defendants' characterization of EPPs' experts' analyses of list price mischaracterizes the complexity of their work.

Defendants also contend that both experts "ignored the role of PBMs" and spread pricing and conducted "no analysis whatsoever" regarding PBM practices, and thus fail to demonstrate common impact because their models ignored alternative explanations for the price increases.[84] First, Dr. Lamb analyzed comparative spread versus non-spread transactions during the

---

[81] Defs.' Opp'n Class Certif. at 40, 16-CM-27242 [Doc. No. 211].

[82] Defs. Sur-Reply in Opp'n Class Certif. at 36, 16-CM-27242 [Doc. No. 272-22] (quoting *In re Plastics Additives,* 2010 WL 3431837 at *15).

[83] *In re Plastics Additives,* 2010 WL 3431837 at *14.

[84] Defs.' Opp'n Class Certif. at 41, 16-CM-27242 [Doc. No. 211] (emphasis omitted).

Benchmark and Class Periods, as well as the concentration of PBMs during both periods.[85] The Court weighed Defendants' arguments regarding Dr. McClave's analysis of spread pricing—in the context of his damages analysis—at *Daubert*.[86] There, the Court concluded that "Dr. McClave's analysis does include a measure of spread pricing between the two periods, both by what is 'baked in' to his initial model and in his supplemental regression model that estimates what spread prices would have been absent the conspiracy."[87] Here, the Court is similarly satisfied that EPPs' experts have accounted for PBM spread pricing in their models. Thus, the role of intermediaries does not destroy EPPs' ability to use common proof to demonstrate causation.

Although each entity in the generic drug supply chain depends on individual negotiations with those entities below and above it, EPPs have demonstrated for purposes of class certification that common evidence can demonstrate economic impact. Dr. McClave's finding that virtually every customer, at both the pharmacy and end-payer level, incurred at least one overcharge is sufficient to show that evidence of impact is common to the class despite individual negotiations.

*Allegedly Uninjured Class Members*

Defendants next argue that EPPs cannot satisfy predominance because the classes include "numerous categories of purchasers that suffered no injury" and because EPPs have not identified a solution to exclude these supposed uninjured class members.[88] Defendants argue that EPPs' experts employ averaging in their models that masks uninjured entities, that purchasers of

---

[85] *See* EPPs' Reply Mem. Supp. Mot. Certif. Class Clomipramine at 18, 16-CM-27242 [Doc. No. 233].

[86] *In re Generic Pharms. Pricing Antitrust Litig.,* 2024 WL 4980784 at *7-8.

[87] *Id*. at *7.

[88] Defs.' Opp'n Class Certif. at 43, 16-CM-27242 [Doc. No. 211].

Mylan-sourced clomipramine from CVS were uninjured, and that EPPs provide no method to remove uninjured class members. The presence of these allegedly uninjured class members is a predominance issue, Defendants argue, because it requires individualized inquiry to determine whether, and to what extent, class members incurred injury.[89]

"Averages are also more of a problem when plaintiffs seek to certify a class of indirect purchasers."[90] In the Third Circuit, courts must conduct "a rigorous analysis" to determine that the use of averaging in an expert's model is acceptable.[91] Defendants argued at *Daubert* that Dr. McClave's analyses are "based on averaging [and] contained no testing to exclude the real possibility of individualized differences . . . " and could not connect his evidence and the inquiry into whether the increased prices were caused by Defendants' anticompetitive behavior.[92] The Court disagreed and found that both experts presented reliable models that did not rely on averaging data. At class certification, Defendants maintain that both Dr. Lamb and Dr. McClave used averages in a way that masked uninjured class members.[93]

In the *Daubert* opinion, the Court determined that Dr. McClave used averages to demonstrate high-level trends, but that his actual regression analysis examined transactional-level data for all purchases of the bellwether drugs, creating millions of "but-for" prices for each

---

[89] *Id*. at 44.

[90] *In re Lamictal Indirect Purchaser & Antitrust Consumer Litig*, No. 12-995, 2018 WL 6567709, at *7 (D.N.J. Dec. 12, 2018), *rev'd on other grounds*, 957 F.3d 184 (3d Cir. 2020).

[91] *In re Lamictal Direct Purchaser Antitrust Litig.,* 957 F.3d 184, 194 (3d Cir. 2020).

[92] Defs.' Mem. Supp. Mot. Exclude McClave at 12, 16-CM-27242 [Doc. No. 201]. Defendants cite to specific examples where they find issue with Dr. McClave's analysis: his graphs that demonstrate the close movement of WAC, PAC, and EPP Drug Costs; correlation coefficients that establish correlation between WAC and PAC; aggregated total monthly dollars by all pharmacies; actual PAC and actual EPP costs compared to "one" but-for cost; the assumption that the ratio of EPP costs to PAC would remain constant; and actual costs average. *Id*. at 9-11.

[93] Defs.' Opp'n Class Certif. at 42, 16-CM-27242 [Doc. No. 211].

pharmacy and end-payer. As the Court held in the *Daubert* opinion, Dr. McClave's model does not "glide[] over" individual variation or rely on averaging to find impact for class members.[94]

Similarly, the Court has already determined that Dr. Lamb's regression analysis included significantly more detail and analysis than Dr. Lamb's analysis in *In re Lamictal Indirect Purchaser & Antitrust Consumer Litigation*, where the Third Circuit reversed class certification.[95] While Dr. Lamb used "general forecasting documents" in *Lamictal*, his regression analysis for the EPPs here used actual PBM data on prices for both of the bellwether drugs.[96] Like Dr. McClave, Dr. Lamb uses unaveraged transaction data in his regression analysis to show impact.[97] Dr. Lamb's use of average prices does not mask any entity's injury. Although Defendants attempt to boil each expert's model down to suggest that their analyses relied on average data alone, a review of their models bears out that each employed raw transactional data and that the models do not rely on averages to demonstrate impact. Here, the Court concludes, upon reviewing both experts' findings, that Defendants mischaracterized their use of averages and, where averaging did occur, it was appropriate under the circumstances and does not provide a basis for denying class certification.

Defendants argue that EPPs ignore that a large percentage of end-payers who obtained Mylan-sourced clomipramine from CVS were uninjured because Mylan did not raise CVS's price for clomipramine following the alleged list price increase.[98] Defendants contend that this leaves a significant number of uninjured plaintiffs in the clomipramine classes—roughly 45

---

[94] *In re Generic Pharms. Pricing Antitrust Litig.,* 2024 WL 4980784 at *6.

[95] *Lamictal*, 957 F.3d at 193-94.

[96] *In re Generic Pharms. Pricing Antitrust Litig.,* 2024 WL 4980784 at *22-23.

[97] *Id.*

[98] Defs.' Opp'n Class Certif. at 44, 16-CM-27242 [Doc. No. 211].

percent of reimbursed claims for Mylan's clomipramine were reportedly sold at CVS during the Damages Period and Mylan clomipramine accounted for over 94 percent of CVS's clomipramine purchases at the time.[99] Thus, Defendants argue that "TPPs that reimbursed Mylan's Clomipramine purchased through CVS paid no overcharge as a result of Defendants' alleged conduct….Significantly, several hundred entities reimbursed claims for Clomipramine solely through CVS."[100]

As a preliminary matter, in the *Daubert* opinion, the Court excluded the opinions of Defendants' expert Dr. Hughes on injury, including his opinions on injury flowing from CVS purchases, based on critical flaws in his report.[101] EPPs argue that the non-expert evidence produced by Defendants does not establish for purposes of class certification that end-payers who purchased Mylan clomipramine from CVS were uninjured.

First, EPPs argue that whether CVS was injured by Mylan is a disputed question of fact. EPPs contend that, although Mylan did not raise prices for CVS, end-payers nonetheless paid more for clomipramine than they would have without the alleged conspiracy.[102] Second, EPPs argue that CVS (and by extension those who purchased from CVS) *did* in fact pay higher prices for clomipramine during the Class Period from Mylan's co-conspirators, Taro and Sandoz.[103] Meaning, even if CVS was not injured by Mylan, the pharmacy nonetheless bears injury from its

---

[99] *Id.*

[100] *Id.* (emphasis omitted).

[101] *In re Generic Pharms. Pricing Antitrust Litig.,* 2024 WL 4980784 at *15. The Court reiterated that holding in its Opinion on reconsideration of certain *Daubert* rulings. *In re Generic Pharms. Pricing Antitrust Litig.,* 2025 WL 478178 at *4.

[102] EPPs' Reply Mem. Supp. Mot. Certif. Class Clomipramine at 25 n.20, 16-CM-27242 [Doc. No. 233] ("Plaintiffs allege that CVS was injured by the orchestrated transfer of the CVS business from Taro to Mylan before the list price increases were implemented.").

[103] *Id.*at 25. EPPs also conted that even if Defendants' argument eventually prevails, the "very limited" number of class members who exclusively bought Mylan-sourced clomipramine from CVS "can be identified and excluded from the proposed Classes." *Id.* at 25 n.21.

purchases from other manufacturers, even if those manufacturers provided a minority of the pharmacy's clomipramine stock. Whether injury did in fact flow from these purchases is a question ill-suited to resolution in the context of class certification. At this stage, the question is not sufficient to defeat predominance.

EPPs argue that Defendants have not identified the existence of any uninjured class members, but rather that Defendants have identified discrete purchases by some customers for which class members did not pay an elevated price.[104] The Court is not swayed by Defendants' arguments that the classes include a substantial number of uninjured class members. In other cases where courts have required that plaintiffs provide a methodology to filter out uninjured class members, those courts had first made a determination that a significant number of uninjured class members did actually remain in the class definition.[105] This Court has not made and does not make such a finding at this time. EPPs have sufficiently demonstrated that they will utilize evidence common to the entire class to argue that all class members suffered injury as a result of Defendants' alleged conspiracy.

### *Common Evidence: Damages*

Defendants argue that the individualized nature of the bellwether prices precludes a class-wide approach to proving damages. Here, they argue, because "the issue of damages does not lend itself to . . . mechanical calculation but requires separate mini-trial[s] of an overwhelmingly large number of individual claims, the need to calculate individual damages will defeat

---

[104] EPPs' Further Reply Supp. Mot. Class Cert. Clomipramine at 7-8, 16-CM-27242 [Doc. No. 275].

[105] *See e.g., Vista HealthPlan, Inc. v. Cephalon, Inc.*, No. 06-1833, 2015 WL 3623005 at *19 (E.D. Pa. June 10, 2015) ("I thus conclude that a significant number of uninjured class members remain within the class definition, and that Plaintiffs have not identified a methodology that would identify and remove those persons on a class-wide basis.").

predominance."[106] In an antitrust case, an expert's damages model "need not be exact."[107] Plaintiffs are only required to present a "reasonable estimate" of damages, as long as it is not the result of speculation.[108] "Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim."[109]

Defendants make two primary arguments that EPPs do not meet their burden for showing that common evidence can be used to support a class-wide approach to proving damages: (1) that Dr. McClave's damages estimate used aggregated figures that mask individualized issues of impact and (2) that EPPs have failed to put forth evidence that can be used to show that Defendants' conduct caused the purported damages. In the *Daubert* opinion, the Court determined that EPPs' experts had offered models that reliably showed a reasonable estimate of damages.[110] For the purposes of class certification, too, EPPs' models are appropriate and are a reasonable estimate of EPPs' damages. As discussed above, Dr. McClave's methodology analyzed overcharges at a transactional level, which accounted for variation across purchasers and manufacturers, as well as other aspects of the market.[111] Further, EPPs have offered evidence to support their argument that Defendants' conduct caused price increases for end-payers. Whether they can establish that injury occurred, and that Defendants did indeed cause damages, is a question to be resolved at a later stage of proceedings. The question does not, however, defeat predominance.

---

[106] Defs.' Opp'n Class Certif. at 46, 16-CM-27242 [Doc. No. 211] (quoting *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 307 (5th Cir. 2003) (internal quotation marks omitted)).

[107] *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013).

[108] *Rossi v. Standard Roofing, Inc.,* 156 F.3d 452, 484 (3d. Cir.1998).

[109] *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 124 (1969) (quoting *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264-65 (1946)).

[110] *In re Generic Pharms. Pricing Antitrust Litig.,* 2024 WL 4980784 at *7.

[111] *Id*. at *6.

*Common Questions of Law*

Defendants argue that there are variations among state laws that EPPs gloss over, and that EPPs bear the burden of proving that their grouping of those laws is a "workable solution."[112] Defendants are correct that EPPs have the burden of demonstrating that variations in applicable state laws do not defeat predominance.[113] Third Circuit law dictates that where the laws of many jurisdictions apply, the district court should examine whether those laws "can be grouped by shared elements and applied as a unit. . . ."[114] This occurs where differences in state law fall "into a limited number of predictable patterns, and any deviations could be overcome at trial by grouping similar state laws together and applying them as a unit."[115] To demonstrate that a grouping of laws is workable, EPPs must provide "extensive analysis" of state law variations to demonstrate that the groupings are a workable solution.[116]

In *Niaspan*, the district court determined that EPPs failed to demonstrate that no significant variations existed among 53 state laws in 26 jurisdictions because EPPs provided no analysis of those variations, including proposed trial plans, jury instructions, or verdict sheets to assist the court.[117] Here, EPPs have produced a trial plan that includes a comprehensive analysis of state-law claims that Defendants do not contest. EPPs' proposed trial plan includes grouping and detailed description of the variation of laws pertaining to their state law claims.[118] EPPs'

---

[112] Defs.' Opp'n Class Certif. at 47, 16-CM-27242 [Doc. No. 211] (internal citation omitted).

[113] *Vista Healthplan, Inc*, 2015 WL 3623005 at *33.

[114] *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 529 (3d Cir. 2004).

[115] *Grandalski v. Quest Diagnostics Inc.,* 767 F.3d 175, 183 (3d Cir. 2014) (internal quotation marks and citation omitted).

[116] *See In re Thalomid & Revlimid Antitrust Litig.,* No. 14-6997, 2018 WL 6573118, at *16 (D.N.J. Oct. 30, 2018) (citation omitted).

[117] *In re Niaspan Antitrust Litigation*, 464 F. Supp. 3d at 724-25.

[118] *See* Ex. 2 EPPs' Proposed Trial Plan, 16-CM-27242 [Doc. No. 183-2].

summary includes analysis to determine the extent that each law is harmonized with the

applicable federal law. EPPs propose the following groupings of state law claims:

- Antitrust Statutes, which EPPs do not divide into subgroups[119]

- Consumer Protection Statutes

    - Group 1: No intent requirement + no reliance requirement

    - Group 2: Intent requirement + no reliance requirement

    - Group 3: Intent requirement + reliance requirement[120]

- Unjust Enrichment Claims

    - Group 1: Jurisdictions in which the elements of an unjust enrichment claim are:
      (1) a benefit conferred on the defendant; (2) at the plaintiff's expense; (3) under
      circumstances that would make retention of the benefit unjust.

    - Group 2: Group 1 elements + an "appreciation" element requiring that the
      defendant understood it was receiving a benefit.

    - Group 3: Group 1 elements + a requirement that the plaintiff lack an adequate
      remedy at law.

    - Group 4: Group 1 elements + an "appreciation" element + a requirement that the
      plaintiff lack an adequate remedy at law.

    - Group 5: Jurisdictions in which the elements of an unjust enrichment claim are:
      (1) an enrichment; (2) an economic detriment or loss; (3) a connection between

---

[119] *Id*. at Ex. 2B.

[120] *Id*. at Ex. 2D.

the enrichment and the impoverishment; (4) an absence of justification for the enrichment and the impoverishment; and (5) the absence of a legal remedy. [121]

Defendants argue that because of variations among the various state law claims, EPPs cannot establish that common questions of law predominate and that their plan to present a jury with instructions that account for differences in state laws will be "so unwieldy as to be completely unworkable."[122] Defendants argue that EPPs' groups fail to establish predominance as to questions of law on multiple bases: (1) that differences in statutes of limitations will require individualized inquiry;[123] (2) that variation as to liability and impact standards for anticompetitive conduct, particularly as those standards pertain to the Unjust Enrichment Class, will cause manageability issues;[124] (3) variations in other state law provisions; and (4) that EPPs do not have standing to bring claims under the laws of 16 states where no named Plaintiff made purchases. [125]

Defendants argue that a significant number of claims will be barred because the statute of limitations has already run.[126] Within several groups, Defendants further argue that statutes of

---

[121] *Id*. at Ex. 2F.

[122] Ex. 1 Defs.' Resp. EPPs' Proposed Trial Plan, 16-CB-27242 at 10 [Doc. No. 257-2]. Defendants appear to have filed this document on the clobetasol docket but not the clomipramine docket. Accordingly, the Court cites the clobetasol docket.

[123] Defs.' Opp'n Class Certif. at 47-48, 16-CM-27242 [Doc. No. 211].

[124] *Id*. at 47.

[125] Alaska, Arkansas, Delaware, Hawaii, Iowa, Kentucky, Maine, Michigan, Montana, Nebraska, Ohio, South Dakota, Vermont, Washington, West Virginia, and Wyoming. Defs. Sur-Reply in Opp'n Class Certif. at 48 & n.29, 16-CM-27242 [Doc. No. 272-22].

[126] Defendants state that this includes "For the proposed antitrust law class…three of the 28 states – Kansas, Mississippi, and Tennessee – have SOLs of less than four years….In the proposed consumer protection class, with three proposed groupings, three of the four states in Group 2 – Alaska, Colorado, and Delaware – have statutes of limitations of less than four years; as does one of the two in Group 3 –Virginia…. In the proposed unjust enrichment class, all subgroups are affected: the only state in Group 1 – Texas – applies a statute of limitations of less than three years, as does one of the two states in Group 3 (Oklahoma), one of the three states in Group 4 (Alabama), and one of the two states in Group 5 (Louisiana); and two of the six states in Group 2 (South Carolina and Washington) apply statutes of limitations of less than four years." Ex. 1 Defs.' Resp. EPPs' Proposed Trial Plan, 16-CB-27242 at 12-13 [Doc. No. 257-2] (citations omitted).

limitations and claim accrual rules vary significantly even within groupings where the statute of limitations has not expired.[127] EPPs' trial plan contemplates variations among statutes of limitations. EPPs represent that each jurisdiction in which there is a statute of limitations concern recognizes the doctrine of fraudulent concealment.[128] In *In re Linerboard Antitrust Litigation,* the Third Circuit affirmed class certification for an antitrust class, despite defendants' contentions that statutes of limitations tolling presented individual issues that defeated predominance.[129] There, the Third Circuit held that even if determinations involving the fraudulent concealment defense to the statute of limitations required individualized proof, courts generally "have refused to deny class certification simply because there will be some individual questions raised during the proceedings."[130] Further, allegations of common proof for fraudulent concealment apply to the "acts of obscuring or masking" by the defendants and do not require individualized findings from class members.[131] Thus, to address variation, EPPs indicate that they "likely will argue that a finding of fraudulent concealment tolls the applicable limitations periods or that the claims are otherwise timely, including because the discovery rule or the continuing violations doctrine applies" and determine after summary judgment how they intend to address any remaining timeliness concerns, including through the use of an additional verdict form question.[132] Defendants point out that the proof requirement varies between states with fraudulent concealment statutes.

---

[127] *Id.* at 13-18.

[128] EPPs' Reply Mem. Supp. Mot. Certif. Class Clomipramine at 30, 16-CM-27242 [Doc. No. 233].

[129] 305 F.3d 145. 160-164 (3d Cir. 2002).

[130] *Id*. at 162

[131] *Id*.

[132] *See* Ex. 2 EPPs' Proposed Trial Plan, 16-CM-27242 at 7 n.11 [Doc. No. 183-2].

Second, Defendants argue that EPPs do not address conflicts of law, particularly among the "Unjust Enrichment Jurisdictions," which entails an equitable remedy that they argue requires individualized fact finding.[133] Courts in this circuit have been skeptical about plaintiffs' ability to concisely group and explain various unjust enrichment statutes for the purposes of class certification.[134] For example, in *Vista Healthplan*, the court criticized plaintiffs' summary of state variations in the unjust enrichment statutes, noting that plaintiffs' accounting was "not comprehensive and glosses over important differences" including variation in the elements required under each state statute and, thus, plaintiffs did not meet their burden of demonstrating that the unjust enrichment class grouping demonstrated that common questions of law predominated.[135]

Courts have also held that unjust enrichment claims are rarely suitable for class treatment because they require individualized inquiry to determine whether, without a remedy, inequity would result or persist.[136] "The polestar of the unjust enrichment inquiry is whether the defendant has been unjustly enriched," and "[r]esolution to this question is, by nature, fact-sensitive."[137] EPPs argue, however, that courts regularly certify unjust enrichment cases that center on common proof of *Defendants'* conduct without need for individualized inquiry into a plaintiffs' equities.[138] Specifically, courts have found that cases where plaintiffs allege anticompetitive conduct that inflates prices for all purchasers are appropriate for class treatment

---

[133] Defs.' Opp'n Class Certif. at 48, 16-CM-27242 [Doc. No. 211].

[134] *See Vista Healthplan, Inc*, 2015 WL 3623005 at *34.

[135] *Id.*

[136] *Id*. (quoting *Vega v. T–Mobile USA, Inc.,* 564 F.3d 1256, 1274 (11th Cir.2009)); *Grandalski*, 767 F.3d at 185.

[137] *In re Actiq Sales & Mktg. Practices Litig.,* 307 F.R.D. 150, 169 (E.D. Pa. 2015).

[138] EPPs' Reply Mem. Supp. Mot. Certif. Class Clomipramine at 34, 16-CM-27242 [Doc. No. 233].

because in those matters, all purchasers paid more than they would have without the alleged anticompetitive conduct.[139]

Here, EPPs have divided the Unjust Enrichment Class into five subgroups based on the elements required in each state. Their proposed grouping takes into account the number of elements needed to establish a claim, differences in scienter, and burdens of proof. This plan, however, demonstrates that common issues do not predominate in the Unjust Enrichment Class. EPPs' grouping of five sets of laws contains many nuanced variations that are likely unworkable at trial. EPPs suggest that the Court use verdict sheets and jury instructions to explain those variations, however the unjust enrichment claims require analysis of a significant number of elements as well as additional combinations of those elements. Further, courts in this circuit have paid credence to the principle that "common questions will rarely, if ever, predominate an unjust enrichment claim, the resolution of which turns on individualized facts."[140] EPPs may, as they argue, draw from the same source of injury to assert their claims for unjust enrichment. That Defendants' conduct is common to the class, however, does not negate the need for individual inquiry as to whether unjust enrichment is an appropriate equitable remedy as to different class members under different state laws. Under these circumstances, the determination of the extent of each parties' equitable remedy would require individualized fact finding and the balancing of individual interests in a manner that is incompatible with class certification. Accordingly, the Unjust Enrichment Class fails the predominance analysis, and will not be certified.

Third, Defendants assert that variations among state antitrust and consumer protection laws would present an impermissibly complex question for the jury. As to the Unjust Enrichment

---

[139] *In re McCormick & Co.*, 217 F. Supp. 3d 124, 145 (D.D.C. 2016) (collecting cases), amended on other grounds, 275 F. Supp. 3d 218 (D.D.C. 2017).

[140] *Vista Healthplan, Inc*, 2015 WL 3623005 at *34 (quoting *Vega*, 564 F.3d at 1274).

Class, the Court agrees, as discussed above. With regard to the Antitrust Class, Defendants argue that EPPs' Trial Plan for damages rests on the assumption that the Court will calculate and award damages.[141] But this plan, they argue, does not account for states that permit pass-on defenses which ostensibly allow Defendants to argue that damages are diminished where a plaintiff was able to "pass on" its injury to entities down the supply chain. Defendants neglected to include this argument in their original opposition brief. The Court has previously excluded Defendants' expert, Dr. Hughes, from opining that end-payer injury is diminished because of higher insurance premiums as a matter of established law.[142] Regardless, pass-on defenses—to the extent that they are permitted under state law—do not defeat predominance because they do not assess injury, which is critical for the Court's predominance analysis: "[a]ny adjustment to damages calculations for pass-on defenses arising under state laws would not affect the fact of antitrust injury, and does not preclude class certification."[143]

In addition, Defendants contend that variations in statutory enhanced damages provisions are an obstacle to class certification. Specifically, Defendants argue that EPPs' proposed Trial Plan to manage variation in these provisions "by grouping the relevant provisions of state antitrust statutes into no fewer than ten separate groups" and to use special verdict forms and post-verdict determinations will confuse the jury.[144] But, as a court in another district found, "[s]tate law requirements regarding enhanced damages are precisely the kind of variation that

---

[141] Defs. Sur-Reply in Opp'n Class Certif. at 45, 16-CM-27242 [Doc. No. 272-22].

[142] *In re Generic Pharms. Pricing Antitrust Litig.*, 2024 WL 4980784 at *12. As detailed in the *Daubert* opinion, Dr. Hughes was prohibited from providing a similar opinion by a court in the District of Maryland. *Id.*

[143] *In re Niaspan Antitrust Litig.*, 464 F. Supp. 3d at 723.

[144] Defs. Sur-Reply in Opp'n Class Certif. at 47-48, 16-CM-27242 [Doc. No. 272].

special verdict forms are designed to address."[145] The Court has considered the proposed Trial Plan and concludes that as to the Antitrust Class, the burdens are manageable.

Defendants also argue that excessive variation exists among the various state laws in the Consumer Protection Class, even though the class includes only nine jurisdictions.[146] EPPs argue that those differences are "readily manageable" at trial because there are so few laws at issue, but Defendants contend that the Court and jury would have to consider whether non-consumer plaintiffs have standing under at least two statutes.[147] However, the laws that they point to provide a cause of action for corporate entities and the variations among those laws are negligible.[148]

Finally, Defendants argue that the Court previously directed the parties to address Article III standing at class certification when it declined to dismiss plaintiffs' state law claims with respect to clobetasol and several other generic drugs.[149] The Court determined at that time that EPPs' and IRPs' allegations were sufficient to demonstrate a "substantial and shared interest" in proving that Defendants' alleged unlawful conduct resulted in overpayments for those drugs and through "injuries redressable by an award of damages under the state antitrust, consumer protection and unjust enrichment laws" cited in each Complaint.[150] In other words, in the context of a motion to dismiss, "it makes little sense to dismiss the state law claims of unnamed class members for want of standing when there was no requirement that the named plaintiffs have

---

[145] *In re Namenda Indirect Purchaser Antitrust Litig.*, No. 15-cv-6549, 2022 WL 4298767, at *11 (S.D.N.Y. Sept. 19, 2022)

[146] Defs. Sur-Reply in Opp'n Class Certif. at 46, 16-CM-27242 [Doc. No. 272].

[147] Colorado and Virginia. *See id.*

[148] *See* EPPs' Further Reply Supp. Mot. Class Cert. Clomipramine at 22, 16-CM-27242 [Doc. No. 275].

[149] *See In re Generic Pharms. Pricing Antitrust Litig.,* 368 F. Supp. 3d 814, 831 (E.D. Pa. 2019).

[150] *Id.*

individual standing to bring those claims in the first place" in determining that absent class members would not be dismissed for lack of Article III standing.[151] Because the state law claims paralleled those of putative class members, the Court concluded that it was more proper to address the question of whether those plaintiffs could bring claims on behalf of unnamed class members in the context of Rule 23.[152] The Court did not previously call into question whether unnamed plaintiffs in these cases possess Article III standing, and as it previously held, where "success on the claim under one state's law will more or less dictate success under another state's law and the laws are materially same" there is a sufficient personal stake" in litigating the claims.[153] As to the Antitrust and Consumer Protection Classes, Defendants have not shown a basis to deny standing.

### *Mylan Estoppel*

Defendants argue that EPPs should be estopped from arguing that Mylan conspired to raise prices for clomipramine.[154] In a related class action, *In re Mylan N.V. Securities Litigation,* plaintiffs brought claims under federal securities laws based on allegedly fraudulent statements by Mylan "explaining its market share and its income in the generic drugs market. Plaintiffs challenge two types of statements as materially misleading due to Mylan's failure to disclose its ongoing participation in various antitrust conspiracies to allocate markets or fix prices in generic

---

[151] *Id*. at 830 (quoting *Langan v. Johnson & Johnson Consumer Cos., Inc.,* 897 F.3d 88, 95 (2d Cir. 2018) and citing *In re Thalomid & Revlimid Antitrust Litig.*, No. 14-6997, 2015 WL 9589217, at *19 (D.N.J. Oct. 29, 2015) (holding the defendants' "attack on plaintiffs' standing to pursue state law claims on behalf of absent class members is not an Article III jurisdictional issue")).

[152] *Id*.

[153] *Id*. at 831 (quoting *In re Asacol Antitrust Litig.*, 907 F.3d 42, 49 (1st Cir. 2018)).

[154] Defs.' Opp'n Class Certif. at 49, 16-CM-27242 [Doc. No. 211]. Defendants' argument pertains only to the clomipramine case, not the clobetasol case.

drug markets."[155] In *Mylan*, the Southern District of New York certified a class of shareholders

alleging securities violations related to approximately 20 generic drugs, including clomipramine.

Subsequently, the court granted summary judgment, dismissing plaintiffs' claims against Mylan

for failing to meet their burden on the issue of loss causation.[156]

Defendants argue that some EPPs are estopped from bringing claims against Mylan in

this action because the court in *In re Mylan* "fully litigated the issue of whether there was a

price-fixing conspiracy as to Clomipramine…" based on the "same Clomipramine conspiracy

alleged here."[157] "Issue preclusion bars a party from relitigating an issue when the identical issue

was decided in a prior adjudication, there was a final judgment on the merits, the party against

whom the bar is asserted was a party or in privity with a party to the prior adjudication, and the

party against whom the bar is asserted had a full and fair opportunity to litigate the issue in

question."[158] "The party seeking to effectuate an estoppel has the burden of demonstrating the

propriety of its application."[159]

Defendants argue that the issues in the *Mylan* securities case and this antitrust action are

closely related because the securities complaint contained price-fixing allegations, Mylan's

document production overlapped with parts of its production in this MDL, and EPPs' expert in

this matter cites two Mylan deponents in the securities case.[160] Further, Defendants argue that

when litigants "'raise multiple issues that are potentially dispositive of a case,' a court's

---

[155] *In re Mylan N.V. Sec. Litig.*, 666 F. Supp. 3d 266, 315 (S.D.N.Y. 2023), aff'd sub nom. *Menorah Mivtachim Ins. Ltd. v. Sheehan*, No. 23-720-CV, 2024 WL 1613907 (2d Cir. Apr. 15, 2024), cert. denied, 145 S. Ct. 436 (2024).

[156] *Id.*

[157] Defs.' Opp'n Class Certif. at 49, 16-CM-27242 [Doc. No. 211].

[158] *Home Depot USA, Inc. v. Lafarge N. Am., Inc.,* 59 F.4th 55, 63 (3d Cir. 2023) (quotation marks omitted).

[159] *Suppan v. Dadonna*, 203 F.3d 228, 233 (3d Cir. 2000).

[160] Defs.' Sur-Reply Opp'n Class Certif. at 42, No. 16-CM-27242 [Doc. No. 272-22].

'independently sufficient alternative findings should be given preclusive effect,' even when those alternative findings are not essential for the ultimate final judgment."[161]

Contrary to Defendants' contention, the *Mylan* court did not "fully litigate" the issue of a clomipramine price-fixing conspiracy. That court determined that plaintiffs' evidence of a price-fixing agreement in violation of the Sherman Act was not sufficient to support plaintiffs' allegations of securities fraud.[162] The court did *not* indicate in any way that it found that a price-fixing conspiracy *for clomipramine* did not exist. In fact, the court determined that plaintiffs had failed to articulate which drugs fell into the category of "Price Fixed Drugs" in that case.[163] The court's primary inquiry and final judgment pertained to securities fraud, not the price-fixing claim. The court did not, as Defendants claim, make an affirmative finding that price-fixing did not occur, but rather indicated that there was insufficient support for the price-fixing claim as it related to the securities fraud allegations at summary judgment. The Southern District of New York's opinion in *Mylan* is irrelevant to the matter at hand.

Weighing the points considered in the Court's analysis above, the predominance requirement is satisfied except as it pertains to the Unjust Enrichment class, which the Court will decline to certify.

### 2. Ascertainability

EPPs must prove by a preponderance of the evidence that the class is ascertainable.[164] This requires EPPs to demonstrate that "(1) the class is 'defined with reference to objective criteria'; and (2) there is 'a reliable and administratively feasible mechanism for determining

---

[161] *Id*. at 43 (quoting *Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244, 254-55 (3d Cir. 2006)).

[162] *In re Mylan*, 666 F. Supp. 3d at 316.

[163] *Id*.

[164] *In re Niaspan Antitrust Litig.*, 67 F.4th at 130.

whether putative class members fall within the class definition.'"[165] Ascertainability does not require a plaintiff to identify all class members at the class certification stage, but rather to make a showing that class members *can* be identified.[166] The purpose of the Third Circuit's ascertainability requirement is to avoid extensive, individual fact-finding or "mini-trials" to determine whether prospective members are properly included in a class.[167] Ascertainability differs from predominance "because the ascertainability requirement focuses on whether individuals fitting the class definition may be identified without resort[ing] to mini-trials, whereas the predominance requirement focuses on whether essential elements of the class's claims can be proven at trial with common, as opposed to individualized, evidence."[168]

EPPs argue that class members in this matter are readily ascertainable. Each is a third-party payer business "whose core responsibilities include managing their prescription drugs plans and making payments to satisfy their portion of the costs of prescriptions dispensed to their members."[169] To support their contention that they are able to identify and verify the claims of each potential class member, EPPs offer two experts: Ms. Laura R. Craft, who opines on the criteria for class membership, methods to establish member eligibility, and available data in the prescription drug industry to support this process, and Mr. Eric J. Miller, who developed a report on industry standard methods for notification to members of the TPP classes, as well as verification and processing of claims from the TPPs.[170] The Court summarized both experts'

---

[165] *Byrd v. Aaron's Inc.,* 784 F.3d 154, 163 (3d Cir. 2015), *as amended* (Apr. 28, 2015) (quoting *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 355 (3d Cir. 2013)).

[166] *Carrera v. Bayer Corp.*, 727 F.3d 300, 308 n.2 (3d Cir. 2013).

[167] *Marcus*, 687 F.3d at 592-94.

[168] *Byrd*, 784 F.3d at 164 (internal quotation marks and citation omitted).

[169] EPPs' Mem. Supp. Mot. Class Certif. [Clomipramine] at 45, No. 16-CM-27242 [Doc. No. 183].

[170] Craft Corrected Expert Report [Clomipramine], Moskowitz Decl. Ex. 1 ¶¶ 3-10, No. 16-CM-27242 [Doc. No. 200-3] (hereinafter "Craft Clomipramine Rep."); Craft Corrected Expert Report [Clobetasol], Moskowitz Decl. Ex.

reports in greater detail in the *Daubert* decision.[171] In that decision, the Court declined Defendants' motions to exclude both opinions.[172]

Defendants argue that EPPs fail to meet the Third Circuit's ascertainability standard because they cannot put forth an administratively feasible methodology to identify entities that are within the proposed class definition.[173] Defendants rely significantly on *In re Niaspan*, in which the Third Circuit affirmed the district court's denial of certification of a class of end-payers pursuing claims against a drug manufacturer for allegedly delaying the launch of generic drug in violation of antitrust laws.[174] Defendants argue that these cases mirror *Niaspan* because they involve "similarly situated plaintiffs, similar experts, and similar PBM transactional data."[175] In *Niaspan*, plaintiffs offered Mr. Miller and Ms. Craft to opine on ascertainability. The district court determined that both experts satisfied the *Daubert* standard.[176] The court's evaluation of class certification, however, was critical of the methodology employed by Ms. Craft and Mr. Miller. In *Niaspan*, plaintiffs explained that Ms. Craft offered a "six-step methodology for identifying class members," which the court criticized as insufficiently detailed, non-specific to the case at hand, and lacking a process by which plaintiffs could excise excluded entities.[177] On review, the Third Circuit affirmed these findings, including that Ms. Craft's use of

---

1 ¶¶ 3-10, No. 16-CB-27242 [Doc. No. 255-3] (hereinafter "Craft Clobetasol Rep."); Miller Decl. ¶¶1-6, No. 16-27242 [Doc. No. 233-2].

[171] *In re Generic Pharms. Pricing Antitrust Litig.,* 2024 WL 4980784 at *24-30.

[172] *Id*. at *28, 30.

[173] Defs.' Mem. Opp'n Class Certif. at 28, No. 16-CM-27242 [Doc. No. 211].

[174] *See In re Niaspan Antitrust Litig*., 67 F.4th 118.

[175] Defs.' Mem. Opp'n Class Certif. at 22, No. 16-CM-27242 [Doc. No. 211].

[176] *In re Niaspan Antitrust Litig.,* 464 F. Supp. 3d at 695, 697.

[177] *Id*. at 704-705.

PBM standardized data alone created ambiguity in the data and that the plaintiffs' data matching technique was unreliable.[178]

Defendants argue that *Niaspan* controls here because the same experts use PBM data, which was insufficient to establish ascertainability in that case, to identify class members here.[179] Defendants contend that, instead of offering an administratively feasible methodology, EPPs attempt to cure the defects identified in *Niaspan* by "replac[ing] the PBM data found deficient in *Niaspan* with innumerable, unverifiable, disparate, and equally deficient claims submissions" in the form of claims data and affidavits provided by the end-payers themselves.[180] This, they argue, improperly relies on the claims administration process to satisfy the ascertainability requirement.[181]

EPPs contend that Ms. Craft's current analysis goes beyond her work in *Niaspan* and is consistent with Third Circuit precedent. In her testimony here, Ms. Craft addressed her opinions in *Niaspan* and the suggestion that her opinions in this matter are "the same" as her opinions in that case, explaining:

> [I]t's just flatly incorrect that this is the same fact pattern or the same case as presented in *Niaspan*. *Niaspan* addressed a very specific question, and that was whether a list of all potential class members could be generated by looking at PBM data that had been produced in bulk, and nothing else.
>
> It presumed that there was no recourse to other information to generate that list, and that a list with names was required at that point in the process prior to class certification.
>
> . . .

---

[178] *In re Niaspan Antitrust Litig.*, 67 F.4th at 136-37.

[179] Defs.' Mem. Opp'n Class Certif. at 22, No. 16-CM-27242 [Doc. No. 211].

[180] *Id*. at 24.

[181] *Id*. at 25.

[Here] what I was asked to do had really two functional parts. And the first was to help compile this very large data set that the Court has already heard about, coming from PBMs that provides transactional detail about many millions of purchases of the class products. And the second was that I was asked to answer the question, can class members here provide data and authoritative business records that confirm their eligibility to participate in the class? Very, very different question than *Niaspan*.[182]

In this matter, Ms. Craft presents six separate opinions: "(1) that the nature of the generics industry results in intense price competition; (2) that transactional data in the pharmaceutical industry is uniquely reliable and robust; (3) that data from PBMs provide an authoritative record of class purchasers; (4) that third party payer class members keep detailed receipts of prescription drugs purchases; (5) that excluded TPPs are easy to identify and can be removed from data used to calculate damages; and (6) that the claims administration process will confirm that only proper class members participate."[183] Here, Ms. Craft argues that she did not create a list of class members, but rather "carefully analyzed the data and other authoritative business records that are available to class members, to TPPs, to determine whether that information was sufficient to confirm their eligibility for the class." [184]

EPPs argue that ascertainability is bolstered by key evidence in their experts' reports that Defendants do not dispute: that National Drug Codes allow products to be tracked through the supply chain and traced back to manufacturers; that Defendants' transactional records track products and account for discounts and rebates; that all end-payer transactions are recorded and preserved; that those records include prices paid for drugs, date and time of sale, and the party responsible for payment; that each class representative has already produced detailed records of

---

[182] Tr. of Daubert Hr'g (Sept. 25, 2024) at 14-15 [MDL Doc. No. 3111]. *See also In re Niaspan Antitrust Ltiig.*, 464 F. Supp. 3d at 695.

[183] *In re Generic Pharms. Pricing Antitrust Litig.*, 2024 WL 4980784 at *24.

[184] Tr. of Daubert Hr'g (Sept. 25, 2024) at 36-37 [MDL Doc. No. 3111].

its purchases; that EPPs contract with PBMs and can obtain records of drug purchases from those entities; that intermediaries can obtain records of drug purchases and segregate them by payer; and that class members will be able to produce receipts of purchases when necessary.[185]

Defendants claim that EPPs' ascertainability methodology fails for the same reasons that it failed in *Niaspan* and under other Third Circuit precedent. Primarily, Defendants point to three key issues in the EPPs' framework: (1) that EPPs' have not proven their ability to obtain data, (2) that EPPs have no methodology to confirm class membership and exclusions, and (3) that EPPs have no methodology to confirm accuracy of the claims data at this point in the litigation. Each argument is addressed below.

### *EPPs' Ability to Obtain Data*

As part of EPPs' argument to support ascertainability, they point to Ms. Craft's analysis of various business records that third-party payers and their intermediaries can produce to show payment information. EPPs suggest that payment records are readily available to class members and can provide necessary information, including (1) the drug at issue, (2) the timeframe in which the drug was paid for, and (3) the jurisdiction.[186] These records, they argue, must be maintained under various laws and regulations and records of this type have already been produced by the named plaintiffs.[187]

But Defendants contend that EPPs have not put forth a methodology to obtain that claims data. First, Defendants argue that third-party payers do not generate that data on their own, but rather PBMs generate and hold that information at the time of transaction with a pharmacy—

---

[185] EPPs' Further Reply Supp. Mot. Class Certif. [Clomipramine] at 9-10, No. 16-CM-27242 [Doc. No. 275].

[186] EPPs' Mem. Supp. Mot. Class Certif, [Clomipramine] at 46, No. 16-CM-27242 [Doc. No. 183].

[187] *Id*. at 46-47.

essentially "repackag[ing]" PBM data.[188] And while EPPs assert that records are kept in the "ordinary course of business," Defendants maintain that third-party payers do not collect and maintain such data.[189] To the extent that TPP claims data exists, Defendants contend that it is generated by PBMs and is likely to exclude important information, such as the name of the third-party payer on each transaction.[190] Defendants say that EPPs have not shown that potentially thousands of class members would be able to produce such data, or whether that data would be able to identify class members if it were produced.[191] To this end, Defendants rely on the recent decision in *In re Lipitor Antitrust Litigation,* in which the District of New Jersey held that a class of third-party payers did not satisfy the ascertainability requirement, relying in part on Ms. Craft's opinions.[192] Defendants argue that the court in *Lipitor* took issue with Ms. Craft's reliance on "data to be collected and produced at some future point by each entity claiming to be a TPP," among other aspects of her opinions.[193] There, the court determined that Ms. Craft's methodology failed in part because Ms. Craft had not identified a step-by-step methodology by which the court could define the class, and that Ms. Craft and EPPs had not presented the "actual data underlying many of her assumptions."[194] The court took issue with the fact that Ms. Craft instead relied on the "say so" of PBM executives' declarations that averred that they could identify administrative intermediaries without any actual data to corroborate those statements.[195]

---

[188] Defs.' Sur-Reply Opp'n Class Certif. at 12, No. 16-CM-27242 [Doc. No. 272-22].

[189] Defs.' Mem. Opp'n Class Certif. at 29-30, No. 16-CM-27242 [Doc. No. 211].

[190] *Id.* at 30.

[191] Defs.' Sur-Reply Opp'n Class Certif. at 12, No. 16-CM-27242 [Doc. No. 272-22].

[192] *In re Lipitor Antitrust Litig.,* No. 12-cv-2389, 2024 WL 2865074 (D.N.J. June 6, 2024).

[193] Defs.' Sur-Reply Opp'n Class Certif. at 7, No. 16-CM-27242 [Doc. No. 272-22].

[194] *In re Lipitor Antitrust Litig.,* 2024 WL 2865074 at *17.

[195] *Id.*

There, "[t]he only evidence provided to the Court [was] the Declarations presented by these two PBM executives. This does not hold up against the rigorous analysis required of the class certification process . . . ."[196]

EPPs point out that the named plaintiffs have already produced data in this matter. Although Defendants argue that the data of a few named plaintiffs pales in comparison to the data that potentially thousands of class members would need to produce, the fact that EPPs have already demonstrated the existence and availability of that information differentiates it from *Lipitor*, wherein plaintiffs were only able to produce declarations that data existed without actual evidence that it could be obtained. In this matter, EPPs have established that end-payers will be able to obtain relevant purchase records because multiple plaintiffs have already done so.

Experts whose opinions have been found to be reliable by this Court opine that EPP class members will be able to obtain that information. Mr. Miller opines that, in his significant experience as someone with decades in this field of work, third-party payers regularly produce this type of data during the claims administration process.[197] Defendants' expert Dr. Laura Happe also opined that end-payers would be able to obtain various records from intermediaries.[198] The generic drug industry is highly sophisticated, subject to various government and internal policies for transaction-level record keeping, and EPPs have already demonstrated that entities in the class are able to produce data that supports class membership. That entities may need to communicate to receive information from intermediaries, which the

---

[196] *Id*.

[197] EPPs' Further Reply Supp. Mot. Class Certif. [Clomipramine] at 17 n.33, No. 16-CM-27242 [Doc. No. 275].

[198] *See* Dep. Dr. Laura E. Happe, EPPs' Mem. Supp. Mot. Exclude Happe, Ex. 3 at 47-50, No. 16-CM-27242 [Doc. No. 231-3].

EPPs has demonstrated is possible, is not a sufficient bar to ascertainability under these circumstances.

*EPPs' Ability to Confirm Membership and Exclusions*

Defendants argue that, beyond asserting that they can obtain data, EPPs must show a "reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition."[199] First, Defendants argue that EPPs cannot confirm class membership because they rely on certain supposedly deficient evidence to do so, including PBM data, PBM declarations, insurance data, and TPP data.[200] Further, regardless of the data used, Defendants argue that individual fact inquiry into the data and contracts will be required.[201] Second, Defendants argue that EPPs offer no methodology to exclude government-subsidized plans, private insurers that manage pharmaceutical benefits for federal entities, or a fully insured plan, nor have they identified a means to exclude non-qualifying transactions, such as transactions to institutional and long-term care facilities.[202]

First, Defendants argue that PBM data alone cannot systematically identify class members because that data does not necessarily name each end-payer.[203] The Court addressed a similar argument from Defendants in its *Daubert* opinion. EPPs do not propose to rely on PBM data alone and, as explained in the *Daubert* opinion, "even if data does not have a field in the PBM data identifying the TPP, that issue is moot when a specific TPP requests its own data from

---

[199] Defs.' Mem. Opp'n Class Certif. at 31, No. 16-CM-27242 (quoting *Niaspan*, 67 F.4th at 130) [Doc. No. 211].

[200] *Id.* at 31-34.

[201] *Id*. at 34.

[202] Defs.' Mem. Opp'n Class Certif. at 34-35, No. 16-CM-27242 [Doc. No. 211]; Defs. Sur-Reply Opp'n Class Certif. at 18, 24, No. 16-CM-27242 [Doc. No. 272-22].

[203] Defs.' Mem. Opp'n Class Certif. at 31, No. 16-CM-27242 [Doc. No. 211].

its own PBM."[204] Defendants propose that EPPs attempt to fix this issue by providing only

declarations from PBMs that they can identify when a class members is an end-payer or

intermediary.[205] Ms. Craft has not opined that PBMs alone can systematically identify payers,

but that administrative intermediaries and end-payers themselves are able to do so. Identification

is not an issue in this circumstance because, as Ms. Craft explained in her deposition, class

members are able to use multiple sources of data to identify their own payments:

> So one of the key things that defendants focus on when they look at the PBM data
> is they say I don't always see the name spelled out for the particular TPP. I know
> there is one, but I don't always see their name spelled out. It might be a code
> number. . . .
>
> **TPPs know the answer to this question.** And when they present their data, they
> will be supplying their names, presumably their tax ID numbers, information that
> they can supply any time, today, tomorrow, five years from now. [206]

Defendants next argue that neither insurance data nor TPP data can be used to identify

class members because that data cannot differentiate whether claims were funded by insurers as

third-party payers or as self-funded plans.[207] A self-funded plan is one in which "plan sponsors,

particularly larger employers, choose to pay for some or all of the health services of their current

and former employees directly from funds collected from their contributions and employee

premiums, rather than by purchasing health insurance."[208] EPPs contend that Defendants have

not identified any instance in a pharmaceutical antitrust litigation in which a fully-insured entity

asserted that it was the payer for a claim, rather than the actual insurer that paid for those

---

[204] *In re Generic Pharms. Pricing Antitrust Litig.*, 2024 WL 4980784 at *26.

[205] Defs.' Mem. Opp'n Class Certif. at 31, No. 16-CM-27242 [Doc. No. 211].

[206] Tr. of Daubert Hr'g (Sept. 25, 2024) at 36-37 (emphasis added) [MDL Doc. No. 3111].

[207] Defs.' Mem. Opp'n Class Certif. at 33, No. 16-CM-27242 [Doc. No. 211].

[208] *Id*. at 8-9 (citing reports by Ms. Craft, Dr. Lamb, and Dr. Hughes).

claims.[209] EPPs argue that the records produced for insurers that also act as intermediaries for a self-funded plan differentiate between claims where the insurer is the third-party payer and where the insurer's *client* is the third-party payer.[210] They do not rely just on Ms. Craft's say so, but on her analysis of insurer data that does just that—for example, data from insurer Aetna that contains a Funding Type field that identifies, plainly, whether the plan was fully insured.[211] In addition, EPPs rely on statements by Rawlings Analytics, "a company that manages healthcare data covering over 300 million Americans" that an insurers' data naturally includes that distinction because "you have to know who is paying for the claim."[212] Both Mr. Miller and Dr. Happe opined that insurers are always able to differentiate between fully insured and self-funded plans.[213]

Thus, EPPs have sufficiently demonstrated that they can use the proposed data sets to ascertain membership in the class. EPPs are not required to identify every class member at this stage in the litigation, but only to show that there is a feasible method by which they can identify class members.[214] In this matter, the class definition is objective and capable of being ascertained, and an entity is not likely to possess uncertainty over whether it falls within the class.

Defendants also argue, however, that EPPs fail to meet their burden for the ascertainability of class exclusions. Specifically, Defendants argue that EPPs have no methodology to exclude government payers because the claims data does not include a method by which to differentiate

---

[209] EPPs' Reply Supp. Mot. Class Certif. [Clomipramine] at 44, No. 16-CM-27242 [Doc. No. 233].

[210] Tr. of Class Certif. Hr'g (Dec. 17, 2024) at 48 [MDL Doc. No. 3188].

[211] *Id.*; Craft Clomipramine Rep. ¶¶ 84-90.

[212] *See* EPPs' Reply Supp. Mot. Class Certif. [Clomipramine] at 43-44, No. 16-CM-27242 [Doc. No. 233].

[213] *Id.*

[214] *Byrd*, 784 F.3d at 163.

between private and state payers.[215] EPPs in turn rely on Mr. Miller, who opines that the class

exclusions are, in his experience, straightforward, and Ms. Craft's opinion that she is able to

apply exclusions within the data sets. At *Daubert*, the Court determined that Ms. Craft's process

to exclude the appropriate entities is reliable.[216] There, the Court found it significant that

Defendants had "identified fewer than 5,000 transactions that should have been excluded out of

14.3 million clobetasol transactions and fewer than 350 transactions that should have been

excluded out of 1.03 million clomipramine transactions."[217] In *Niaspan*, the court declined to

certify the class, in part, because experts did not divulge specifics on how they would exclude

fully-funded plans in a complex class definition.[218] As described above, EPPs have persuaded

the Court that they can feasibly differentiate between fully insured and self-funded plans. Unlike

methods that the court critiqued in *Niaspan*, Ms. Craft does not rely solely on PBM data to apply

that exclusion in these cases. Notably, the court in *Niaspan* determined that Ms. Craft had made

a sufficient showing that her proposed methodology could exclude government payers.[219] The

Court is similarly persuaded that EPPs methodology is sufficient to exclude those government

payers.

*EPPs' Ability to Test Claims Data*

Finally, Defendants argue that the EPPs cannot test class members' claims based on a

combination of the data sources described above.[220] Instead, Defendants argue that EPPs propose

only a post-certification and post-trial process whereby the claims administrator will send notices

---

[215] Defs.' Mem. Opp'n Class Certif. at 34-35, No. 16-CM-27242 [Doc. No. 211].

[216] *In re Generic Pharms. Pricing Antitrust Litig.,* 2024 WL 4980784 at *27.

[217] *Id*.

[218] *In re Niaspan Antitrust Litig.,* 555 F. Supp. 3d 155, 163 (E.D. Pa. 2021).

[219] *Id*. at 165.

[220] Defs.' Mem. Opp'n Class Certif. at 35-37, No. 16-CM-27242 [Doc. No. 211].

of the class action to potential members—identified through a proprietary database—who can return completed forms and data to demonstrate class membership.[221] Defendants argue first that EPPs' proposal to rely on affidavits by class members is improper, has been rejected by courts, and does not provide Defendants due process to challenge the validity of those claims.[222] They next argue that that the claims administration process is improper and relies on EPPs who self-identify with "idiosyncratic data" and through "self-serving attestations."[223]

Regarding the use of affidavits, EPPs argue that the cases Defendants rely on to suggest affidavits are improper involve situations in which affidavits from class members were the *only* means by which plaintiffs sought to support class inclusion.[224] EPPs contend that this matter is "starkly different" from both *Marcus* and *Carrera* because, in both instances, the plaintiffs conceded that it was "unlikely customers would have retained a receipt" of their purchases.[225] In contrast, EPPs maintain that class members here do have receipts, or can obtain them, and that those receipts, rather than affidavits, will establish the "fact and amount of relevant purchases."[226]

Where plaintiffs possess records or other reliable means to determine class membership, the Third Circuit has held that they may also use affidavits to support ascertainability.[227]

---

[221] *Id.* at 35.

[222] *Id.* at 36.

[223] *Id.*

[224] *See* EPPs' Reply Supp. Mot. Class Certif. [Clomipramine] at 45-46, No. 16-CM-27242 [Doc. No. 233] ("The evidence showed that BMW and its dealers did not maintain records that would establish class membership. The Third Circuit said that BMW should not be required 'to accept as true absent persons' declarations that they are members of the class, without further indicia of reliability[.]' The class in *Carrera* included retail purchasers of an over-the-counter dietary supplement. To satisfy the ascertainability requirement, plaintiffs relied on the prospect of 'retailer records' and 'affidavits of class members, attesting they purchased WeightSmart and stating the amount they purchased.'") (citations omitted).

[225] *Id.*

[226] *Id.*

[227] *City Select Auto Sales, Inc. v. BMW Bank of N. Am, Inc.*, 867 F.3d 434, 441-42 (3d Cir. 2017).

Although Defendants argue that EPPs do not possess those other records, EPPs do in fact propose a process by which class members can obtain information and provide detailed receipts of their purchases, as described above. Regardless, Defendants argue that EPPs' proposed methodology will require the court to conduct individualized inquiries into data fields to determine whether a particular entity or transaction is included in the class definition.[228] Essentially, Defendants argue that the claims administration process and verification of class members' claims will essentially create "mini-trials" that render a class action here inappropriate.[229]

The Third Circuit, however, permits some level of verification during the claims administration process as inherent in determining whether a class member has a legitimate claim: "Such a process of identification does not require a mini-trial, nor does it amount to individualized fact-finding, and indeed must be done in most successful class actions."[230] EPPs cite *Kelly v. RealPage Inc.* for the proposition that "[t]ogether, *Byrd*, *Hargrove*, and *City Select* instruct that a straightforward 'yes-or-no' review of existing records to identify class members is administratively feasible even if it requires review of individual records with cross-referencing of voluminous data from multiple sources."[231] Defendants contend that the question in this matter is not "straightforward" in the same way, because each claimant may obtain data from a different source and because the EPPs do not have a feasible method to identify and exclude class members.[232] While these cases are certainly complex, the specific question at hand is less so.

---

[228] Defs.' Mem. Opp'n Class Certif. at 34, No. 16-CM-27242 [Doc. No. 211].

[229] *Marcus*, 687 F.3d at 593.

[230] Byrd, 784 F.3d at 170-71 (internal quotation marks and citation omitted).

[231] *Kelly v. RealPage Inc.,* 47 F.4th 202, 224 (3d Cir. 2022).

[232] Defs.' Sur-Reply Opp'n Class Certif. at 17, No. 16-CM-27242 [Doc. No. 272-22].

Being satisfied with the EPPs' process on determining membership and exclusions, as detailed above, the question here is akin to the straightforward yes-or-no questions proposed in the cited Third Circuit cases—did third-party payor claimants purchase the bellwether drugs during the relevant time period? This inquiry will require, as in any class certification, a degree of inquiry, but the Court is not persuaded that it will require substantial individualized "mini-trials."

EPPs have demonstrated that class is ascertainable. Ascertainability is guided by three principal rationales: "First, ascertainability and a clear class definition allow potential class members to identify themselves for purposes of opting out of a class. Second, it ensures that a defendant's rights are protected by the class action mechanism, and that those persons who will be bound by the final judgment are clearly identifiable. Finally, it ensures that the parties can identify class members in a manner consistent with the efficiencies of a class action."[233] Each of those rationales is satisfied here—EPPs have proffered a method by which class members can identify themselves, their method of identification does not raise questions regarding whether certain class members are or are not bound by a final judgment, and EPPs have demonstrated that class actions of this nature have gone forward before in an efficient manner. The cases that Defendants cite do not defeat certification here. In *Marcus* and *Carrera*, ascertainability was in question where the plaintiffs proposed no records other than affidavits and declarations of class members. And, unlike in *Niaspan* and *Lipitor*, EPPs in this matter do not propose to use PBM data alone to identify class members and apply class exclusions. In *Niaspan*, the court did not indicate that a class of third-party payers could never satisfy the ascertainability requirement. Instead, it determined that it was not satisfied that the plaintiffs in that case had done so based on

---

[233] *City Select*, 867 F.3d at 439 (internal quotation marks and citations omitted).

the state of the record.[234] In contrast, the Court is satisfied with EPPs' showing on the record in

these cases.

EPPs have demonstrated that the Consumer Protection and Antitrust classes are

ascertainable.

### 3. Superiority of Adjudication

Plaintiffs are required to show under Rule 23(b)(3) that class treatment is superior to

other methods for achieving a "fair and efficient" adjudication of the controversy. This

requirement essentially asks a court to analyze the class members' interests in pursuing a class

action versus joinder and individual actions, the extent of litigation already begun by class

members, the benefit of litigating in one forum, and the difficulty of managing a class action.[235]

EPPs argue superiority is satisfied in these matters because individual actions are not an

efficient way to manage claims in the MDL, particularly given the sheer number of potential

class members in the EPP matters. Thus, they argue that proceeding on a class basis "will reduce

'the burden of litigating potentially thousands of individual lawsuits, all [with] the same set of

operative facts.'"[236] Defendants argue that EPPs cannot establish superiority because they cannot

use common proof to establish impact and damages.[237] EPPs counter that there can be no serious

dispute that class treatment of Plaintiffs' claims is more efficient than all other methods of

adjudication, as "failure to certify [Plaintiffs'] claims could result in class members having to file

---

[234] *In re Niaspan Antitrust Litig.*, 464 F. Supp. 3d at 707.

[235] *In re Avandia Mktg., Sales Pracs. & Prods. Liab. Litig.*, No. 07-md-1871, 2024 WL 6684343, at *6 (E.D. Pa. Nov. 24, 2014); *In re Modafinil Antitrust Litig.*, 837 F.3d at 253 n.11.

[236] EPPs' Mem. Supp. Mot. Class Certif. [Clomipramine] at 45, No. 16-CM-27242 (quoting *In re Cigna Corp. Sec. Litig.*, No. 02-cv-8088, 2006 WL 2433779, at *5 (E.D. Pa. Aug. 18, 2006)) [Doc. No. 183].

[237] Defs.' Mem. Opp'n Class Certif. at 50, No. 16-CM-27242 [Doc. No. 211].

thousands of individual suits in which the discovery and factual issues would be nearly identical."[238]

As established above, the Court is satisfied with the EPPs' ability to establish impact and damages through common proof for two of their proposed classes. Joinder or individual suits in these cases, where potentially thousands of individual actions could arise in place of class action, would be untenable and detrimental to judicial economy. Further, although the court in *Niaspan* found that class certification was not a superior method of adjudication where the class action proceeded under 53 state laws arising from 26 jurisdictions, that court determined that the plaintiffs had not sufficiently demonstrated that variations in state law would be manageable. Here, the Court has determined that EPPs have successfully presented evidence that those variations could be manageably addressed for the Antitrust and Consumer Protection classes. The superiority requirement is thus satisfied.

## IV.    CONCLUSION

EPPs' motion for class certification is **GRANTED** in part as to the Antitrust and Consumer Protection classes and **DENIED** in part as to the Unjust Enrichment class.

An order will be entered.

---

[238] *In re Abbott Lab'ys Norvir Antitrust Litig.,* No. 04-cv-1511, 2007 WL 1689899, at *10 (N.D. Cal. June 11, 2007).